IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JORDAN THOMAS,
 Plaintiff,

v.

BALTIMORE POLICE DEPARTMENT, et al.,
 Defendants.

CIVIL ACTION NO.: ___MJM 2 6 CV 0 1 6 8 2

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

USDC- BALTIMORE
'26 APR 29 PM12:09

# I. PARTIES

1.  Plaintiff, Jordan Thomas, is a sworn Police Officer employed by the Baltimore Police Department ("BPD") and was assigned to the Southern District at all times relevant to this Complaint.
2.  Defendant Baltimore Police Department is a municipal law enforcement agency operating within the State of Maryland. At all times relevant to this Complaint, BPD acted under color of state law.
3.  At all times relevant to this Complaint, the following individuals were supervisory and/or command personnel within the Baltimore Police Department and are sued in their individual capacities for actions taken under color of state law:

    a. Defendant Major H. Middleton, who held a command-level position and was responsible for oversight, disciplinary decisions, and personnel matters affecting Plaintiff;

    b. Defendant Lieutenant Joshua. Jordan, who served as Plaintiff's direct supervisor;

    c. Defendant Supervisory Personnel (Southern District Chain of Command), including Sergeants Yolanda Brown, Timothy Copeland, and Amy Strand, each of whom exercised supervisory authority over Plaintiff and are alleged to have participated in, authorized, failed to correct, or otherwise been involved in the conduct described herein;
4.  Defendants John/Jane Does 1–10 are additional persons whose identities are presently unknown, including other supervisory, command, or Internal Affairs personnel, who participated in, authorized, ratified, or failed to intervene in the conduct described in this Complaint.



HD

Rcv'd by:___AR___

## II. JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.
6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.
7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred within the District of Maryland.

---

## III. STATEMENT OF FACTS

### A. February 8, 2026 – Officer Assistance Response and Subsequent Criticism

8. On February 8, 2026, Plaintiff responded to an officer-assistance call on Bethune Road.
9. The area was covered in snow and ice, making normal access difficult and hazardous.
10. To quickly and safely reach the officer requesting assistance, Plaintiff briefly "slid across" the hood of a parked vehicle.
11. After the incident, Lt. J. Jordan reviewed Plaintiff's body-worn camera footage, expressed no concerns, laughed about the move, even exclaiming "we love a good hood slide", and initially praised Plaintiff's quick decision-making.
12. Days later, however, Plaintiff was criticized for the same conduct despite no new evidence or information.
13. This abrupt reversal contributed to Plaintiff's belief that he was being subjected to arbitrary and unequal treatment.

### B. February 12, 2026 – Signal 13 Response, and then exigent unholstering of Handgun while operating Police vehicle incident

14. On February 12, 2026, Plaintiff was voluntarily assigned to front desk duties while working overtime on the morning shift at a full duty capacity.
15. Plaintiff heard a Signal 13 (officer in distress) broadcast by the Officer herself screaming the words " signal thirteen" on her radio and plaintiff and immediately responded from the front desk, with knowledge that the officer was not far away and there were not many Officers available at that time.
16. Plaintiff arrived on scene within approximately two to three minutes.
17. Upon returning to the District, Plaintiff was praised by the Officer and other co-workers for the decision to respond, and Lt. J. Jordan also stated he "had no issue" with Plaintiff's decision to leave front desk for the Officer in trouble and for his prompt and decisive response, only citing the only thing he would have preferred done differently was that I locked the District's doors, despite the fact the doors are already locked by default.

18. Several days later, despite the prior commendation, Plaintiff was criticized and referred for investigation regarding the same conduct.

19. No material facts had changed between the initial praise and subsequent criticism.

20. This reversal established a pattern of inconsistent supervision and retroactive discipline.

21. On the same day as this incident, February 12th, 2026, now on the afternoon shift (plaintiff's assigned shift at the time), Plaintiff responded to call for service involving a man with a rifle in the street walking around with a child.

22. Plaintiff unholstered weapon and rolled down vehicle window and pointed weapon upwards at ceiling of vehicle as to not "laser" himself or the outside of his vehicle while driving patrol car at low speed within 1-2 block radius upon approach to where suspect was in exigent preparation for a number of possibilities of outcomes, especially considering that plaintiff was, at that time, going to be the first one to potentially confront the suspect as he arrived in the area first.

23. Plaintiff and another Officer contronted the suspect together, in which suspect dropped rifle, but did not get on the ground. Plaintiff pointed weapon out of the passenger side window at suspect and ordered same to get on the ground, to which he then complied.

24. Plaintiff then exited patrol vehicle, holstered weapon, and handcuffed the suspect.

25. Plaintiff was then scrutinized by Sgt. Copeland, and Sgt. Jordan Moore about the incident, stating the action was unsafe, and "stupid". Attempts to explain the action as exigent and try to bring understanding to the situation to the supervisors was dismissed.

26. Sgt. Copeland referenced the agency's firearms handling policy, where it is stated members shall not operate a vehicle with a firearm in their hands, however the policy does not say anything about exigent circumstances.

## C. February 24, 2026 – Signal 13 / False Statements

21. On February 24, 2026, Plaintiff responded to a police-involved shooting after transmitting he would be responding over the police radio.

22. Witnesses (Officer Isaiah Jackson and Officer Santos Maldonado, and Dispatcher Simone) confirmed hearing Plaintiff's radio transmission, and advised that Sgt. Y. Brown did not make any radio broadcasts to Plaintiff in response to him responding to the incident location.

23. Sgt. Y. Brown falsely stated that Plaintiff had failed to transmit and had misrepresented the location he was responding from to go to the incident, and falsely stated that she made radio transmissions on Southern District channels and Eastern District channels (where the incident was) to communicate with Plaintiff not to respond to the location.

24. These statements by Sgt. Y. Brown were contradictory and demonstrably false.

25. Plaintiff was ordered to leave the scene and return to the Southern District and later removed from duty, unable to complete his shift.

26. Plaintiff's attempts to explain were interrupted and dismissed by Sgt. Brown, and Lt. Jordan.

27. Plaintiff later produced documentary evidence confirming his account in the form of an email to Sgt. Brown, Lt. Jordan, Captain Gary Edmondson, and Major Henrietta

Middleton to protect himself from Sgt. Brown's false statements, and to make sure the truthful and factual account of the incident would not be miscontrued or altered.

## D. February 27, 2026 – Reporting Harassment and Administrative Suspension

28. On February 27, 2026, Plaintiff reported for duty in full duty status and full uniform and was assigned to front desk duties despite being in full duty status and there already being a suspended member on the desk on that day.

29. Plaintiff then spoke with Sgt. Jordan McHenry, who was the shift commander on that day, why he was assigned to the desk despite the aforementioned conditions. Sgt. McHenry informed Plaintiff it was an order from Lt. Jordan until further notice. Lt. Jordan was off on this day. Around that time, Sgt. T. Copeland joined the conversation, and began to tell plaintiff more about the decision made, and how it was in reference to "what's been going on with you lately", referencing the aforementioned incidents. Plaintiff then disputed that his actions were justified and began to explain about inconsistent treatment about his actions and conduct from supervisors, and then spoke about how it affects his professional relationships with co-workers, regarding ongoing harassment, false rumors, and retaliatory treatment within the Southern District (for sending clarification email about Eastern District incident). During that conversation, Sgt. Copeland demonstrated to Plaintiff that he was unwilling to investigate Plaintiff's concerns, stating in substance that such treatment in regards to co-workers are essentially allowed to harass plaintiff causing professional defamation and hostile work environment was simply "how it is." Sgt. Copeland further stated that Plaintiff had been "missing for two hours" during the February 24, 2026, Signal 13 incident. This assertion directly supported prior false allegations made by Sgt. Y. Brown concerning Plaintiff's conduct during that same incident. Plaintiff explained that false rumors and conflicting supervisory accounts were damaging his professional reputation and creating a hostile work environment, and resulting in Sgt. Copeland trying to use incorrect information against plaintiff in that very same conversation without knowing the truth.

30. Approximately one hour after this conversation, Plaintiff was administratively suspended without a clear explanation. The only explanation offered was by Sgt. McHenry, who conducted the suspension. Sgt. McHenry advised plaintiff that he received a phone call from Major Middleton instructing him to suspend police powers of plaintiff. Plaintiff was told by Sgt. McHenry that the Major advised that she was "given permission" to suspend plaintiff by an unknown Police Colonel or Lieutenant Colonel, likely also under false assertions given by the Major, given to her by Sgt. Brown , Lt. Jordan, and/or Sgt. Copeland. Plaintiff was given a copy of his administrative suspension paperwork.

31. Plaintiff reasonably believed the suspension was retaliatory and connected to his complaints regarding harassment and supervisory misconduct, again, mostly in part by the clarifying email he sent.

32. Later that day, after the conversation with Sgt. Copeland and Sgt. McHenry, Plaintiff requested a meeting with Major H. Middleton in order to get clarity as to why he was suspended, and who he was suspended by. During that conversation Major Middleton

had did not confirm who Plaintiff was suspended by, only stating that the decision was "above her", and explained to him he was suspended for the handgun unholstered while driving incident, the response to the signal 13 in the Eastern District, and the response to the signal 13 from the front desk. Major Middleton used these incidents in order to characterize and call him as an "action junkie" in a punitive context, a statement Plaintiff believed was false, defamatory, and reflective of an unfair supervisory perception. Every attempt by plaintiff to explain actions, explain unfair working conditions, harassment and rumor spreading by co-workers, false statements by Sgt. Brown, and inconsistent supervisory treatment, was met with Major Middleton advising plaintiff that she was "not looking for excuses", " You only listen to respond", and "you need to learn how to talk to your co-workers". The last comment was especially comflciting to plaintiff as earlier in that same conversation, Major Middleton dismissed plaintiff's complaints about rumors being falsely spread about him and how the failure to intervene by supervision has damaged/is damaging plaintiff's image, stating to plaintiff that "people talk" and compared the police department to a "school" most likely in the context that what I was complaining about was "childish".

33. During this conversation, Plaintiff revealed he had been thinking about and wanted to transfer to Adult/Juvenile Booking, a section within the agency where he felt he was treated fairly, and allowed to be productive. Plaintiff asked since he was suspended, if he could be detailed to Adult/Juvenile Booking since that section is classified as a suspension site anyways (full duty Officers are assigned there however). Plaintiff advised being full duty at that section would be beneficial for him.

34. Major Middleton dismissed this idea, stating that she cannot "just detail" (detail means to temporarily assign a member to any part of the agency for certain circumstances) a member of her command to any unit, despite plaintiff knowing that this is not true. Major Middleton also advised that unless Adult/Juvenile Booking were to post for a position, I could not put in for it, despite the fact I also knew that this was not true, especially if unique factors are present, such as employee incompatibility with the environment.

35. When plaintiff asked if anything had to be done by him for him to be reinstated to full duty status or if there was a timeline to expect to be returned to full duty status, Major Middleton dismissed him citing that "she does not control the suspension" and I should not worry about that, and instead "reflect on how you got here", referring to plaintiff being suspended.

36. Plaintiff was then in such emotional distress and fatigue, he requested to put in Vacation time for the rest of the day to go home and "digest" the entire ordeal.

## E. March 11, 2026 – Transfer Request

37. On March 11, 2026, Plaintiff formally requested a transfer via departmental email from the Southern District to the Adult/Juvenile Booking Section. Plaintiff also CC'd in the email, the Police Union (FOP), and the agency's health and wellness section so they could be involved or at least made aware of plaintiff's reasoning for transfer, hoping either or both entities could assist in making the transfer happen. Plaintiff was advised by Sgt. Jon Glazerman of the Union/FOP to specifically put the union's email address on

the transfer email. This was told to plaintiff after plaintiff reached out to the union on his own prior to the transfer for assistance with the issue's in his workplace.

38. Plaintiff sought the transfer due to ongoing harassment, false rumors, excessive scrutiny, and retaliatory treatment.

39. Plaintiff explained that the Southern District had become a hostile work environment that was negatively affecting his reputation, well-being, and ability to perform his duties.

40. Plaintiff believed reassignment would allow him to work free from continued harassment and unfair treatment.

41. Major Middleton would later find out about this transfer request and call another meeting with plaintiff, on a subsequent day, this time in the presence of plaintiff's entire chain of command (Sgt. Jordan Moore, Lt. Jordan, and Captain Edmondson). In this meeting, Major Middleton advised plaintiff that he "went behind her back" and placed the transfer form in, stating that she told the plaintiff he could not apply for a position if it was not posted for. Plaintiff attempted to explain that this statement was not reasonable for the circumstances he was facing, but was dismissed by the Major every time, her continuously referring to how he supposedly had no grounds to place this transfer request.

42. During this conversation, plaintiff asked for clarity again as to whether his suspension was ordered by "the District" (meaning by Major Middleton herself) or by Internal Affairs. Plaintiff was not given an answer. Major Middleton referenced statement from previous conversation stating she does not control the suspension, indicating that the matter was above her. Plaintiff believes that statement about not being in control of the suspension is false.

## F. March 12, 2026 – Reporting Supervisory Discrepancies

41. On March 12, 2026, Plaintiff authored multiple memoranda (departmental administrative form 95) documenting inconsistent supervisory treatment to eventually give to District's union representative (Det. Walter Holleman).

42. Plaintiff also asked Det. Holleman to ask Major Middleton about what entity suspended plaintiff, whether it was "the District" (meaing she herself ordered the suspension), or if it came from Internal Affairs, or just to find out exactly who and why suspension was administered since plaintiff believed that Major Middleton was not being fully transparent or communicating properly with plaintiff about the suspension. Since the suspension was "adminstrative", that would imply that the District (Major Middleton) authorized the suspension. This information is reflected in the agency's "suspension procedures" policy. Plaintiff was almost certain at this point Major Middleton suspended him, and was not sure why she was acting so detached and secretive about his situation.

43. These memoranda further demonstrated a pattern of inconsistent supervision, shifting narratives, and retaliatory treatment.

## G. March 16, 2026 – Suspension Discrepancies

47. Following his suspension, Plaintiff received conflicting explanations regarding who had authorized the action. Det. Holleman had reached out to plaintiff, stating he spoke with Major Middleton in reference to his requests, and that she told him, that Internal Affairs (Public Integrity Divison) was the entity that suspended the plaintiff and not her.

48. On March 18th, 2026, following this new information, Plaintiff reached out to Sgt. Kianah Bryant of Public Integrity Division via email to ask for clarity on his suspension, and to request a suspension hearing. Sgt. Bryant would respond to the email and advise that PID does not handle administrative suspensions, only disciplinary ones, essentially communicating to plaintiff that PID did not suspend him. Plaintiff then responded to the email citing Det. Holleman's findings, however Sgt. Brynt stopped responding to Plaintiff.

49. These inconsistencies suggested procedural irregularities and a lack of transparency, and confirmed to Plaintiff that Major Middleton had lied to Det. Holleman, and confirmed that Major Middleton was not being upfront or fully transparent with plaintiff.

## H. April 12, 2026 – Workplace Harassment

49. On April 12, 2026, Sgt. Copeland altered an official document to label Plaintiff's assignment as "Chair 1", referencing in a punitive and mocking way, that plaintiff was suspended and confined to the District's front desk position.

50. The alteration was accompanied by mocking behavior and laughter in the presence of Officer Myrell Smith, and by extension, any other Officer/Supervisor(s) who would see this official document as it got sent up communications chain of command.

51. This conduct humiliated Plaintiff and contributed to the hostile work environment.

## I. April 18, 2026 – Improper Orders While Suspended

52. While administratively suspended, Plaintiff was ordered to handle to a felony-level call over the phone.

53. This directive conflicted with standard practice that suspended personnel cannot handle felony-level incidents in person or over the phone.

54. When Plaintiff questioned the order, he was met with dismissive and mocking responses.

55. Plaintiff was unable to locate reliable policy which would have supported the orders he was given.

## J. April 24, 2026 – Internal Affairs Transportation Issue

55. Plaintiff was required to report to Internal Affairs.

56. Sgt. A. Strand failed to arrange timely transportation despite having ample notice (1 hour).

57. As a result, Plaintiff was late for his required appearance.

58. Plaintiff later learned that Sgt. Strand made hostile and concerning remarks about him.

## K. Miscellaneous incidents –

59. In the span of at least a year long period up until plaintiff's suspension, Plaintiff has been advised numerous times by Sgt. Copeland, Sgt. Moore, and Lt. Jordan that Officers have complained to to them that plaintiff "speeds" while operating department vehicles. Plaintiff has advised every single time to every one of these confrontations by supervision that he does not speed or drive unsafely by any means. In one instance, Sgt. Moore had alleged an Officer complained to him that plaintiff was "speeing" while transporting a prisoner inside of a prisoner transport van. Knowing that this was not true, plaintiff suggested to Sgt. Moore and Lt. Jordan to watch his body camera footage to prove that this was not true. Neither supervisor acknowledged that they would do so, and plaintiff is unsure if any action to try and disprove allegations such as these ones are true. Plaintiff believes that supervisors unfairly hear these rumors/statements from these unknown Officers and fail to properly investigate if they are true or not, opting instead to take the hearsay as factual and as a result, plaintiff is treated poorly (i.e, taken off of his position of the prisoner transport officer numerous times, not believed when he advises he does not do the things people say he does, etc). Plaintiff also believes that supervision knows that these statements are rumors are not true because despite all the comments and confrontations from supervisors about plaintiff's alleged driving habits, plaintiff has never once been subject to internal investigation by PID or even official in-house non-punitive counseling in reference to poor driving habits. Plaintiff believes if such allegations had merrit, he would have been subject to discipline/PID investigation long ago, but even so, supervison still acts as if and treats plaintiff as unreliable and reckles.

60. Plaintiff was seeked assistance from the police department's union and PID/Internal Affairs Section. Plaintiff was told by Union/FOP Sgt. Jon Glazerman that the union would be unable to assist with his matter, directing him to Internal Affairs. Sgt. Glazerman advised plaintiff to put in a transfer form requesting to leave the District and to CC the union on the email for the transfer, to which plaintiff did, as mentioned above. When plaintiff responded to internal affairs to address his issues with the District, to include the Officers, the supervisors, and the command staff (Major Middleton), Plaintiff was instructed by unnamed PID Detective that any explanation as far as trying to defend himself and to complain on the District's personnel for the hostile work environment, the false statements made by Sgt. Brown, the unfair suspension, etc. would be considered "retaliaion" and referenced the agency's retaliation policy since some of the matters the plaintiff needed to address were already brought to plaintiff's attention as "under investigation". The Detective essentially informed plaintiff that he would be taking a substantial risk of employment termination for making his complaints as they would be perceived as retaliation on plaintiff's end, which is a fireable offense in the agency. With this information, plaintiff decided not to make his complaints. When plaintiff asked how he was supposed to combat his growing issues at his Disrict and get help as far as leaving the environment so other pastures (i.e Adult/Juvenile Booking as mentioned above), the Detective advised him he would have to wait for PID to summons him for "Official Statements". Plaintiff determined that this answer was unrealistic and from that point forward, felt as if he had exhausted all his options as far as trying to address the problems he was experiencing. Plaintiff determined that he cannot reasonably wait to be randomly called at any given time and date (within a time frame of up to a year from when an individual incident is reported to them), while still being subjected to a growing hostile work environment and not be helped as far as at least being removed from the

environment and being suspended and unable to work in comfort on top of that. Plaintiff cites again that at the time of this complaint, Health and Wellness and the Union have failed to intervene despite being made aware of these conditions. Plaintiff's transfer request has not been approved.

61. Plaintiff, as of April 19th, has been placed on a Performance Improvement Plan for 30 days following a departmental early intervention conducted "automatically" by the health and wellness section on April 3rd, 2026. This intervention, consisting of plaintiff, Sgt. Moore, Lt. Jordan, Captain Edmondson, Major Middleton, Director Vernon Herron, Lt. Charles Sullivan, and Ms. LaWang Hyman, was not formed as a result of plaintiff's complaints. It was formed "automatically" as the health and wellness section recieves automatic notice of Officers who receive a certain number of complaints in a short period of time so they can intervene. During this intervention, despite it being portrayed as a open space for plaintiff to speak about what has been going on at work, it was not treated as such by plaintiff's chain of command, only the aforementioned member of health and wellness. Plaintiff's chian of command demonstrated an unwillingness to listen to plaintiff, i.e Lt. Jordan walked out of the meeting when plaintiff mentioned that the situations (signal 13 incidents, unholstered handgun incident, false statement allegations against me) that have caused the meeting to form "had holes in them" , (which also caused Director Herron to stop plaintiff and remind him this meeting was not for defense), despite the meeting having supposed to be an opportunity to communication. Director Herron made a comment about how he met plaintiff during an incident in which he desribed plaintiff as a "phenomenal" Officer, but Captain Edmondson stated that he does not believe that PLaintiff is a phenomenal Officer for what he did on that day he met Director Herron. Plaintiff was not allowed to justify or explain anything brough to him as Director Herron stated the meeting was not the time for justification, despite being told the meeting was supposed to promote communication and understanding among all involved. This stipulation meant Plaintiff was not able to properly explain himself, such as when the comment was made about the issues "having holes in them" was met with Director Herron reminding plaintiff not to defend or justify, which made no sense to plaintiff. Sgt. Moore expressed unfamiliarity with how to conduct a performance improvement plan for one of his subordinates and was told by Director Herron that the health and wellness section would assist him if he needed help. Sgt. Moore then asked plaintiff why he had to be placed on a performance improvement plan in order to "do what you need to do", expressing annoyance about the fact he would now have to create a plan in conjunction with plaintiff. Plaintiff responded he was "only in the boat with everyone else", essentially stating that it is not his choice to be on a performance improvement plan, and that he is simply following the orders being given to him. This indicated again to the plaintiff, that his chain of command was annoyed at the fact they had to be summonsed for this meeting, and almost seemed as if the question directed at plaintiff was to "shift or blame" the plaintiff. Plaintiff does not believe he should be subjected to a performance improvement plan as the issues brought up are based on false merit, and stem from a hostile work environment.

62. At the time of this complaint's filing, plaintiff has not heard any word from any entity that was present during the early intervention, including his direct supervisors, Sgt. Moore and Lt. Jordan about the performance improvement plan. Plaintiff has received no notice, or construct of a plan for his revision as the agency policy regarding early interventions states the subject of the plan is to have inputs on such a plan's creation. As far as plaintiff knows, the performance

improvement plan was to begin on April 19th, 2026, but has not been given any information about it despite asking about it.

## L. Pattern of Retaliation and Hostile Work Environment

63. The incidents described herein were not isolated.

64. Plaintiff was repeatedly subjected to shifting narratives, inconsistent discipline, retaliatory treatment, public ridicule, and reliance upon false rumors.

65. Supervisors frequently reversed prior decisions without new evidence and treated Plaintiff differently from similarly situated officers.

66. These actions created an objectively hostile and abusive work environment.

67. Being administratvely suspended, plaintiff is now unable to work overtime in any capacity other than the front desk. Front desk overtime has been extremely difficult to obtain for plaintiff, at times being advised that other police district's do not even allow overtime for their front desk positions. Plaintiff has only worked one single front desk overtime shift at the time of this complaint. As plaintiff is financially reliant on the overtime, his inability to work overtime in conveniant, consistent fashions has affected his ability to comfortably keep up with his personal finances significantly. This has also caused emotional damages to plaintiff as the suspension was/is not justified and was/is based on false and inconsistent behavior/information and plaintiff asserts that he did not do any wrong to warrant the level of scrutiny and punishment in the situation he was/currently is being subjected to.

---

# IV. CLAIMS FOR RELIEF

## COUNT I – RETALIATION (42 U.S.C. § 1983)

68. Plaintiff engaged in protected activity by reporting misconduct, opposing retaliatory treatment, and requesting intervention.

69. Defendants retaliated against Plaintiff because of that protected activity.

70. Defendants' conduct would deter a reasonable officer from engaging in similar protected conduct.

## COUNT II – HOSTILE WORK ENVIRONMENT

71. Defendants engaged in severe, pervasive, and ongoing conduct.

72. This conduct unreasonably interfered with Plaintiff's employment and created an abusive working environment.

## COUNT III – DEPRIVATION OF DUE PROCESS

73. Plaintiff was disciplined in the form of administrative suspension and subjected to Internal Affairs investigations without fair procedures, fair in-house investigation/considerations, or consistent justification.

74. Defendants deprived Plaintiff of protected liberty and property interests under color of state law.

# V. DAMAGES

70. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered:

a. Emotional distress;
 b. Reputational harm;
 c. Career-related damages;
 d. Financial losses; and
 e. Other consequential damages.

# VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Award compensatory damages;

B. Award punitive damages;

C. Grant declaratory and injunctive relief;

D. Order expungement of improper disciplinary records;

E. Order reassignment or transfer as appropriate;

F. Award costs, attorney's fees where authorized, and such other relief as the Court deems just and proper.

---

# VII. JURY DEMAND

71. Plaintiff demands trial by jury on all issues so triable.

---

Respectfully submitted,

Jordan Thomas
Plaintiff, Pro Se
Date: 4-29-26

3000 Falls rd APT 305

Baltimore, MD, 21211