Thomas V. Baltimore Police Department

**POLICE DEPARTMENT**
BALTIMORE, MARYLAND

REPORT
Form 92/95

DATE- 12 March 2026

ASSIGNMENT: Southern District C/B Patrol Rotate

TO: Major H. Middleton

VIA: Official Channels

FROM: P/O Thomas, Jordan K576

SUBJECT: Reporting Supervision discrepancy

Ma'am,

     I respectfully report that on February 8th, 2026, that I responded to a call for an Officer who stated on the radio that he needed more units in an abrupt, alarming tone on Bethune Rd. I responded to the location, being the first Officer to arrive. While running towards where the Officer was, still looking for him as he had not given any further transmissions after his initial request for help, I heard him yell for me from across the street, directing me to where he was. (the nature of the incident, was what was described as a fight involving a large number of parties on scene). Due to the fact the sidewalks and curbs were icy and had a fair amount of snow blocking my immediate path to the Officer, I slid across the hood of a parked car as it was the best and quickest way for me to get to the Officer without risk of myself falling/slipping on the snow and ice.

     Upon BWC De-activation, an Officer who was watching my BWC live had called me to express that the maneuver was impressive to them, describing it as "the cleanest hood slide I've ever seen" and encouraged me to view the BWC for myself. I then responded to Lt. J. Jordan's Office and told him what I did, wanting for us to both be able to watch the BWC and he stated "We love a good hood slide". He the proceeded to pull up the BWC and we viewed the maneuver together. We both shared humor about it, and I discussed it further explaining why I felt it was necessary and the banter was overall positive, with nothing punitive at all, rather a sense of "good job" was the flow of the entire voluntary interaction. As days passed, the action would sometimes come up in random conversation, including in the presence once of Sgt. T. Copeland, in which he expressed dissatisfaction with the move, stating I had more than enough room to get to the Officer (implying he watched the video at some point himself), and dismissed my defense about stating what with the snow and ice, I felt it was the best and quickest choice. Then, about a few days after that, Sgt. J. Moore had a conversation with me denouncing the act as well, referring to it as unnecessary and stated "I don't know if you think your in a movie" basically saying that he believed I "did too much". At some point around this time as well, Lt. Jordan would also now change his perspective on the incident in a punitive way, also stating to me the move was not necessary and stated that it "is not a good look", despite the fact we had watched it together and laughed about it, and there were no punitive words for me then. Nothing had changed between then and the Lt's changed opinion. This discrepancy makes it difficult to gauge what my supervisors do and do not deem acceptable, and the change in the Lt's opinion makes me feel like I was not treated fairly when it was addressed to me punitively.

Respectfully Submitted,

P/O Thomas, Jordan K576

1:26-cv-01682-MJM

Respond on Reverse Side ☐     Page 1 of 1

Thomas V: Baltimore Police Department

POLICE DEPARTMENT
BALTIMORE, MARYLAND

REPORT
Form 92/95

DATE- 12 March 2026

ASSIGNMENT: Southern District C/B Patrol Rotate

TO: Major H. Middleton

VIA Official Channels

FROM: P/O Thomas, Jordan K576

SUBJECT: Reporting Supervision discrepancy

Ma'am,

I respectfully report that on February 12th, 2026, that I responded to a Signal 13 in which the Officer screamed on the radio the words "signal 13" on her radio herself. I, working the District's front desk position, was in full uniform and was in possession of vehicle keys in preparation for my next shift, responded to the location where the Officer was, which only took me approximately 2 and a half minutes to respond to. I advised the dispatcher I was going as well. I went because I listen to the radio all the time and I knew that the shift on this morning wad already short, and some of the little units we had at the time of the signal 13 were on other calls, making it reasonable for me to leave the front desk at the time, especially with how close the Officer was to me, going in response mode. After arriving on the scene, I left to return to the front desk after assisting Officers with a search, incident to arrest. Several Officers on the day of (and in passing days) expressed amazement and the Officer herself expressed gratitude and a happy response that a front desk officer responded to a signal 13.

Later that day, I told Lt. J. Jordan about the experience in a positive and prideful way, and I asked him if that would be acceptable if I did it on his shift (as I felt knowing my superiors and how they tend to not give me their support, that it was necessary to ask this question ahead of time). The only thing he had an issue with, was that I did not lock the doors to the District (despite the last set of doors to the District's front doors requiring to be buzzed open, technically leaving the District locked) but regardless, Lt. Jordan told me that he had no problem with what I did. However, on a following day, Sgt. J. Dockett addressed his shift during roll call and called me out stating that "we all need to play our positions, like in a football game" basically denouncing the act of me responding to the signal 13 from the front desk, leading me to have to apologize to him so there would be no further conflict. Sgt T. Copeland would advise me on February 27th, 2026 that the incident would be or already has been entered into BlueTeam. Also on that date, Major Middleton pointed to this act as partial justification for ordering me to be administratively suspended, which also occurred on this day. These discrepancies among the supervision telling me what is and is not acceptable leaves me feeling like I am being penalized unfairly, and has lead to an unfair and unreasonable suspension.

Respectfully Submitted,

P/O Thomas, Jordan K576

1:26- CV- 01682- MJM

Respond on Reverse Side ☐         Page 1 of 1

Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 12 March 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**        **Major H. Middleton**

**VIA:**        Official Channels

**FROM:**        P/O Thomas, Jordan K576

**SUBJECT:** Reporting False Statements made by Sgt. Y. Brown I301, and other relevant information

Ma'am,

I respectfully report that on February 24th, 2026, at approximately 1820 hours, I responded to the second broadcast of a Police involved shooting signal 13 on 1600 Pelham Ave. At the time the first shotspotter alert/signal 13 came out, I was on Guilford Ave and E. Chase St, en route to Front St to get fuel. When I heard the transmission, I diverted my original path to Front St and instead drove my vehicle and parked it on E. Chase St between Valley St and Harford Rd, past Greenmount Ave and E. Chase St. I waited until a second signal 13 was dropped and at that point, I decided to key up on Southern channel, and advised the dispatcher that I was not that far away from the location, and that I would be responding from Central Booking. I then switched to the Eastern Channel, advised them the same thing, and began to the location in emergency response mode, getting there in about 5 minutes.

The reason I was where I was to begin with, was because at the time, at approximately 1750 hours, I left CBIF after 3 prisoners I was monitoring had cleared medical and I was allowed to leave. When I left the facility, I did not put over the air that I was clear as it is not common practice to do. Not all Officers do this, myself included. Sometimes I do, sometimes I do not. It is simply because I am always returning to my command after leaving CBIF regardless, sometimes I just naturally don't do it for that reason. Also common practice, is for Officers such as myself to stop at nearby places of business in the vicinity of CBIF before returning to our parent commands. This is especially common practice in Districts where food options for example, may be limited such as the Western District, the Eastern District, and the Northwestern District to name a few. On this day, after leaving CBIF, I went to the CVS located on 934 N. Charles St in order to make a personal purchase, especially seeing that the Southern District does not have a CVS. I'd say I must have arrived at the CVS by approximately 1755 hours. While I was there, I noticed there was a business check book and decided to sign it, because I'm there, so why not. I signed this book at 1803 hours. After this, I then decided to get something to eat from

1:26- CV- 01682- MJM

the nearby Chipotle restaurant on 1209 N. Charles St as I have not ate since about 11 hours prior. It took me approximately one to two minutes to respond from CVS to the Chipotle. While there, I noticed that they had a business check book, and like CVS, I decided to sign it while I was there because why not. I signed that book at 1809 hours. I then got back in my vehicle and drove NB on Charles St and made a right onto E. Mt. Royal Ave and went EB towards where E. Mt. Royal Ave turns into Guilford Ave. My intention was to drive to Front St as the car was driving was very low on gas, and then make my way back to the SD District. My intended route was to make a left turn from Guilford Ave onto E. Chase St, turn right onto Greenmount Ave, and then take Greenmount Ave to Hillen St so I could travel towards Front St. However, as soon as I heard the first signal 13 and the shotspotter (16 rounds) while I was on E. Chase St from Guilford Ave, I assumed that due to the two broadcasts coming out mere seconds after each other, that there was a very high chance that this was a police involved shooting (I was correct, and it was). I found out I was correct because I briefly switched over to the Eastern radio channel to listen to find out if it was and I heard confirmation that it was, but I did not know if an Officer was shot or not. I then decided to switch back to Southern District channel and parked my car on E. Chase St. and Valley St. and I decided that if the signal 13 dropped a second time, that I would go, to which it did and then everything I stated happened afterwards at the beginning of this document occurred.

While I was on the scene, I used my crime scene tape to put back up some tape that an ambulance had driven through. I then directed a Northeastern District Officer who responded to hold one end of the crime scene tape on Belair Rd while I held up the other, so we could quickly lift the tape up in case more emergency vehicles needed to get through. I also instructed some citizens to move back from the scene, and get behind the tape. After a while, I observed that more Officers arrived to where I was and I instructed them to take over my position while I returned back to my car to place my crime scene tape back, with the intention of finding the supervisor in charge and asking them what else I could do for them. However, when I returned to my car, I observed that my cellphone, which I had left in the car, was ringing and Officer Rankine was calling me. He was calling me on behalf of Sgt. Y. Brown, a supervisor for the Southern District Charlie shift on this day. He advised me that I "didn't notify nobody" and I cut him off, stating that I did transmit that I was going to the signal 13. He then said that "well, we didn't get that transmission" and would further say "ten (Sgt. Brown) just keyed up and said you need to come back and come deal with us". I acknowledged what Officer Rankine said, and I told him I'd come back but to inform the supervisors that I was stuck (at least eight patrol cars had pulled up and parked behind me in a long line, and there about five patrol cars and the crime scene directly in front of me, so I was struck). He said that he would let her know.

I then walked back up the crime scene and tried to locate an Officer who I believed was driving the car right behind me so I could start the process of finding the Officers with these cars so I could follow Sgt. Brown's order. However, after me and the Officer walked back to where we parked, I realized that there were just too many cars for the order to be fulfilled timely. At this point, I tried to make contact with Sgt. Brown via my phone but she did not answer at first. At the same time, Officer Maldonado had called me asking what was going on in the Eastern District, to which I stated I did not know as to maintain the integrity of what was going on. While I had him, I asked him if he heard my get on the radio and advise that I was coming here,

to which he said that he did hear me, albeit on the Eastern Channel (he switched over as well to listen). When I was able to make contact with Sgt. Brown, I told her I was stuck in the Eastern, referring to the backed up cars in front and behind me. She dismissed my comment completely, stating for me to return to the Southern District in a hostile manner. I then "as soon as these cars move, I'll do it". She responded "ain't no as soon nothing" and then proceeded to say that she "came on the air" and told me to "respond back, before you even got there, and, the Eastern District dispatcher came on the air and told you to come back". Both of these statements are false and I will explain more later in this document. She then made a comment that "Your Lt". (referring to My Lt, Lt. J. Jordan) logged into your BWC live and watched me "walk up on the scene". She is referring to a brief moment that someone (I noticed, but I did not know who at the time who it was) began to watch my BWC live while I was on scene. Specifically, the live feed caught me walking back towards my car with the crime scene tape right before I noticed my phone ringing. I was able to tell that the already agitated and aggressive Sgt. Brown had assumed that this brief viewing of what I was doing was me "just arriving" to the scene. Before I could explain at all, only able to say "No, I was walking back- I-" before she said she did not care, and she did not care how I did it, but to get my car back to the District, and to log off for the remainder. At this point, I found and told some Eastern District supervisors and told them about Sgt. Brown's order. I spent close to the next 20 minutes waiting for Officers to be located, to be stopped what they were doing on the scene, and respond to where I was so we could all slowly move our cars backwards off of Pelham Ave. At a certain point once all the Officers were found and got to their cars behind me and I started to move, I deactivated my BWC as I was now leaving the scene. Sgt. Brown would eventually call me after BWC deactivation to ask me where I was and I advised I was in the process of reversing. Sgt. Brown told me when I got out, to meet her on "Chesterfield Ave", which is about a street over from Pelham over, so I guess she decided to come to the scene but I don't know why. I told her I would as soon as I was done reversing, as it was a lengthy process that was still taking very long to accomplish. When I finally was able to leave the scene, I called Sgt. Brown back and asked her to clarify again where exactly she was, to which she just told me to go back to the Southern District. On the way back to the Southern District, I called the Southern District Dispatch and spoke with Ms. Simone, the dispatcher. I asked her if she heard me say that I was going to the signal 13, to which she said that she did. That confirmed that I definitely did key up on my radio and advised I was going to the location. (It should be noted, that my transmissions on both Southern and Eastern airs were not caught on BWC because I made them only seconds before I turned my BWC on and turned on my vehicle's lights and sirens. However, on the BWC you can see my right arm reaching across my chest, reaching for my radio microphone with sits on my left shoulder. That is where I made my transmissions).

Upon my arrival back to the Southern District, I initiated, on my own, a conversation with Sgt. Brown with every intention on clearing up all the discrepancies that I mentioned above in this report. This conversation happened in the presence of Lt. Jordan and Sgt. C. Brooks. I tried to begin the conversation by explaining I did not do anything wrong, and as soon as I started speaking about where I was, Sgt. Brown began to cut me off from speaking, telling me that I was "miraculously" clear from CBIF "just in time" for the signal 13, and then she mentioned something about having the time that I cleared CBIF, (presumably from CBIF themselves), and said something to me along the lines of I lied when I said "I'm coming from CBIF". I found this suspicious because on the signal 13 scene over the phone, she told me that I

"didn't tell nobody" about me going to the scene. When I tried to ask how she heard me say "I'm coming from CBIF" after she said I didn't make any transmission, before I could even fully ask the question, she told me once again to "clock out, go home, your done". She then made some comment about her having 3 adult sons and that I "wouldn't win an argument" with her, even though I was not trying to argue, Still attempting to explain my side of what happened, I started off by saying I left CBIF "at five, forty something" (these are the exact words used because as I was in a hostile situation in real time, I was trying to recall the information as quickly as I could). When I said "five forty something", Sgt. Brooks chimed in and said "4" as if she was trying to finish the sentence I was saying for me and give me the "correct" time. I also found this suspicious because at 4:00 on this day, I was still at CBIF and none of my prisoners had even reached the X-ray machine inside the facility yet. So I am not entirely sure where this assumption came from. At the same time, Sgt. Brown mentioned that I had been clear from CBIF for "two hours" and accused me of lingering about when I was clear. I immediately stated that this was not true, and that I signed the warrant book (my last prisoner who cleared medical had a warrant, which would mean I'd have to log his information into a warrant book at CBIF upon his clearing medical before I could leave) and that they could refer to that book to prove I was at CBIF for all that time. I then explained that I went to the CVS as soon as I left the jail, and explained that I signed a business check book while I was there, so that  the time logged in that business check book should also prove my point further that I had only just left CBIF. I then explained that I went to the chipotle only minutes afterwards and did the same exact thing and suggested that the time I put in that book be checked as well. As I began to explain how I was now on my way to Front St as my car was very low on gas, specifically on my directions I was taking so I could properly explain where exactly I was when the shotspotter came out I accidentally advised I was on Eager St. (I stated "I was on uhhh, I think it was… Eager St, headed towards Greenmount Ave-" trying to retain the exact name of the street (E. Chase St, not Eager) while still in the middle of this hostile interaction, Sgt. Brooks interrupted and asked "don't you work the Eastern?" referencing how I work OT patrol shifts in all 9 districts of BPD. I received this comment as her trying to challenge and take advantage of the fact I could not immediately remember the names of the streets and that I should know exactly where I was, and I believe she was attempting to "trip me up". I responded that I did and that I was trying to remember but all the interruptions and the unwillingness to hear me out fully was making it more difficult to accurately explain (which I believe they intentionally were trying to do). Sgt. Brown asked me if I told the dispatcher that I had cleared CBIF, and I told her that I did not and tried to explain that it was not common practice to do so because I was going back to the Southern District anyways, and that sometimes I do, sometimes I don't and that this is common practice for other Officers too. Then Sgt. Brown and Sgt. Brooks began to accuse me of "running errands" instead of immediately returning to the District, still under this assumption is sounded like, that I had been clear since "4" like Sgt. Brooks initially said. I tried to explain again that I was only making two quick stops at two businesses for legitimate purposes that are both less than 5 minutes from CBIF and in the same area as CBIF, and again that it is very common practice for Officers to make these quick stops at nearby business close to CBIF before returning to their Districts, but at this point, Lt. Jordan chimed in and he stated that none of it mattered, that he's "tired of me", and he began to reference how he "just had to BlueTeam" me "a few days ago" (IMMEDIATELY after the word "ago" spoken by Lt. Jordan, Sgt. Brooks chimed in and said "for lying", before Lt. Jordan picked right back up) and then he said that "we have these conversations over and over again and I'm sick of this shit". After this, Sgt. Brown ended the

conversation by saying "The Captain (Captain G. Edmondson) has been notified of all of this, go home, clock out, and give me your vehicle keys". At that point, I was tired of not being allowed to explain, and I simply told Sgt. Brown I still had to log off the compter and get all my equipment out of the car. At that point, everybody walked away, and as I was walking back to my car, I heard Sgt. Brooks tell Sgt. Brown "I'm leaving y'all, I'm gonna go tell my supervisor where I'm going" in a mocking, condescending tone, poking fun at the entire situation, specifically the part where they said that I did not notify "nobody" that I was responding to the signal 13m even though I did, and had evidence to support this. This is the type of environment and the exact type of treatment I have been subjected to for as long as January of 2025, it worsening and reaching a peak point in summer of 2025. I then returned to my car, did what I said I needed to do, hung the patrol car key back in the key box and left. I called out medical the next two days, and removed my name from Sgt. Brown's shift for OT that I had planned to work as well because I was very mentally fatigued by the entire incident, especially the conversation at the end. I decided on February 26th that I was going to send Sgt. J. Moore (my direct supervisor), Sgt. Brown, Lt. Jordan, Sgt. Brooks, and Captain Edmondson a detailed email which actually explained everything that happened accurately. I decided to do this since Sgt. Brown had mentioned that Captain Edmondson had already been "notified" of the incident, and knowing that this "notification" happened before our conversation, I realized that the Captain would be receiving (or basically already has received) inaccurate and false information from Sgt. Brown and I needed to act to make sure Sgt. Brown's false information could be disproved as soon as possible so I could protect myself from her false statements. I have since got pictures of the business check books at the CVS and the chipotle, and I got a picture of the warrant log book, all of these books showing what times I placed on them so my exact whereabouts and the times could be confirmed. I further stated in the email why I used the term "Central Booking" when I responded to the signal 13, and that if I was trying to be deceptive and lie about my whereabouts like Sgt. Brown and Sgt. Brooks accused me of doing, that I wouldn't have written anything in those business check books. (This email will be attached to this 95).

In summary, Sgt. Brown accused me of making a false statement by saying I was responding to the signal 13 from Central Booking because she, for whatever reason, thought that I had been clear from CBIF around 1600 hours and was lingering about instead of returning to my command. She said that the "false statement" was that I was "coming form CBIF" but in her head, I had been "clear" of CBIF for at leats two hours. (This would later be confirmed because in a separate conversation, documented on a separate 95 form, Sgt. T. Copeland would tell me on February 27th when the incident was mentioned during that conversation, that I was "missing for two hours", leading me to believe that this situation had now spread elsewhere in the District). Again, I want to mention that Sgt. Brown claimed to me on the phone while on scene on BWC that I did not make a radio notification that I was responding to the signal 13, so I am unsure of where she got the knowledge that I said "I was coming from Central Booking". I have multiple Officer witnesses (Officer S. Maldonado, and Det. I. Jackson) as well as the dispatcher I mentioned (Ms. Simone) who can attest and say that they heard my transmissions. Sgt Brown has lied and said that I made no such transmission, but then advised that the transmission that I did make was a false statement, which contradicts her earlier statement of me not saying anything. Sgt. Brown lied when she told me on the phone on BWC that she had came over the Southern and Eastern airs to tell me to not respond /return to the Southern District and that the Eastern Dispatcher had also said the same. These are all false statements and I heavily believe

that whatever information she told Captain Edmondson, or anyone else for that matter has resulted in me being administratively suspended. (This is been proven because after I was administratively suspended on February 27th, Major Middleton herself told me that this entire incident was part of the reason I was suspended. This entire conversation was also documented on a separate 95 form). Sgt. Brown's actions in relation to this entire incident, including her false statements, has now had a severely negative impact on my well-being, sense of safety and security, and has played a role in me being suspended.

At the time of this writing, I have not received any written, verbal or otherwise formal notification of investigation from the Public Integrity Division for this incident or even that the incident was going to be BlueTeamed, only that "The Captain has been notified" from Sgt. Brown. I have not been formally counseled either. I mentioned this as to avoid any notion that this is being written in retaliation as to remain in compliance with policy 1729. I believe this to likely be because after I sent the email clarifying what occurred, it probably became recognized to the recipients that my account of events and the act of sending such an email in of itself as a clear indicator that my account of events was accurate, especially as I said I had evidence to support everything I said. Furthermore, nobody ever responded to the email, and none of the involved recipients ever mentioned this email to me (except the Major briefly stating that she "saw" it during the conversation we had which I stated was documented on another 95 form). Even furthermore, I actually have been served investigation notices for the other things that Major Middleton advised to me as the reasons I was suspended, but not this, despite the fact the the allegations occurred within days of this incident and by now, I'd assume I'd be notified of any investigation. (Again, this whole conversation was placed on another a 95 form). I was suspended on my next working day after the email was sent, and I believe this was done in retaliation for clarifying the incident. As stated above, the email will be attached to this 95 form, as well as the suspension form I was given.

I want to note that I have an explanation for why Sgt. Copeland may know about the incident, among other incidents despite being on a different shift than me. On February 26th, at 5:47 PM, (the same day I sent the email, sent at 4:04 PM), I received a phone call from a co-worker (who I will keep anonymous so they do not get retaliated against, unless I absolutely HAVE to reveal their name), that apparently, Sgt. Copeland had been "tasked" by Captain Edmondson in order to "look into everything" and to "get me". This would explain why he seemed to be well versed in this incident when we spoke on February 27th. (Again, that conversation was documented on another 95 form). I also noticed that the BWC for the Eastern District BWC has "markers" on parts of the footage. And while I am unable to see when or who put them there on my end of Axon, I highly believe it to be Sgt. Copeland. This makes me believe very heavily that I am being targeted at this District. On February 27th, I told Major Middleton I wanted to transfer (not be detailed) and return to my previous assignment, Juvenile Booking. She advised she does not control such moves and did not appear to want to move in that direction anyways. On March 11th, 2026, I placed a transfer form through the chain to return to Juvenile Booking to TransferRequests and to the Health and Wellness Section, and the FOP to try and guarantee transfer. On March 12th, I gave Sgt. Moore a copy of that transfer form as I was told on the 11th that that was the proper way to go about this.

Respectfully Submitted,

P/O Thomas, Jordan K576

 Outlook

---

**Clarification of February 24 Incident – Officer Involved Signal 13 Response**

---

**From** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>

**Date** Thu 2/26/2026 4:04 PM

**To** Moore, Jordan (BPD) <Jordan.Moore@BaltimorePolice.org>; Brown, Yolanda (BPD) <Yolanda.Brown@BaltimorePolice.org>

**Cc** Jordan, Joshua (BPD) <Joshua.Jordan@BaltimorePolice.org>; Edmondson, Gary (BPD) <Gary.Edmondson@BaltimorePolice.org>

Good afternoon,

This statement serves as a follow-up to the conversation that we (myself, Sgt. Brown, Sgt. Brooks, and Lt. Jordan) had in reference to the incident mentioned in the email's subject at approximately 1900-1930 hours. This statement provides a factual account of my activities on February 24 and my response to the officer-involved Signal 13 in the Eastern District as I was not able to properly address my account of the facts during the initial conversation.

## Central Booking

- At approximately 1400 hours, I was at Central Booking dropping off Warrants for Officer Edmond as he had 3 prisoners at CBIF.

- Officer Edmond contacted Lt. Jordan requesting to be relieved with the three prisoners so he could get off on time.

- I was already present at CBIF and planned to work overtime into the next shift, so the request was approved.

- I remained at Central Booking until the final prisoner cleared medical.

- I logged the final prisoner in the Warrant Office book at 1746 hours.

- I left the facility shortly thereafter.

## CVS – 900 Block of Charles St

Seeing that our District does not have a CVS and knowing that there was one about 3 minutes away from CBIF,

- I drove to the CVS located on the 900 block of Charles Street.
- I signed the business check book at 1803 hours.

## Chipotle – 1200 Block of Charles St

Seeing that I was then only about 1 minute away from a Chipotle also in the immediate vicinity and knowing I have not ate since approximately 7 AM,

- I then drove to the Chipotle restaurant located on the 1200 block of Charles Street.
- I signed the business check book at 1809 hours.

## En Route Toward Southern District / Fuel Stop

- After leaving Chipotle, I began traveling towards the gas station on Front St before going back to the Southern District as the car I was driving was very low on gas.
- While traveling on Guilford Ave approaching E. Chase St, I heard a dispatcher broadcast a 16-round ShotSpotter alert for Pelham Avenue in the Eastern District.
- A Signal 13 was broadcast immediately afterward for the same location.

## Decision to Respond

My instinct told me that a shot spotter alert immediately followed by a signal 13 that there was a very strong possibility that this was a police involved incident.

- I entered the address into GPS to see how far away it was.

- I briefly switched to the Eastern District radio channel and heard transmission confirming it was a police-involved shooting.

- I returned to the Southern District channel.

- I parked at the intersection of East Chase Street and Valley Street, which was only approximately a block and a half distance from my original route to Front St ( To take E Chase St to Greenmount Ave, then take Greenmount Ave to Hillen St so I could turn right on Hillen to make it to Front St), and it was also approximately 3 and a half city blocks from CBIF. Knowing now that this was especially a police involved incident, I decided that if a second Signal 13 was to broadcast, then I would respond to the location.

- A second Signal 13 was broadcast.

- I notified Southern District dispatch that I was not far from the location and would be going from Central Booking.

- I switched to Eastern District channel and advised the same

- I activated my Body Worn Camera and proceeded to the location in response mode.

## On-Scene Actions

- Upon arrival, I assisted with scene security and placement of crime scene tape.

- An ambulance drove through the tape on Belair Road, displacing it.

- I coordinated with a Northeastern District wagon officer to hold opposite sides of the tape to allow emergency vehicles to pass without further disruption.

- I directed civilians not to enter the crime scene.

- After additional units arrived, I began to walk to my vehicle to return my crime scene tape and then I wanted to seek direction from supervision on the scene regarding continued assignment.

## Order to Return to Southern District

- As I was returning my tape to my car, I noticed my cellphone, which I left in the car, was ringing. I answered it and it was Officer Rankine advising that Southern District supervision was ordering me to return.

- I then called and informed Sgt. Brown that my vehicle was positioned on Pelham Avenue with multiple police vehicles in front of and behind it and also attempted to explain my actions up until that point, but I was not effectively allowed to do so.

- I was instructed to leave the scene regardless of the aforementioned conditions.

- Multiple units from the scene then had to come to where I was after I notified Eastern supervision of my order and pause what they were doing to reposition their vehicles to allow my vehicle to exit. This process took approximately twenty minutes.

- I returned to the Southern District.


## Radio Communications


To address concerns that I did not notify dispatch that I was going to the Signal 13,

- I notified Southern District dispatch that I was responding to the Signal 13 right before I began responding in emergency response mode, seconds prior to BWC Activation.

- I also notified Eastern District dispatch of my response, also seconds prior to BWC Activation.

- While en route, I made a few radio transmissions advising my distance from the scene and inquiring where I would be needed upon arrival as I was listening to their needs on the radio (more crime scene tape, a street to be blocked off, etc).

- I contacted Southern District dispatch (Ms. Simone) after I left the incident who confirmed that I transmitted I was responding.

- Officer Maldonado also advised that he heard my radio transmission stating I was responding.


## Clarification Regarding "From Central Booking" Transmission

- When I advised that I was responding "from Central Booking," I was geographically located approximately 3 and a half city blocks from Central Booking at the time of transmission.

- I did not transmit my specific cross streets and I did this the way that I did for the following reasons:

When I said I was going to the officer involved shooting scene from central booking, I meant that transmission as to geographically, that was the closest "known BPD landmark" I was coming from, being that E Chase St and Valley St is only about 3 and a half city blocks from central booking. I was not about to say the exact location where I was coming from because I know, to the keen ear on the radio, that a reasonable person would have a better understanding as to exactly how far away I am from the incident scene if I were to say a nearby landmark, as opposed to exact cross streets. It's like saying, "I'm coming from the Southern District" but I'm really on Potee St and Reedbird Ave. Or "I'm coming from Cross Street Market" but I'm really on E Fort Ave and Light St, or "I'm going from John's Hopkins Hospital" but I'm really on Orleans St and Ensor St. It saves time being on the radio. And it gives the keen listener a better idea and less thinking to do as to exactly how far away a responding unit is from a location, especially for an incident so critical as a police involved shooting. Now, I would understand the allegation much better if I was for whatever reason say, for example, at Mondawmin Mall and had said "I'm going from Central Booking" as that statement would not make any sense. So with that said, I am advising that any notion that I made a false statement about my whereabouts when responding to the incident location are wrongful accusations. Furthermore, it was said to me during our conversation and even while I was still on the scene, talking on the phone with Sgt. Brown that multiple broadcasts were made for me to not respond to the location, and/or to return to the southern district. While I cannot account for what was said on the southern air as I immediately switched to and remained on eastern air as soon as I announced that I was going to the scene, I can say that no such transmissions were made on Eastern air. I reviewed my BWC to make absolute sure of this.

As far as the concern as to why I did not immediately tell the dispatcher that I was leaving central booking when I immediately left, I can say that this is not a habit that I always do. Sometimes I do, sometimes I don't. It's not something I'd ever consider such an issue considering every single time, I am going back to the southern district. Even if I make a stop along the way, it is always within the immediate vicinity of the jail, and never somewhere outlandishly far away. For example, the chipotle like the one I went to on this day. After speaking to fellow officers/wagon officers and asking if they do the same, meaning if they always say that they are leaving the jail on the radio, they told me

that they also do not always do so because it's just not a consistent habit because we know we're going back to our districts anyway, even if we make short stops in the immediate area for necessities, in reasonable amounts of time. I wasn't traveling anywhere that was an unreasonable distance, like to the Northeast Market in East Baltimore, or The Target in Canton, or the Giant supermarket in Hampden, or the McDonald's on Reisterstown Rd and Cold Spring Ln, or the CVS on Penn and North for examples. I was going to destinations that were less than 5 minutes from the jail. One, to buy something because my district doesn't have a single CVS in it, the other, to buy food as I haven't eaten for about 11 hours at that time, and the last to get gas for a car that was very low on gas. Furthermore, If I was trying to be deceptive or had any ill-intent to "linger" for whatever reason, I wouldn't have documented my times in the business check books of the establishments I went to. I documented the checks in those business check books just because I was there, and why not. This should also disprove any assumptions that I was not being truthful, what with there having been a comment made about me "miraculously" (this was the exact word used) having left CBIF right as the signal 13 dropped, implying that I was lingering about and was being untruthful about the exact time I actually was allowed to leave CBIF/my last prisoner clearing medical compared to my response time to the incident.

## Notification

As stated above, This statement is provided to document the sequence of events and communications related to my response to the February 24 Signal 13. As I was told on that day during the conversaion that the Captain has been notified of this incident, I am also sending this email to him to ensure transparency regarding this matter.

Respectfully Submitted,
P/O Thomas, Jordan K576
Southern District Patrol C/B Patrol Rotate
(410)-261-0988 (Mobile)
(410)-396-2499 (District)
Jordan.Thomas@Baltimorepolice.org



-

Form 154

# SUSPENSION OF POLICE POWERS

## MEMBER TO BE SUSPENDED

Name: Jordan Thomas          Rank/Title: Police Officer          Seq. #: K-576

E.O.D: 8/10/2020          Current Assignment: Southern District

Primary Phone #: 718-781-9852          Alternate Phone #: _____

## PERMANENT RANK SUPERVISOR CONDUCTING SUSPENSION

Name: Sergeant Jordan McHenry          Rank/Title: Sergeant          Seq. #: J-114

Current Assignment: Southern District          Primary Phone #: 443-682-1030

## ORDER OF SUSPENSION

**PART 1**

Effective IMMEDIATELY, your authority and police powers as a sworn member of the Baltimore Police Department are SUSPENDED due to (*Check the appropriate box*):

☐ An allegation of misconduct or criminal activity.

☑ An administrative or medical matter (such as failing to qualify with a firearm, extended illness, etc.).

☐ A termination recommendation has been made as a result of a case presented to the Departmental Disciplinary Review Committee (DRC) or the Administrative Charging Committee (ACC).

This suspension constitutes a REVOCATION OF YOUR AUTHORITY to exercise the duties and powers of a sworn police officer.

**PART 2**

This suspension shall be (Check One):     ☑ WITH full pay and benefits.     ☐ WITHOUT pay and benefits.

**PART 3**

Member's Initials:

JT 1. You are prohibited from taking any police action.

JT 2. If you encounter circumstances requiring police action, regardless of time or location, you are required to notify the appropriate on-duty law enforcement authorities.

JT 3. You MAY NOT carry any departmental firearm until this Order of Suspension is lifted and your police powers have been restored by your Commanding Officer.

JT 4. If you possess any permit to carry a concealed, privately-owned firearm, you MAY NOT carry or transport that firearm into any Departmental facility, building, vehicle, etc.

JT 5. You MUST abide by all remaining policies, procedures, and directives of the Baltimore Police Department EXCEPT those governing the exercise of police powers and the ability to carry a firearm.

JT 6. You MUST immediately surrender the following items to the Permanent-Rank Supervisor conducting this Suspension: (1) All departmental firearm(s), ammunition, magazines, and firearm accessories; (2) Badge; (3) Departmental ID card; (4) MPCTC certification card; (5) If issued, any Conducted Electrical Weapon, with cartridge(s); (6) BWC if issued, (7) Your police radio; and (8) If directed to do so, any departmental cell phone, smartphone, SidePartner, etc.

JT 7. You MUST report for your next scheduled tour of duty in an administrative capacity, or at a time and place as may be determined by the Permanent Rank Supervisor conducting this Suspension, unless directed to do otherwise by your Commanding Officer. This Order of Suspension DOES NOT, in and of itself, grant or authorize any form of leave.

## SUSPENDED MEMBER'S ACKNOWLEDGMENT

BY SIGNING BELOW, I CERTIFY THAT I HAVE READ, UNDERSTAND, AND WILL COMPLY WITH THE RESTRICTIONS LISTED IN THE ABOVE ORDER OF SUSPENSION, AND THAT I HAVE RECEIVED A COPY OF THIS ENTIRE DOCUMENT.

Printed Name: Thomas Jordan     Signature: _____     Seq. #: K576     Date: 2-27-26

Form 154 - Rev 3/2025

Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 10 May 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**      **Major H. Middleton**

**VIA:**      Official Channels

**FROM:**      P/O Thomas, Jordan K576

**SUBJECT**: Reporting first contact with Union/Sgt J. Glazerman of SD District lying incident and subsequent suspension, and PID response

Ma'am,

I respectfully report that on February 26th, 2026, I sent an email to the BPD's union, specifically directing my email to Vice President Jon Glazerman and President Michael Mancuso. The email was to request a phone call with one of the two in reference to how Sgt. Y. Brown had lied on me to command staff following an incident that occurred involving me on February 24th, 2026. Minutes after this email was sent, I received a phone call from Sgt. Glazerman where I gave him a briefing of the entire incident. Our phone call concluded with him advising me that I was to respond to the Public Integrity Division (PID, BPD's Internal Affairs Section) and make a complaint. He then texted me (screenshot attached) after our phone call reminding me that if I was making a statement as an accused person to ensure I had an attorney with me. Unsure if this comment was the result of some misunderstanding from our phone call, I asked if I needed an attorney present during a statement of which I am a complainant and he advised I do not. On the next day, February 27th, the day I was suspended, I already had to go down to PID to make a separate statement for something unrelated. While I was down there, I spoke with a PID EODS detective whose name I did not get, about what was happening with me in the SD District, to also include the new unprecedented suspension I was subjected to hours ago at the time. This detective, in the presence of Sgt. Anthony Levierge, advised me that any complaint that I make against any member/supervisor, after I have already been entered into BlueTeam (software used by supervisors to report members to PID), or advised by a supervisor that I was going to be entered into BlueTeam or disciplined otherwise, regardless of if I received an official investigation notification or not, it would be considered retaliation for me to do. This statement made it impossible for me to make any statements on anything that I had at the time, due to the fact the detective advised me that any complaint I made would be considered

1:26 - cv - 01682-MJM

retaliation which he described as a departmental offense which carries a penalty of termination. He then referenced the anti-retaliation policy. I then asked the detective how members such as myself are supposed to report misconduct by supervisors or misconduct directed towards me otherwise with this rule in place, citing that I would basically be unfairly subjected to an administrative suspension under false guise for an unknown period of time. The detective advised me that the correct course of action was to wait until PID was to summons me for a statement in reference to each individual allegation, which only then I would be able to defend my points and make the complaints I wanted to make. This information was extremely daunting to me, and as of the time of this report's writing (May 10th, 2026), I have not been made aware of any investigation in reference to the incident which was described to me as the main reason I was suspended. But, I have been told that I was going to be disciplined for it. So by this detective's explanation, I was/am unable to make any statements about it to them otherwise I would risk termination. This leaves me still unfairly administratively suspended almost three months later, with no idea of how much longer until I can make my complaints on Sgt. Brown and the rest of the supervisors involved to hold them accountable, and to relieve myself of this unfair suspension which was administered under false pretense because of Sgt. Brown's false statements. I then left PID without making the statement I wanted to make which Sgt. Glazerman recommended that I should have. This 95 is to serve as an explanation as to why I have not made any complaints or official statements about anything regarding my suspension, or the situation which Sgt. Brown lied on me, or the instances which demonstrate how poorly I was being treated in the SD District as those incidents were also placed into BlueTeam at the time. All of this occurred before I had obtained evidence of harassment and incidents involving me that were not entered into BlueTeam or mentioned to me as going to be entered into BlueTeam. Every time an instance of hostile work environment or harassing behavior occurred towards me at work after this day, I documented them with the intention of bringing them to a higher authority at some point, and eventually to PID once I had enough evidence, which at this point, I believe that I do, and because also at this point, the hostile work environment at my workplace is becoming too unbearable as of the latest incident that occurred on May 9th, 2026. Those incidents I just mentioned, which do not fall under the anti-retaliation rules the PID detective told me, will now be reported to PID on May 11th, 2026 after a conversation with Director Vernon Herron of BPD's Health and Wellness Section, where I advised him of the most recent instance of workplace hostility/retaliation of many that have occurred since I have spoken to that PID detective, and Director Herron instructed me to file a complaint. The goal of that complaint will be to attempt to hold the supervisors who have harassed me accountable, and to seek expedition in my transferring out of the SD District as at this point, the union and health and wellness have failed multiple times to intervene and prevent harassment from continuing and refused to assist me transfer despite these working conditions I keep telling them about.

Respectfully Submitted,

P/O Thomas, Jordan K576

7:05      .ıll 5G 97

## outlook.office365.com

Need assistance

(i)   Flag for follow up.

**Jordan Thomas**     ...
To: Jon Glazerman;  Michael Mancuso
Thu 2/26/2026 6:18 PM

Good evening,

I need to speak with one of you in regards to a very big issue I am having related to work, asap. Please give me a call at ▉▉▉▉▉ as soon as possible.

☺

Reply all

**Thu, Feb 26 at 6:51 PM**

Just making sure that if you're making a statement as an accused you have an attorney with you. If it's a witness statement you're not entitled to one.

Just want to make sure you're aware of that!

I got you. Do I need the attorney present if I'm just making the statement as a complainant?

No. Only if you're making a statement as Ana accused.

Understood. Thank you

**Mon, Mar 2 at 7:27 AM**

*Thomas v. Baltimore Police Department*

POLICE DEPARTMENT
BALTIMORE, MARYLAND

REPORT
Form 92/95

DATE- 12 March 2026

ASSIGNMENT: Southern District C/B Patrol Rotate

TO: Major H. Middleton

VIA Official Channels

FROM: P/O Thomas, Jordan K576

SUBJECT: Reporting concerning comment made about me by supervisor

Ma'am,

I respectfully report that on February 27th, 2026, only approximately 1 hour before I would be administratively suspended, that I arrived to work in full uniform, but was placed on the front desk position alongside a limited duty personnel. I asked why I was on the desk despite some post spots not being filled, and despite a limited duty personnel already being on the desk. Sgt. J. McHenry advised me that he was instructed by Lt. J. Jordan (who was not present on this day) that I would be on the desk "until further notice". Myself and Sgt. McHenry then engaged in banter about how I feel like I am not being treated fairly in the District, and shortly after Sgt. T. Copeland joined the conversation and gave his inputs. Sgt. Copeland referenced an incident where I responded to an Officer shooting involved signal 13 from the CBIF vicinity 3 days prior, trying to say my actions were questionable due to some thought that they (the supervisors on that day) had come up with on their own that I was "missing for two hours". I tried to bring up how that narrative has a lot of holes in it, it was perceived as me being argumentative and I was not allowed to effectively explain myself. To the best of my memory, he then brought up how I " seem to be going backwards", and that I have "been involved in multiple questionable incidents since I was reinstated that have been put into BlueTeam" and that "the supervisors are scared to let me work". I then brought up the fact that some unknown Officers in the District spread rumors about me which eventually make their way to the supervisors, which damages how they perceive me. I brought up an example that someone had apparently started a rumor that I had pulled out my service weapon on a handcuffed prisoner in our interrogation room. (I was notified of this rumor on February 25th by a friend over the phone). Sgt. Copeland advised that the rumor was proven false and no such thing happened. When I asked if anything happened to whoever spread the false rumor or if they (the supervisors) planned on telling me about it, Sgt. Copeland stated it was a "misunderstanding" and I said, "that doesn't make it right" and he responded "it doesn't but that's just how it is" despite the fact that this is just one of many rumors/comments made about me that get way blown out of proportion, and how severely it impacts my image socially, and professionally to my co-workers and supervisors. The conversation ended with Sgt. Copeland telling me that I am to be very closely monitored. I feel as my comments about Officers not being held accountable for spreading fake rumors about me (which has been happening for a very long time) was not taken seriously (they never are). The comment made about the supervisors being "scared to work with me" made me feel like the supervisors perceive me as a threat but with no cause, especially with the "questionable incidents" mentioned to me only being me going to a signal 13 from the front desk, going to a signal 13 from nearby CBIF to another District, playing music which some supervisors say is too loud, in the patrol wagon to keep prisoners in positive moods, driving fast with the wagon when no such rumor or conversation about me doing that has ever been proven or BlueTeamed probably because they know iI'm not doing anything bad, made me feel like a transfer out of this environment was necessary if these incidents make me so scary to work with. I mentioned I had been thinking about a voluntary transfer Full Duty to Juvenile Booking, an environment where I never had any issues at work. Sgt Copeland supported the idea, and then the conversation ended. About an hour later, I was administratively suspended by Sgt. McHenry and given no reason at all, until I had a sit-down meeting with Major Middleton myself at my own request to get an answer for this. Overall, I do not believe that the supervisors in my district are being fair to me, and they are allowing false rumors to be spread about me, damaging my professional image, and their perceptions about me, and not holding the rumor starters accountable.

Respectfully Submitted,

P/O Thomas, Jordan K576

1:26-cv-01682-MSM

Respond on Reverse Side  ☐          Page 1 of 1

Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 14 March 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**       **Major H. Middleton**

**VIA:**       Official Channels

**FROM:**    P/O Thomas, Jordan K576

**SUBJECT:** Reporting suspension conversation had with Major Middleton on Feb. 27th 2026

Ma'am,

      I respectfully report that on February 27th, 2026, at approximately 0800 in the morning I was administratively suspended at the SD District by patrol Sgt. J. McHenry, and he told me that it was in reference to a phone call he received Major Middleton. Sgt. McHenry told me that the phone call was brief and that the Major received permission from an unknown Police Colonel. for the admin suspension to be ordered. I still was not told exactly why I was suspended, as Sgt McHenry said he did not know why and was not told, So it wasn't until I decided to reach out to the Major on my own. Major Middleton, in the presence of Sgt. C. Brooks, at approximately 1130 hours, told me I was suspended for the following reasons:

- A decision that I made on the afternoon of February 12th to drive with a weapon unholstered upon approach to the area where a suspect with a rifle and a child were. She cited that the act of driving a vehicle with a weapon unholstered violated our policy, but I attempted to explain that I believed that the situation was exigent.

- A decision that I made on the morning of February 12th to respond to a signal 13 (meaning that an Officer needs help ASAP) broadcasted by the Officer yelling the phrase "signal 13" on the radio herself while assigned to the front desk of the SD Station on OT, responding to the location where the incident i about 2 and a half minutes ( I was in full gear, had a car key, and had knowledge that our shift was short that day). (Furthermore, when I voluntarily engaged in a conversation with this action with one of my direct supervisors, my Lieutenant, Lt. J. Jordan, the only thing he was dissatisfied about was that I did not lock the door to the District, but he told me that otherwise, he saw no issue with what I did). That was until other people had an issue with it and then all of a sudden he was now against what I had did and I was informed action would be taken against me for it.

1:26- CV- 01682- MJM

- A decision that I made on February 24th where I responded from the vicinity of CBIF to an Officer-Involved Shooting/Signal 13 in the Eastern District. The problem there being that Sgt. Y. Brown (shift commander at the time) accused me of being "miraculously" (this was the word used) being clear of the city jail (I was there pending the medical clearance of 3 prisoners before I could leave) "just in time" to respond to the signal 13, which I responded to in 5 minutes from when I stated on the radio I would be responding. Sgt. Brown was basically assuming that I was lingering about either inside of the jail or elsewhere in the city after my prisoners at the jail cleared. Sgt. Brooks chimed in when I was explaining that I left the jail by "five forty-ish" (these are the words I used because I was trying to remember on the spot), but as soon as I said that, she said "4", basically meaning she was trying to "correct" me and say I left the jail at 1600 hours. (I have proof that this is all untrue, in the form of photos I took on a following day in an attempt to clear up this allegation, of the log of the last prisoner being clear, at 1746 hours, as well as two additional photos of two business check books at a nearby CVS and Chipotle where I logged the times I was at those two locations, 1803 hours and 1809 hours respectively), Sgt. Brown and Sgt. Brooks citing that I had made a false statement about my whereabouts when I responded to the signal 13 when I said "I was coming from CBIF" on my radio (the signal 13 had came out only minutes after I left the Chipotle, en route back to the SD Station, with only one more stop to make at Front St. for gas). I was not allowed to effectively explain myself on this day to her as to where I was after leaving the jail (CVS and Chipotle), or the fact I had time entries as proof to dispel this assumption I was lingering and apparently cleared CBIF since "4" (I still do not know where this inaccurate information came from), because Sgt. Brown had already advised me multiple times, even before I got back to the station, to clock out and leave early, and herself and the other present supervisors (Lt. Jordan and Sgt. Brooks) continuously cut me off while I tried to explain. Sgt. Brown also advised me that "The Captain has been made aware of this" referring to Captain Edmondson and was trying to tell me she was done talking by continuously saying "clock out, go home". This made me feel it necessary to send Sgt Brown, the Captain, and the other supervisors present a very detailed and very specific email on the 26th containing the facts about what exactly had happened that lead me to respond to the signal 13, and where I was which would lead to all the  false statement allegations about my whereabouts being proven false, and to support transparency since Sgt Brown had basically told me she was going to give or had already given the Captain what I absolutely knew was inaccurate information.

On the 27th of February, my first day back to work since that incident and since I sent that email, I was first placed on the front desk despite there already being a limited duty personnel on the desk, and also me being full duty status as a Police Officer and some patrol spots not filed, for my normal tour of duty. When I asked why I was on the desk, Sgt. McHenry, the shift commander that morning, advised me that Lt. Jordan, my supervisor and his, (who was not at work on this day), advised him, that I was to be on the desk until further notice, ordered by Lt. Jordan. ( I have a separate 95 form dedicated to this specific conversation and what it entailed) Then, about an hour later, I was called into the Sergeant's office to be administratively

suspended. Like I said before, I was not told why and I had to seek conversation with the Major on my own to get this question answered, and the 3 above incidents were the ones explained to me as why, in what the Major referred to as "questionable incidents." She also referred to me as an "action junkie', as a possible explanation as to why I decided to respond to the signal 13 in the ED in particular and as a character trait of mine, to which I debunked and cited I am no such thing, and that I made the choices that I made for the signal 13 in the ED were out of genuine concern for my side-partners in an emergency situation, and then I suggested that she probably got that "action junkie" image of me because I like to do things such as traffic enforcement and thorough investigations in a position where I am not expected to do those things (The position being the SD Wagon man, the duties strictly being transportation and nothing further). The Major also advised me that she read my email, despite not being an original recipient of it. I believe that that fact, alongside the other things I was told, including the outlook of me being an "action junkie" has led to an unfair suspension. I believe that she must have derived this "action junkie" image of me from a combination of incidents she has seen for herself (such as the unholstering of my firearm during what I perceived as an exigent circumstance) and false rumors on top of these "questionable incidents" that get spread by Officers in my District and they eventually make their way to her, even though these rumors have either never been proven, or been confirmed to be untrue. This also defames my character and makes establishing positive work relationships very difficult and makes growth within the agency harder, being suspended like this, and being dubbed an "action junkie" in a negative way. I think that the decision to suspend me was punitive and heavily inspired in retaliation by the email that I sent, where I clarified exactly what happened and began a paper trail with the actual correct information as to what happened led me to an unfair suspension for speaking up. I also do not believe that the three things explained to me would constitute an administrative suspension either, further making it unfair and retaliatory for me speaking up and clarifying things. The reason I clarify "actual CORRECT information" is because in the same conversation on the night of February 24th, Sgt. Brown had made comments to me alleging I did not transmit on Southern channel that I was responding even though I did, and I confirmed with KGA that she heard (Ms. Simone), and two other officers as well (S. Maldonado, and I. Jackson). Sgt. Brown also stated that she got on Southern District air, and Eastern District air and that Eastern District's KGA got on the air to tell me not to respond or to come back to the Southern District. I knew for a fact these allegations were untrue, because I listen to my radio. And I keyed up multiple times on Eastern Channel. Upon BWC review, NEITHER of these things Sgt Brown said to me were true, which is ANOTHER reason I felt the need to send an email clarifying to the Captain and everybody else what had actually happened so things didn't get misconstrued). Officer Jackson advised me that he heard my transmission on the Southern Air, and added that Sgt Brown, or ANY supervisor for that matter did NOT get on Southern District air to order me to return to the District, and Officer Maldonado told me he heard my transmit on Eastern channel. Major Middleton began to go into detail about how as Unit 41 on that night, that she could not "justify having a Southern Officer in the Eastern" for a police involved shooting, stating that "to have an Officer respond from the Southern District to

the Eastern District" would be unjustifible. Hearing this, I determined that the Major was misinformed and somehow got information that I had responded to this Eastern District signal 13 from within the actual Southern District borders itself. I quickly reminded and corrected her, like I said in my email, which she said that she read, that I was NOT in the Southern District, that I was near CBIF, hence why I went, after a second broadcast for a signal 13 at that. Major Middleton disregarded what I said about where I was and then told me that she can justify units from the Northeast, the Southeast, and the Northern Districts because those Districts actually border the Eastern District as a way to tell me that me responding to the signal 13 was "wrong". (However, after a conversation I had with a Western District Officer on March 14th, 2026, I was told that apparently, when the Signal 13 dropped, Officers Hazel and Rodriguez with Western District patrol, the District on the complete opposite side of the Eastern District with no borders whatsoever, were allowed to respond to the scene by their shift commander on that night, Sgt. M. Hodge. (Obviously, only finding this information out after this conversation I had with my Major, I was not able to bring it up to her but I mention it in this document to show that her statement to me about not being able to justify units from Districts that do not border the Eastern is absolutely not fair to me. In retrospect, I find it very distasteful and biased against me that the Major left out that Officers from a District that do not border the Eastern District went to that scene and ONLY mentioned the Officers from Districts that do border the Eastern District showed up. Even with all of those points however, none of it should ever matter considering I was already in a bordering District, the Central Distirct near CBIF by the time the signal 13 was dropped).

Major Middleton did not have much response for me stating that Sgt. Brown lied, or about the fact other units from other Districts responded to the signal 13 after this. Her response was to change the topic to my habits as a wagon man. She specifically was referring to comments that made it up to her about me driving our wagon with music playing "loudly". When I explained that music's volume cannot be properly understood by listening to a BWC, and that it's different when you are actually in/near the wagon, explaining it's not as loud as people think, and that in my experience as a wagon man that music tends to calm down/sooth certain prisoners so they are not problematic at CBIF, she appeared somewhat receptive, but still maintained her point. She also made points during this conversation that I "listen to respond and explain, not to understand and hear". I disputed that I never get any chances to explain anything, which is why I was in the situation that I was in. Which is why supervisors treat me the way they do, and why Officers are allowed to spread false information to them, and not do anything about it when they are proven to have no merit. I explained that the supervisors hardly ever let me effectively explain anything, opting to cut me off and almost "force" me to conform to unfair conditions. I told her then when I suggest looking at BWC footage to dispel certain rumors for example that I drive fast in the wagon to look at it's speedometer for specific incidents (like one from only a few days where Sgt. J. Moore told me someone told him I pulled into the District's lot fast with a prisoner in the back, I told him we could watch my BWC and they'd see I was only going between 5 and 10

mph. My suggestion was not acknowledged and I am not sure if it was ever checked) and she did not have much of response for that either, instead opting to turn the conversation into a "self reflection" direction.

To close out the conversation, I asked the Major if there was a timeline as to when I could expect to return to full-duty status, and I asked if while I was suspended, if any "tasks" had to be completed or "conditions satisfied" in order for me to return to my normal status. She advised she does not control that stuff and did not know, and instead encouraged me to consider the suspension as a "pause" to "take time to reflect" how I got here. I stand on the fact that I do not believe I have done anything to warrant the treatment I get at this District, this suspension, or any supervisors being intimidated to work with me. I believe that the Supervisors treat me unfairly, allow rumors to spread time and time again, even after they've either been debunked fully or if the specific rumor was the result of something that I did do, getting heavily and "cartoonishly" misconstrued through "word of mouth" and "hearsay", and do not do anything about the people they are getting false information from, and punish me for things other people get away with. I now believe that the command staff in this District and perhaps even beyond the District has now jumped on this narrative that I am, for a lack of a better term, a "dangerous", "disliked", "problematic" or "constriversal" Officer that "nobody wants to deal with". Nobody is doing anything about these working conditions and after the conversation about why I was suspended by my Major, with my Major, I believe that the supervisors are being allowed to "bully" me around and I believe this is all an attempt to push me out of the District. Other Officers, who I can name, can absolutely attest to the fact that I am treated differently, as they see it, and tell me their thoughts and opinions. I am willing to name these people in necessary. The email I sent in reference to the Eastern District signal 13 situation, and a copy of the suspension paperwork I was given will be attached to this 95 form.

Respectfully Submitted,

P/O Thomas, Jordan K576

 Outlook

---

**Clarification of February 24 Incident – Officer Involved Signal 13 Response**

---

**From** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>

**Date** Thu 2/26/2026 4:04 PM

**To**    Moore, Jordan (BPD) <Jordan.Moore@BaltimorePolice.org>; Brown, Yolanda (BPD) <Yolanda.Brown@BaltimorePolice.org>

**Cc**    Jordan, Joshua (BPD) <Joshua.Jordan@BaltimorePolice.org>; Edmondson, Gary (BPD) <Gary.Edmondson@BaltimorePolice.org>

Good afternoon,

This statement serves as a follow-up to the conversation that we (myself, Sgt. Brown, Sgt. Brooks, and Lt. Jordan) had in reference to the incident mentioned in the email's subject at approximately 1900-1930 hours. This statement provides a factual account of my activities on February 24 and my response to the officer-involved Signal 13 in the Eastern District as I was not able to properly address my account of the facts during the initial conversation.

## Central Booking

- At approximately 1400 hours, I was at Central Booking dropping off Warrants for Officer Edmond as he had 3 prisoners at CBIF.

- Officer Edmond contacted Lt. Jordan requesting to be relieved with the three prisoners so he could get off on time.

- I was already present at CBIF and planned to work overtime into the next shift, so the request was approved.

- I remained at Central Booking until the final prisoner cleared medical.

- I logged the final prisoner in the Warrant Office book at 1746 hours.

- I left the facility shortly thereafter.

## CVS – 900 Block of Charles St

Seeing that our District does not have a CVS and knowing that there was one about 3 minutes away from CBIF,

- I drove to the CVS located on the 900 block of Charles Street.
- I signed the business check book at 1803 hours.

## Chipotle – 1200 Block of Charles St

Seeing that I was then only about 1 minute away from a Chipotle also in the immediate vicinity and knowing I have not ate since approximately 7 AM,

- I then drove to the Chipotle restaurant located on the 1200 block of Charles Street.
- I signed the business check book at 1809 hours.

## En Route Toward Southern District / Fuel Stop

- After leaving Chipotle, I began traveling towards the gas station on Front St before going back to the Southern District as the car I was driving was very low on gas.
- While traveling on Guilford Ave approaching E. Chase St, I heard a dispatcher broadcast a 16-round ShotSpotter alert for Pelham Avenue in the Eastern District.
- A Signal 13 was broadcast immediately afterward for the same location.

## Decision to Respond

My instinct told me that a shot spotter alert immediately followed by a signal 13 that there was a very strong possibility that this was a police involved incident.

- I entered the address into GPS to see how far away it was.

- I briefly switched to the Eastern District radio channel and heard transmission confirming it was a police-involved shooting.

- I returned to the Southern District channel.

- I parked at the intersection of East Chase Street and Valley Street, which was only approximately a block and a half distance from my original route to Front St ( To take E Chase St to Greenmount Ave, then take Greenmount Ave to Hillen St so I could turn right on Hillen to make it to Front St), and it was also approximately 3 and a half city blocks from CBIF. Knowing now that this was especially a police involved incident, I decided that if a second Signal 13 was to broadcast, then I would respond to the location.

- A second Signal 13 was broadcast.

- I notified Southern District dispatch that I was not far from the location and would be going from Central Booking.

- I switched to Eastern District channel and advised the same

- I activated my Body Worn Camera and proceeded to the location in response mode.

## On-Scene Actions

- Upon arrival, I assisted with scene security and placement of crime scene tape.

- An ambulance drove through the tape on Belair Road, displacing it.

- I coordinated with a Northeastern District wagon officer to hold opposite sides of the tape to allow emergency vehicles to pass without further disruption.

- I directed civilians not to enter the crime scene.

- After additional units arrived, I began to walk to my vehicle to return my crime scene tape and then I wanted to seek direction from supervision on the scene regarding continued assignment.

## Order to Return to Southern District

- As I was returning my tape to my car, I noticed my cellphone, which I left in the car, was ringing. I answered it and it was Officer Rankine advising that Southern District supervision was ordering me to return.

- I then called and informed Sgt. Brown that my vehicle was positioned on Pelham Avenue with multiple police vehicles in front of and behind it and also attempted to explain my actions up until that point, but I was not effectively allowed to do so.

- I was instructed to leave the scene regardless of the aforementioned conditions.

- Multiple units from the scene then had to come to where I was after I notified Eastern supervision of my order and pause what they were doing to reposition their vehicles to allow my vehicle to exit. This process took approximately twenty minutes.

- I returned to the Southern District.

## Radio Communications

To address concerns that I did not notify dispatch that I was going to the Signal 13,

- I notified Southern District dispatch that I was responding to the Signal 13 right before I began responding in emergency response mode, seconds prior to BWC Activation.

- I also notified Eastern District dispatch of my response, also seconds prior to BWC Activation.

- While en route, I made a few radio transmissions advising my distance from the scene and inquiring where I would be needed upon arrival as I was listening to their needs on the radio (more crime scene tape, a street to be blocked off, etc).

- I contacted Southern District dispatch (Ms. Simone) after I left the incident who confirmed that I transmitted I was responding.

- Officer Maldonado also advised that he heard my radio transmission stating I was responding.

## Clarification Regarding "From Central Booking" Transmission

- When I advised that I was responding "from Central Booking," I was geographically located approximately 3 and a half city blocks from Central Booking at the time of transmission.

- I did not transmit my specific cross streets and I did this the way that I did for the following reasons:

When I said I was going to the officer involved shooting scene from central booking, I meant that transmission as to geographically, that was the closest "known BPD landmark" I was coming from, being that E Chase St and Valley St is only about 3 and a half city blocks from central booking. I was not about to say the exact location where I was coming from because I know, to the keen ear on the radio, that a reasonable person would have a better understanding as to exactly how far away I am from the incident scene if I were to say a nearby landmark, as opposed to exact cross streets. It's like saying, "I'm coming from the Southern District" but I'm really on Potee St and Reedbird Ave. Or "I'm coming from Cross Street Market" but I'm really on E Fort Ave and Light St, or "I'm going from John's Hopkins Hospital" but I'm really on Orleans St and Ensor St. It saves time being on the radio. And it gives the keen listener a better idea and less thinking to do as to exactly how far away a responding unit is from a location, especially for an incident so critical as a police involved shooting. Now, I would understand the allegation much better if I was for whatever reason say, for example, at Mondawmin Mall and had said "I'm going from Central Booking" as that statement would not make any sense. So with that said, I am advising that any notion that I made a false statement about my whereabouts when responding to the incident location are wrongful accusations. Furthermore, it was said to me during our conversation and even while I was still on the scene, talking on the phone with Sgt. Brown that multiple broadcasts were made for me to not respond to the location, and/or to return to the southern district. While I cannot account for what was said on the southern air as I immediately switched to and remained on eastern air as soon as I announced that I was going to the scene, I can say that no such transmissions were made on Eastern air. I reviewed my BWC to make absolute sure of this.

As far as the concern as to why I did not immediately tell the dispatcher that I was leaving central booking when I immediately left, I can say that this is not a habit that I always do. Sometimes I do, sometimes I don't. It's not something I'd ever consider such an issue considering every single time, I am going back to the southern district. Even if I make a stop along the way, it is always within the immediate vicinity of the jail, and never somewhere outlandishly far away. For example, the chipotle like the one I went to on this day. After speaking to fellow officers/wagon officers and asking if they do the same, meaning if they always say that they are leaving the jail on the radio, they told me

that they also do not always do so because it's just not a consistent habit because we know we're going back to our districts anyway, even if we make short stops in the immediate area for necessities, in reasonable amounts of time. I wasn't traveling anywhere that was an unreasonable distance, like to the Northeast Market in East Baltimore, or The Target in Canton, or the Giant supermarket in Hampden, or the McDonald's on Reisterstown Rd and Cold Spring Ln, or the CVS on Penn and North for examples. I was going to destinations that were less than 5 minutes from the jail. One, to buy something because my district doesn't have a single CVS in it, the other, to buy food as I haven't eaten for about 11 hours at that time, and the last to get gas for a car that was very low on gas. Furthermore, If I was trying to be deceptive or had any ill-intent to "linger" for whatever reason, I wouldn't have documented my times in the business check books of the establishments I went to. I documented the checks in those business check books just because I was there, and why not. This should also disprove any assumptions that I was not being truthful, what with there having been a comment made about me "miraculously" (this was the exact word used) having left CBIF right as the signal 13 dropped, implying that I was lingering about and was being untruthful about the exact time I actually was allowed to leave CBIF/my last prisoner clearing medical compared to my response time to the incident.

## Notification

As stated above, This statement is provided to document the sequence of events and communications related to my response to the February 24 Signal 13. As I was told on that day during the conversaion that the Captain has been notified of this incident, I am also sending this email to him to ensure transparency regarding this matter.

Respectfully Submitted,
P/O Thomas, Jordan K576
Southern District Patrol C/B Patrol Rotate
(410)-261-0988 (Mobile)
(410)-396-2499 (District)
Jordan.Thomas@Baltimorepolice.org

Case 1:26-cv-01682-MJM Document 5-1 Filed 05/14/26 Page 33 of 126



Form 154

# SUSPENSION OF POLICE POWERS

## MEMBER TO BE SUSPENDED

Name: **Jordan Thomas**     Rank/Title: **Police Officer**     Seq. #: **K-576**

E.O.D: **8/10/2020**     Current Assignment: **Southern District**

Primary Phone #: **718-781-9852**     Alternate Phone #: _____

## PERMANENT RANK SUPERVISOR CONDUCTING SUSPENSION

Name: **Sergeant Jordan McHenry**     Rank/Title: **Sergeant**     Seq. #: **J-114**

Current Assignment: **Southern District**     Primary Phone #: **443-682-1030**

## ORDER OF SUSPENSION

**PART 1**

Effective IMMEDIATELY, your authority and police powers as a sworn member of the Baltimore Police Department are SUSPENDED due to (*Check the appropriate box*):

☐ An allegation of misconduct or criminal activity.

☑ An administrative or medical matter (such as failing to qualify with a firearm, extended illness, etc.).

☐ A termination recommendation has been made as a result of a case presented to the Departmental Disciplinary Review Committee (DRC) or the Administrative Charging Committee (ACC).

This suspension constitutes a REVOCATION OF YOUR AUTHORITY to exercise the duties and powers of a sworn police officer.

**PART 2**

This suspension shall be (Check One):     ☑ WITH full pay and benefits.     ☐ WITHOUT pay and benefits.

**PART 3**

Member's Initials:

JT 1. You are prohibited from taking any police action.

JT 2. If you encounter circumstances requiring police action, regardless of time or location, you are required to notify the appropriate on-duty law enforcement authorities.

JT 3. You MAY NOT carry any departmental firearm until this Order of Suspension is lifted and your police powers have been restored by your Commanding Officer.

JT 4. If you possess any permit to carry a concealed, privately-owned firearm, you MAY NOT carry or transport that firearm into any Departmental facility, building, vehicle, etc.

JT 5. You MUST abide by all remaining policies, procedures, and directives of the Baltimore Police Department EXCEPT those governing the exercise of police powers and the ability to carry a firearm.

JT 6. You MUST immediately surrender the following items to the Permanent-Rank Supervisor conducting this Suspension: (1) All departmental firearm(s), ammunition, magazines, and firearm accessories; (2) Badge; (3) Departmental ID card; (4) MPCTC certification card; (5) If issued, any Conducted Electrical Weapon, with cartridge(s); (6) BWC if issued, (7) Your police radio; and (8) If directed to do so, any departmental cell phone, smartphone, SidePartner, etc.

JT 7. You MUST report for your next scheduled tour of duty in an administrative capacity, or at a time and place as may be determined by the Permanent Rank Supervisor conducting this Suspension, unless directed to do otherwise by your Commanding Officer. This Order of Suspension DOES NOT, in and of itself, grant or authorize any form of leave.

## SUSPENDED MEMBER'S ACKNOWLEDGMENT

BY SIGNING BELOW, I CERTIFY THAT I HAVE READ, UNDERSTAND, AND WILL COMPLY WITH THE RESTRICTIONS LISTED IN THE ABOVE ORDER OF SUSPENSION, AND THAT I HAVE RECEIVED A COPY OF THIS ENTIRE DOCUMENT.

Printed Name: **Thomas Jordan**     Signature: _____     Seq. #: **K 576** Date: **2-27-26**

Form 154 - Rev 3/2025

Thomas V. Baltimore Police Department

John G )

Mon, Mar 2 at 7:27 AM

Good morning Sgt, just wanted to let you know that the day after our phone call, that I was administratively suspended. They didn't even tell me why initially, only after I requested a meeting with the major myself. The reason I was given was for "a few incidents" since February had began, including responding to two signal 13's. One of which, they tried to muddle in that I was lying about my whereabouts. I sent them an email clarifying the entire incident about what I did because some of the information they had wasn't even correct, and then the first day back to work after they read the email, now I was suspended and they told

Follow up conversation after speaking to Union on Feb 26th.

Asking for help and he advises to place transfer form. I would place this transfer to Juvenile Booking unit.

Signed,
John Thomas

1: 26- CV-01682- MJM

suspended and they told me I was suspended for "a few incidents" (which I can go into greater detail on). The major said herself that she read the email and she wasn't even a recipient, so that's how I know it was read. I found it very questionable that they suspended me as soon as I clarified how things went down and I believe it's an attempt to silence me or slow me down from defending myself. Are you guys able to help me with the suspension and getting me out of this district? PIB told me that they couldn't help.




Mo. **John G ⟩** AM

**Where are you currently assigned?**

**Please send me an email from your persona account to <u>jglazerman@fop3.org</u> with all of the pertinent details.**

Okay, doing it now

**Have you put in a 70 requesting to leave the district?**

I'm in the SD currently. And no, I haven't put in any 70 forms because I wanted to wait to see what entities such as yourself, health and wellness, etc. would say.

I'm typing up that email now

6:24 ➤    .ıil 5G 🔋100





**John G** ⟩



A 70 is the first step

You can cc <u>info@fop3.org</u> when you send the 70

I understand. I just sent you the email from my personal account, please let me know if you got it

Ok

Thomas V. Baltimore Police Department

**POLICE DEPARTMENT**
BALTIMORE, MARYLAND

REPORT
Form 92/95

DATE- 11 March 2026

ASSIGNMENT: Southern District C/B Patrol Rotate

TO: Major H. Middleton

VIA Official Channels

FROM: P/O Thomas, Jordan K576

SUBJECT: Request for Transfer

Ma'am,

      I respectfully request to be transferred out of the SD District and assigned permanently to the SSS - Adult/Juvenile Booking Court and Liaison Unit. Along with this 95 form is a 70 form in reference. The nature of this request despite this not being a posted position comes from several negative direct and indirect interactions I have had with command, supervision, and officers of the District starting from as early as January of 2025. It has now reached a point at the SD District where I now am the subject of harassment from Officers, and extreme scrutiny by supervision due to false rumors having been spread about me in my District by unknown Officers among my ranks and such rumors going unchecked by supervision and command, even after proven to be false. I am unable to perform my work effectively as a Police Officer without being micromanaged to unreasonable degrees and being told I'd be entered into Blue-Team multiple times for some specific incidents without said incidents either being properly investigated before they become "open numbers", or those incidents being ones where if another Officer were to do what I did, it would result in no action or a lesser punishment than what I am normally subjected to. I am being unfairly treated in this environment due to the perception of my character that has been cemented into the images of me in the eyes of the command staff, supervision, and some of the Officers, and at this point, I believe that image of my character and personality and the type of Police Officer I am is irredeemably beyond repair in the SD District, this irredeemable image now resulting in an unfair administrative suspension ordered by my Major. Being assigned to SSS - Adult/Juvenile Booking would return me to a positive working environment where I was effective in my role when previously assigned in the past with no fear of issues with my environment, and I did not have any issues working there at all with anyone. I worked free of scrutiny and was not subjected to unfair/unnecessary/unfavorable treatment by the supervision.

1:26 - CV - 01682 - MJM

Respectfully Submitted,

P/O Thomas, Jordan K576

Respond on Reverse Side ☐      Page 1 of 1

**FORM 70**

# REQUEST FOR TRANSFER

THIS FORM IS USED TO REQUEST A TRANSFER.

SUBMIT TO: TRANSFERSREQUEST@BALTIMOREPOLICE.ORG.



**Members seeking a district to district transfer need to complete the entire form. Members seeking posted positions only need to complete the Requestor Information section.**

## REQUESTOR INFORMATION

| | | | |
|---|---|---|---|
| Name: | Thomas, Jordan | Reclassification Date (if PO): | 06/21/2022 |
| Rank/Title: | Police Officer | Promotion Date (if SGT/LT): | |
| Current Assignment | SD District C/B Patrol | Assignment Requested:<br>Special Services Section - Adult/Juvenile Booking and Court Liaison Unit | |
| Seq. No. | K576 | | |
| Phone: | (718)-781-9852 | | |
| EOD: | 08/10/2020 | | |

Requestor Signature        Date **03/11/2026**

**RECLASSIFICATION OR PROMOTION DATE ABOVE ARE REQUIRED IN ORDER FOR THIS FORM TO BE VALID.**

**INCOMPLETE INFORMATION WILL INVALIDATE THIS SUBMISSION.**

## DISTRICT TO DISTRICT TRANSFER

**Current Assignment**

| District | Recommendation:<br>Approved ☐ Disapproved ☐ | Commander Rank/Name | | Date: | | Initials: | |
|---|---|---|---|---|---|---|---|

**Prospective Assignment**

| District | Recommendation:<br>Approved ☐ Disapproved ☐ | Commander Rank/Name | | Date: | | Initials: | |
|---|---|---|---|---|---|---|---|

**Human Resources**

| Director | Transfer Packet Received? | YES ☐ | NO ☐ | Date: | | Initials: | |
|---|---|---|---|---|---|---|---|

**FORM 70 – Rev. 07/2025**

 Outlook

---

**RE: K576 Transfer request form and 95 form**

---

**From** Cox, Jennifer (BPD) <Jennifer.Cox@baltimorepolice.org>
**Date** Wed 3/11/2026 3:55 PM
**To**   Jordan Thomas <Jordan.Thomas@baltimorepolice.org>

No problem at all. HR would be the unit to retain that information. Adult and Juvenile booking is separate from court liaison unit but they are posted positions unless you are transferred to adult/juvenile booking under special circumstances which would have to be approved up the chain of command from all the different bureaus involved. Adult and juvenile bookings is no longer under the patrol division.

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Wednesday, March 11, 2026 1:41 PM
**To:** Cox, Jennifer (BPD) <Jennifer.Cox@baltimorepolice.org>
**Subject:** Re: K576 Transfer request form and 95 form

Good afternoon,

The new formatted 70 form on Forms and Reports does not have the Sergeant, Lieutenant, Captain, and Major signature boxes anymore, so because of that I didn't know that they still needed to be involved. So, would that mean I would just give my 70 form to my direct Sergeant and start form there?

And moving forward so I don't contact the wrong entities, which unit handles transfers? I thought the COP's Office did, I apologize for any confusion.

---

**From:** Cox, Jennifer (BPD) <Jennifer.Cox@baltimorepolice.org>
**Sent:** Wednesday, March 11, 2026 1:30 PM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>; TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Subject:** RE: K576 Transfer request form and 95 form

Good afternoon Officer Thomas,

The COP office does not handle transfers. If the unit is a posted position, you can't put in for that unit. This request has to be initially approved through your chain of command, considering this request is involving a different bureau.

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Wednesday, March 11, 2026 10:41 AM
**To:** TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Subject:** Re: K576 Transfer request form and 95 form

Good morning,

This would be considered a transfer from patrol (admin suspended status) to a unit (SSS - Adult/Juvenile Booking) that currently does not have a posting. Following our brief phone conversation after your last email where I asked for clarity and then where you were unclear as to how to handle a situation like this, I will be CC'ing the Chief of Patrol Office's general email address provided. Thank you again!

---

**From:** TransfersRequest <TransfersRequest@baltimorepolice.org>
**Sent:** Wednesday, March 11, 2026 10:25 AM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>; TransfersRequest <TransfersRequest@baltimorepolice.org>
**Cc:** info@fop3.org <info@fop3.org>; Glazerman, Jonathan (BPD) <Jonathan.Glazerman@BaltimorePolice.org>; Officer Safety and Wellness (BPD) <OSW@baltimorepolice.org>
**Subject:** RE: K576 Transfer request form and 95 form

Greetings, Could you advise on the type of transfer being requested? At this time, I currently don't have a posting for that unit. Thank you !


**Ke'Asia Harris**
Human Resources Generalist II
Baltimore Police Department, HR Section
601 E Fayette Street, Baltimore, MD 21202
keasia.harris@baltimorepolice.org
Cell: 443.500.1725 Office: 443.984.9918
Telework days: Tuesday
In office days: Mon/Wed- Fri
General Work hours: 8:30 a/m- 4:30p/m daily (M-F)
Mailing Address- 242 W. 29th Street, Baltimore, MD 21211

Please take a moment to provide feedback on the service you received:
https://www.surveymonkey.com/r/BPDHRSSurvey


 


**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Wednesday, March 11, 2026 10:18 AM
**To:** TransfersRequest <TransfersRequest@baltimorepolice.org>
**Cc:** info@fop3.org; Glazerman, Jonathan (BPD) <Jonathan.Glazerman@BaltimorePolice.org>; Officer Safety and Wellness (BPD) <OSW@baltimorepolice.org>
**Subject:** K576 Transfer request form and 95 form

Good morning,

Please see attached for paperwork requesting a Transfer. The paperwork is timestamped.

**Respectfully Submitted,**
**P/O Thomas, Jordan K576**
**Southern District Patrol C/B Patrol Rotate**
**(718)-781-9852 (Mobile)**
**(410)-396-2499 (District)**
**Jordan.Thomas@Baltimorepolice.org**



Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 18 March 2026

**ASSIGNMENT: Southern District**

**TO:**       **Major H. Middleton**

**VIA:**       Official Channels

**FROM:**      P/O Thomas, Jordan K576

**SUBJECT:**   Suspension reason and suspension entity discrepancy

Ma'am,

I respectfully report that on March 17th, 2026, I emailed PID Admin Sgt. K. Bryant asking for clarity on why I was suspended. The nature of the email was that my District's union represtentaive, Det. W. Holleman, called me on the 16th and advised me that he had a conversation with our Major, in which she told him that I was not suspended by her or a Colonel like I was lead to believe, but that I was suspended by PID. This statement conflicts the conversation that I had with the Major regarding my suspension on Feburary 27th, which I documented on a form 95. The Major told me I was suspended for some incidents that she brought up that in her opinion demonstrated a need for me to be "sat down", indicating that the suspension was ordered/requested by this unknown Colonel by her based on the incidents she told me about . It also conflicts what Sgt. McHenry, the supervisor who did the suspension, told me. He told me that he received a phone call from the Major stating she "got permission" from an unknown "Colonel" for me to be suspended, with no mention of PID. When I sent Sgt. Bryant the email that I mentioned, she responded that PID only handles disciplinary suspensions, not administrative ones like my paperwork says, basically saying that PID did not suspend me. I and Det. Holleman now believe that the Major is not being entirely truthful about the reasons why I am suspended and the actual entity that suspended me, and I am unsure why. This only further increases my claim that this suspension is unfair and not necessary, and retaliatory for sending my clarifying email, mentioned in another 95 I documented. Det. Holleman also told me that the Major mentioned to him, that the email did plaay a role in the suspension. The email chain with Sgt. Bryant will be attached to this 95.

Respectfully Submitted

P/O Thomas, Jordan K576

1:26- CV- 01682 - MJM

 Outlook

## Re: Suspension and conditions clarification needed

**From** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>

**Date** Wed 3/18/2026 10:31 AM

**To**    Bryant, Kianah (BPD) <Kianah.Bryant@BaltimorePolice.org>; Jones, Deandrea T. (BPD) <Deandrea.Jones@BaltimorePolice.org>

So my union rep here in the Southern District told me that he spoke with my Major, and he was told that the suspension was in fact ordered by PID. I am definitely not under ADD as it's not medical. My paperwork specifically says administrative, but then like I said my union rep said that the Major said it was ordered by PID. I know PID only deals with disciplinary suspensions, so that's why it was actually more confusing when the union rep said he was told PID ordered the suspension. It's also why I forwarded this email to Sgt. D Jones as I called PID yesterday and I was told that she would be the "only one" who would be able to tell me.

I'm sorry to bring you into this mater any further than I already have, but is there any way you could find out any more clarity based on what was told to my union rep? I'd greatly appreciate any help I can get.

**From:** Bryant, Kianah (BPD) <Kianah.Bryant@BaltimorePolice.org>
**Sent:** Wednesday, March 18, 2026 10:23 AM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Cc:** adavey@sbwdlaw.com <adavey@sbwdlaw.com>
**Subject:** Re: Suspension and conditions clarification needed

Good Morning Officer Thomas,
I would suggest that you check with ADD or your command for clarification if you were advised that your suspension is administrative. PID only handles disciplinary suspensions.

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Tuesday, March 17, 2026 7:21 AM
**To:** Bryant, Kianah (BPD) <Kianah.Bryant@BaltimorePolice.org>
**Cc:** adavey@sbwdlaw.com <adavey@sbwdlaw.com>
**Subject:** Suspension and conditions clarification needed

Good morning Sgt. Bryant,

As you may know, as of February 27th, 2026, I have been administratively suspended once again. I have recently received information that this was a PID decision. I would like to know a clear, concise, or otherwise the "official" reason as to what the suspension was for, as on the day I was suspended, I was not given any clarity as for why. All I was told by the suspending Supervisor was that he "got a phone call from the Major". I had a unofficial/informal conversation with my Major where she gave me some insight from her opinion, but I do not have an official, formal reason as to what exactly/specifically warranted the suspension, or it's conditions, or when I am to be reinstated.

I would like to know if a suspension hearing is on the way, and if one is not being planned, I would like to request one.

Respectfully Submitted,
P/O Thomas, Jordan K576
Southern District Patrol C/B Patrol Rotate
(410)-261-0988 (Mobile)
(410)-396-2499 (District)
Jordan.Thomas@Baltimorepolice.org



*Thomas V. Baltimore Police Department*

*Signed: Jordan Thomas*

**1:26 - CV - 01682 - MJM**

📷 Outlook

## Fw: Phase III Intervention (PO Jordan Thomas) [In-person]

| | |
|---|---|
| **Organizer** | Hyman, LaWang (BPD) <LaWang.Hyman2@baltimorepolice.org> |
| **Meeting time** | This event occurred 1 month ago (Fri 4/3/2026 11:30 AM - 12:30 PM) |
| **Location** | 2901 Druid Park Dr. Suite A210 Baltimore, MD 21215 |
| **My response** | Not yet responded |
| **Required attendees** | Hyman, LaWang (BPD), Moore, Jordan (BPD), Jordan, Joshua (BPD), Edmondson, Gary (BPD), Middleton, Henrietta (BPD), Austin, Bryant (BPD), Sullivan, Charles K. (BPD), Herron, Vernon (BPD) |
| **Optional attendees** | McCray, Ellesse (BPD), Hossein, Katherine (BPD), Thadius McMillian, Jordan Thomas |
| **Message sent** | Thu 4/2/2026 8:15 PM |

**From:** Hyman, LaWang (BPD) <LaWang.Hyman2@baltimorepolice.org>
**Sent:** Monday, March 30, 2026 9:22 AM
**To:** Moore, Jordan (BPD) <Jordan.Moore@BaltimorePolice.org>; Jordan, Joshua (BPD) <Joshua.Jordan@BaltimorePolice.org>; Edmondson, Gary (BPD) <Gary.Edmondson@BaltimorePolice.org>; Middleton, Henrietta (BPD) <Henrietta.Middleton@BaltimorePolice.org>; Austin, Bryant (BPD) <Bryant.Austin@BaltimorePolice.org>; Sullivan, Charles K. (BPD) <Charles.Sullivan@BaltimorePolice.org>; Herron, Vernon (BPD) <Vernon.Herron@baltimorepolice.org>
**Cc:** McCray, Ellesse (BPD) <Ellesse.McCray@BaltimorePolice.org>; Hossein, Katherine (BPD) <Katherine.Hossein@baltimorepolice.org>; Thadius McMillian <Thadius.McMillian2@baltimorepolice.org>
**Subject:** Phase III Intervention (PO Jordan Thomas) [In-person]
**When:** Friday, April 3, 2026 11:30 AM-12:30 PM.
**Where:** 2901 Druid Park Dr. Suite A210 Baltimore, MD 21215

*The Early Intervention Unit (EIU) looks forward to meeting with PO Jordan Thomas and his command on Friday, April 3, 2026 at 1130 hrs. During this meeting EIU-staff will be conducting a Phase III Intervention with PO Jordan Thomas in reference to an Early Intervention Notification that was forwarded to Sgt. Jordan Moore via Benchmark/email. Please take a moment to review the notification along with policy 1707.*

During this meeting, I was involuntarily subjected to undergo a Performance Improvement Plan, despite not thinking one was necessary. As of 5/10/26, 2 months after this meeting, I have no communication regarding this PIP's contents and have been told It would be "reviewed" with me, and I questioned it multiple times, with no. Answers given.

Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 17 April 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**       **Major H. Middleton**

**VIA:**      Official Channels

**FROM:**    P/O Thomas, Jordan K576

**SUBJECT:**  Reporting workplace harassment

Ma'am,

I respectfully report that on April 12th, 2026, at approximately 1730 hours, I was working the front desk position at the Southern District, 9C99 alongside a co-worker who was also on the front desk with me (9C99X), Officer M. Smith. While working, Sgt. T. Copeland came to the front desk with a rundown to give me and Officer Smith. A rundown is a document printed daily per shift which is created by supervisors and given to the front desk Officer(s) which displays which Officers are working on that particular day, what area they are working, and what car they are driving. Typically in the Southern District, one responsibility of the front desk Officer(s) is to receive an incomplete rundown from the supervisor at the beginning of the shift, and find out which Officer is driving what vehicle and to write it on the rundown, and then to give it back to the supervisors. The supervisor then types the car numbers onto the rundown via a computer and sends the completed rundown to the Communications Section. The completed rundown is then given back to the front desk Officer. The rundown that was presented to myself and Officer Smith by Sgt. Copeland had a modification on it, separate from what I wrote on it (I was the one who got the vehicle numbers on this day and wrote them down). Specifically, the final rundown was given back to me with the car numbers I hand-wrote down fully typed out, but at the bottom of the rundown, which is where the front desk Officers are listed, showed "Chair 1" in place of where a car number for me would be if I was working a full-duty area/position. Obviously, being an administratively suspended Police Officer means I am the front desk Officer until that suspension is lifted, which means I do not drive a police car. So this "Chair 1" modification to the rundown, basically stating that my "vehicle" for the day was a chair at the front desk by a supervisor who knows my suspension situation, and is partially involved, was an extremely distasteful insult to me. This insult was further amplified by the fact the the Sgt. Copeland actually handed me the rundown specifically (despite the fact Officer Smith was next to me at the time) and told "me" to "look at it because something was changed", standing there mockingly waiting for me to find the "Chair 1" on the rundown next to my name.

1:26- CV- 01682- MJM

When I saw it, I acknowledged it, and Sgt. Copeland began to laugh out loud mockingly. I met the Sgt. Copeland's laughter with "compliance laughter" of my own even though I was offended by this insult on the rundown in order to maintain my composure as well as to refrain from exhibiting my true thoughts about the insult to again, avoid further adding on to the hostile workplace I am currently in. Sgt. Copeland continued to laugh and then made a comment about how he used "add small things like that to rundowns to fuck with people" (referring to suspended personnel) but mentioned how he was disciplined for it before at some unknown time and "stopped". I find this rundown insult to be extremely insensitive to my suspension situation, again as Sgt. Copeland is aware of it and partially involved. It demonstrates the hostile and stressful work environment I am currently in that I have spoken about before in the past involving members of this District, and it only makes me want to be re-assigned to the Adult/Juvenile Booking Section (a unit I have been assigned to before and have been asking my command to be re-assigned to) even more. Adult/Juvenile Booking was one environment in the agency where I was able to work stress-free and the environment was free of hostility. This is not the first time I have asked to be re-assigned there either, as I have placed a transfer from the Southern District to Juvenile Booking via Official Channels on March 11th, 2026 and CC'd the FOP, and the Health and Wellness Section on that email. Neither the FOP or the Health and Wellness Section acknowledged. I have advised my Major of the Southern District that I am having issues with members of the District (including supervision) before and have also brought to her attention my desire to go back to Juvenile Booking, both of which she dismissed. I am aware that a member of the Juvenile Booking Section has recently retired, and she was on the midnight shift, meaning that unit may be expecting a vacancy soon. I am requesting once again to be assigned to Adult/Juvenile Booking, and on the midnight shift now. I am experiencing more and more stress and being subjected now to direct disrespectful humor on an official agency document at my expense for being suspended and unable to do the full functions of a Police Officer, which is something that my supervision, including the offending supervisor, are aware of how poorly that affects me. To Whomever this 95 form reaches, I am pleading for assistance in this ongoing matter regarding my workplace hostility that I have brought up before and not being helped, and for me to be re-assigned to Adult/Juvenile Booking's midnight shift following the retired Officer's departure so I can be away from this hostile workplace.

Respectfully Submitted,

P/O Thomas, Jordan K576

## SOUTHERN DISTRICT RUNDOWN

| DATE | | 4/12/2026 | | SHIFT | Charlie | AUTHOR | 0 | Overtime | | 0 |
|---|---|---|---|---|---|---|---|---|---|---|
| SHIFT CONSTANT | | 17 | | SHIFT STRENGTH | 18 | Drafts | 0 | Overtime | | 0 |
| Officers | 18 | Lts | 1 | Sgts | 3 | OIC | 0 | Wagon | | 1 |
| Leave | | Medical | | Light Duty | 0 | David Cars | 3 | Discretion | | 3 |

| Unit # | Shop # | Rank | Seq # | Name | OT Start | OT End | Status/Draft Order | Notes |
|---|---|---|---|---|---|---|---|---|
| **SHIFT SUPERVISORS** | | | | | | | | |
| 9C09 | | LT | J396 | JORDAN, JOSHUA | | | | |
| 9C10 | 9599 | SGT | J114 | MCHENRY, JORDAN | | | | |
| 9C20 | | SGT | I496 | MOORE, JORDAN | | | | |
| 9D30 | 8811 | SGT | H908 | COPELAND, TIMOTHY | | | | |
| **SECTOR 1** | | | | | | | | |
| 9C11 | | | | | | | | |
| 9C12 | | | | | | | | |
| 9C13 | 9409 | OFC | K814 | MEZQUITA, SELENA | | | | Trainee Gleason (L-301) |
| 9C14 | 8786 | OFC | K856 | ROBINSON, COREY | | | | Trainee Ward (L338) |
| 9C15 | 9402 | OFC | J068 | OWENS, DOMINIQUE | | | | Trainee Simpkins (L-358) |
| 9C16 | 9866 | OFC | K819 | SAHEIM-LOPEZ, AMAAD | | | | |
| 9C17 | 8800 | OFC | K889 | BAH, ALPHA | | | | |
| 9C18 | 9655 | OFC | K725 | CORBIN, KEITH | | | | |
| 9C19 | 8945 | OFC | K662 | JACKSON, ISAIAH | | | Volunteer | |
| **SECTOR 2** | | | | | | | | |
| 9C21 | 8822 | OFC | G299 | JAMES, RODNEY | | | | |
| 9C22 | 8850 | OFC | L085 | WEST, CHARMIAN | | | | |
| 9C23 | 8785 | OFC | K664 | STURLA, NICOLAS | | | | |
| 9C24 | 8872 | OFC | K570 | YUKNALIS, WILLIAM | | | Volunteer | |
| 9C25 | | OFC | L231 | GANNON, MICHAEL | | | Volunteer | |
| 8C26 | 9233 | OFC | J247 | OHIN, STEPHANE | | | | |
| 9C27 | 9418 | OFC | K888 | CARDOSO, ELEAZAR | | | | Trainee Marmolejos (L-020) |
| 9C28 | 9241 | OFC | L033 | VASQUEZ, GILSA | | | Volunteer | |
| 9C29 | | | | | | | | |
| **DAVID SHIFT** (select from Unit# dropdown) | | | | | | | | |
| 9D31 | | | | | | | | |
| 9D32 | | | | | | | | |
| 9D33 | 9420 | OFC | I888 | HOOPER, JEFFREY | | | | traffic sector 1 |
| 9D34 | | | | | | | | |
| 9D35 | 9724 | OFC | K054 | AUSTIN, TROY | | | | cherryhill |
| 9D39 | 9241 | OFC | J954 | ZAZA, ZAEBELE | | | | traffic sector 2 |
| **WAGON** | | | | | | | | |
| 9C91 | 9280 | OFC | H173 | MCLEOD, RAFAEL | | | Volunteer | |
| 9C92 | | | | | | | | |
| **DISCRETIONARY UNITS** | | | | | | | | |
| SD10 | | | | | | | | Extra Supervisor |
| SD1 | | OFC | H844 | HOOD, ARTHUR | | | Volunteer | Hanover and Patapsco |
| SD2 | 9148 | OFC | L173 | KEYS, ARMANI | | | Volunteer | Curtis Bay |
| SD3 | | OFC | K982 | BIRCH, CHRISTOPHER | | | Volunteer | |
| SD4 | | | | | | | | |
| SD5 | | | | | | | | Squegee |
| SD6 | | | | | | | | |
| **FRONT DESK** | | | | | | | | |
| 9C99 | Chair 1 | OFC | K576 | THOMAS, JORDAN | | | | |
| 9C99x | Chair 2 | OFC | K097 | SMITH, MYRELL | | | | |
| **ADDITIONAL NOTES** | | | | | Version: 1.2 / Last Updated: 01-01-25 / Unlock Password: sd | | | |
| **ACTIVE AFTER ACTIONS** | | | | | | | | |

**Rundown: 4-12-2026**   **Prepared by:** Zachary Novak   **Created:** 4/12/2026 5:20 PM

Thomas v. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 18 April 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**       **Major H. Middleton**

**VIA:**       Official Channels

**FROM:**    P/O Thomas, Jordan K576

**SUBJECT:**   Reporting workplace harassment

Ma'am,

I respectfully report that on April 18th, 2026, at approximately 2000 hours, KGA raised me via the radio while working the front desk position while administratively suspended. KGA asked me to conduct a callback to handle a call for service in reference to a wire fraud in which the victim gave what was described as a "Navy Credit Union imposter" her money under false pretense. When I asked KGA how much money was involved, she advised she did not know and provided me with the victim's callback number so I could find out the amount. This was when I made contact with the victim, and she advised me that the exact amount stolen was $2,226.00 USD. I then advised her I would send an Officer to her location, as it is common practice that suspended personnel, or ANY personnel for that matter, cannot handle felonious incidents over the phone. In this case, being that the victim was the victim of a wire fraud in which the amount of currency taken was over $1,500.00 USD (a felony amount of currency in the state of MD), I determined I would not be able to handle the incident over the phone, much less with my police powers suspended. Upon doing this, Sgt. T. Copeland got on the radio and unprofessionally stated something along the lines of "You know you are at the desk and not at TRU, right?", referring to the fact that I am not assigned to the telephone reporting unit of the BPD and I do not fall under their policy (Policy 506). This comment was supposed to indicate to me that since I am not in TRU, that I would be able to handle the call for service. It is important to note that TRU is composed mostly of suspended BPD personnel, such as myself. However, it has been common practice in the department for as long as I could remember, that suspended personnel working a District front desk, full duty personnel working a District front desk, and members of TRU are not able to handle felony incidents over the phone regardless of whether the felony is violent or not. I then responded to Sgt. Copeland on the radio and advised him something along the lines of "As far as I am aware I cannot handle calls like that over the phone". Sgt. Copeland then responded on the radio stating in an annoyed tone something along the lines of "If you really don't want to do the call, I can send one of my guys (referring to an Officer on his shift) to deal with it". Lt. J. Jordan then gets on the radio and asks KGA what type of call she was trying to

1: 26- CV- 01682 - MJM

dispatch to me to which she reiterated to him the nature of the call, and she mentioned to him that I spoke to the victim over the phone and that I was advised by the victim that the amount of money exceeded $1,500.00 USD. Lt. Jordan then advises "okay, yeah he can handle that" referring to me. I then responded on the radio that I would call the victim back to handle the call per the order. When I called the victim back however, she advised me that she really wanted an Officer to respond in person and began to cry over the phone stating she doesn't know what to do, was moving within the next day, and persisted in an Officer responding to the location. I then told her once again that I would have an Officer respond to her location, however this time because she wanted an Officer to respond in person. I relayed this information to KGA on the radio, hesitantly stating that "I know how this is going to sound-", and " I am not making excuses, this is simply what the victim said to me" while explaining what the victim wanted. After this, there was no response from Sgt. Copeland or Lt. Jordan and an Officer ended up going to the call in person. In between being ordered to take the call, and actually calling the victim back the second time, and after speaking with the victim the second time, I reviewed my PowerDMS (software used by the BPD for Officers to access law and department policy at any time) to make sure I was not mistaken in my actions regarding this incident. I was unable to find any information, to include policy or memorandums, that allowed members to be able to handle a call of felonious nature over the phone, whether suspended or full-duty status, or whether they are in TRU or not. I also was unable to locate any information as far as the responsibilities of District front desk Officers. This is why it has always been common practice for as long as I have worked District front desk positions while suspended and while full-duty, in this District and in other Districts ever since at least 2023 as that is as far back as I can remember. Because there are no policies that explicitly clarify whether this incident would have been able to be handled by me on this day anyways, and I was ordered to handle the call even though I have had to send calls back from KGA of similar natures in the past in my current District, I believe that the decision made initially starting with Sgt. Copeland's comment on the radio was harassing in nature. Especially since his initial comment was not even an order, but rather what I believe was a "jab" at my intelligence, as he stated "You know you are on the desk, and not at TRU, right?" when he could have simply ordered me to take the call or called me via my cellphone in order to explain to me that I can take the call, especially since again, our PowerDMS was unclear as to helping me find an answer for this. Even so, I do not believe it would have mattered because overall I do not believe I would be able to handle that call over the phone anyways do to its felonious nature, coupled with the fact that I am administratively suspended, which per policy 304 (suspension procedures) of the BPD, means I am unable to take police/enforcement action of any kind. Which technically means that I should not be handling any calls for service at all, but this is in of itself just another thing that our policies do not specify. I found Sgt. Copeland's commentaries, and the decision made for me to handle the felony call for service over the phone while on administrative suspension was wrong and done for the purpose to harass me and intentionally make me feel uncomfortable, and to give me this sense from the supervisors that they can tell me to do whatever they want me to do even though there are no policies to explicitly make their orders clear as correct, and because of the common practices I mentioned which conflict with their orders, creating a hostile work environment. I was not approached or "corrected" about this incident by any supervisor following it, further implying that there was no correction that needed to be made or would be possible to have been made due to the lack of clear policy/memorandums that exist. This is not the first time I have complained about my work environment or its supervisors.

Respectfully Submitted,

P/O Thomas, Jordan K576

# Policy 304



| Subject | |
|---|---|
| **SUSPENSION PROCEDURES** | |

| Date Published | Page |
|---|---|
| **1 May 2017**<br>**AMENDED: 26 February 2025** | **1 of 9** |

## By Order of the Police Commissioner

## POLICY

**Maintain the Highest Standards.** It is the policy of the Baltimore Police Department (BPD) to ensure that members maintain the highest level of physical, emotional, and ethical readiness to perform their duties.

## DEFINITIONS

**Disciplinary Suspension** – The temporary removal of a member from duty, without pay, as a final disciplinary action.

**Emergency Suspension** – The temporary removal of a member's law enforcement authority in connection with an allegation of misconduct or the investigation of an incident that may lead to an allegation of misconduct. This action is taken when it is believed to be in the best interest of the public and the BPD.

**Medical and/or Administrative Suspension** – The temporary removal of a member's law enforcement authority for medical or other reasons (e.g., failure to meet annual Maryland Police Training and Standards Commission requirements) not related to a disciplinary investigation.

**Medical Review Officer (MRO)** – The Director of the Public Safety Infirmary (PSI) for the BPD charged with evaluating any member who has been referred by the Director, Human Resources Section (HRS) for an evaluation, and whose police powers have been suspended for any medical reason in order to determine the continuation of any related suspension already in place.

**Suspension Hearing** – An administrative hearing conducted to review the facts and circumstances leading to a member's Emergency Suspension. This hearing is conducted by a member of the command staff appointed by the Police Commissioner.

## GENERAL

All permanent-rank sergeants and above are authorized to:

1.      Consistent with this policy, suspend police powers of any member when the member is alleged to have engaged in serious or criminal misconduct.

2.      Suspend the police powers of any member he or she reasonably believes has a medical or psychological condition that might be preventing the member from performing their job

functions in a safe and effective manner, or that the medical or psychological condition could pose a direct threat to the member's safety or the safety of others.

3. Suspend police powers of any member for administrative reasons when the member has failed to maintain proper certifications, training requirements or other non-disciplinary reasons.

4. Suspend the police powers of members due to administrative matters wherein the suspension of police powers is in the best interest of the BPD and/or the member.

## Suspension for Misconduct or Criminal Activity "Emergency Suspension"

### Permanent-rank Supervisor

1. Upon determining that a suspension is warranted based upon the criteria above, immediately:

   1.1. Contact OPR and request to transport the member to OPR, or have the OPR Duty Supervisor respond to initiate the formal suspension procedure.

   1.2. The suspending supervisor shall initiate a Blue Team entry detailing the circumstances which resulted in the suspension.

### Office of Professional Responsibility (OPR)

1. Suspend the law enforcement authority of any sworn member and/or suspend from duty any member whose alleged actions are of such a serious nature that suspension appears to be in the best interest of the public and the BPD. Examples of reasons to suspend a member include, but ARE NOT limited to:

   1.1. Violations of criminal law;

   1.2. Serious traffic violations;

   1.3. A respondent in a protective order;

   1.4. Serious allegations of excessive force;

   1.5. Under the influence of alcohol or other substance while on-duty;

   1.6. Other disciplinary matters that may result in termination of employment; and

   1.7. When the Disciplinary Review Committee or Administrative Hearing Board has recommended the termination of the member's employment.

2. Complete and issue Form 154, Suspension of Police Powers (See Appendix A), to the suspended member.

3. Complete a Duty Status Change Form, 344 (See Appendix B), and forward it to HRS at: Dutystatuschange@BaltimorePolice.org.

| **Policy 304** | **SUSPENSION PROCEDURES** | **Page 3 of 9** |

4.    Collect the following items from the suspended member:

    4.1.    Departmentally-issued firearm(s), ammunition, magazines, accessories (e.g., issued weapon-mounted flashlights, etc.);

    4.2.    Badge;

    4.3.    Departmental identification card(s);

    4.4.    Maryland Police Training and Standards Commission (MPTSC) Certification Card;

    4.5.    ~~Issued body armor;[1]~~

    4.6.    Body Worn Camera (BWC), if applicable;

    4.7.    Conducted Electrical Weapon (CEW) and all cartridges, if applicable; and

    4.8.    Portable radio, if applicable.

5.    If the suspended member has been issued a departmental electronic device (mobile phone), make a determination as to whether or not it best suits the interests of the Department to take custody of the device or allow the member to retain it.

6.    By the next business day, ensure that the items of police equipment and apparel listed above in items 4.1. – 4.7., inclusive, are secured in the Armory Unit, located in the Baltimore Police Department's Headquarters Building.

**NOTE:**    If the Armory Unit is closed, these items shall instead be retained in a secure location at either OPR or the suspending entity's command until the Armory Unit reopens.

7.    Submit all original reporting to the Chief, OPR.

8.    Forward a copy of all reporting to the affected member's commanding officer.

Suspended Member

1.    Immediately relinquish the above items to the designated permanent-rank supervisor or member of OPR.

2.    If directed to do so, relinquish any departmentally-issued electronic device.

3.    When subject to Emergency Suspension or Medical/Administrative Suspension:

    3.1.    Do not take any police/enforcement action. If you encounter any conditions that require police action, immediately notify the appropriate on-duty law enforcement authority.

    3.2.    Do not carry any departmentally-issued firearm.

---

[1] Policy directive 4.5. amended by PCM 25-03 Soft Body Armor (Vest) Directives for Members Not on Full-Duty Status dated 26 February 2025. Please refer to PCM 25-03 for additional guidance.

3.3.    Do not enter a police facility with any firearm.

3.4.    Adhere to all policies and procedures of the Baltimore Police Department, with the exception of those pertaining to police powers and the authority to carry a firearm.

3.5.    Report to your commanding officer.

4.    Obtain an Employee Identification "A" Card from the Identification Card Office. Wear/carry this temporary identification card until the Suspension from Duty has been resolved.

5.    Respond to your suspension hearing when/if ordered to do so.

Commanding Officer, Suspended Member's Assignment

1.    Upon learning of circumstances which may warrant the imposition of an Emergency Suspension, immediately notify OPR.

2.    Ensure the suspended member is escorted to the Identification Card Office as soon as practical so that the member may be issued an Employee Identification "A" Card.

Office of Administrative Hearings

1.    Convene the necessary Suspension Hearing when notified by OPR.

2.    Based on the outcome of the Suspension Hearing, document if a suspension will be continued, and if it is to continue, whether it will be with or without full pay and benefits.

3.    At the conclusion of the Suspension Hearing, forward copies of all necessary records and reports to the Director, HRS, so that the appropriate Human Resource Order(s) may be prepared.

## Suspension of Police Powers for Medical/Administrative Reasons

Permanent-rank Supervisor – Suspended Member's Assignment

1.    Upon determining that a Medical/Administrative Suspension is warranted immediately:

1.1.    Advise the member that their police powers are being suspended;

1.2.    Complete an Administrative Report, Form 95, detailing the circumstances which resulted in the suspension, and complete and issue Form 154, Suspension of Police Powers (See Appendix A), to the suspended member;

1.3.    Complete a Duty Status Change Form, 344 (See Appendix B); and forward it to HRS at: Dutystatuschange@BaltimorePolice.org;

1.4.    Forward a copy of the Administrative Report and Suspension of Police Powers to HRS and the member's commanding officer; and

1.5.    Follow procedures of Policy 1733, *Fitness for Duty Evaluations.*

### Medical Review Officer (MRO), Public Safety Infirmary

Evaluate members referred for fitness for duty evaluations by the Director, HRS, pursuant to Policy 1733, *Fitness for Duty Evaluations.* If necessary, refer members to the designated psychological services provider for further evaluation or counseling.

### **Disciplinary Suspension**

### Permanent-rank Supervisor

1.    Upon determining that a Disciplinary Suspension is warranted based on a final disciplinary finding, immediately:

    1.1.    Advise the member that their police powers are being suspended;

    1.2.    The suspending supervisor shall complete an Administrative Report, Form 95, detailing the circumstances which resulted in the suspension, and complete and issue Form 154, Suspension of Police Powers (See Appendix A), to the suspended member.

    1.3.    Complete a Duty Status Change Form, 344 (See Appendix B), and forward it to HRS at: Dutystatuschange@BaltimorePolice.org.

    1.4.    Forward a copy of the Administrative Report and Suspension of Police Powers to the member's commanding officer.

**NOTE:**    This section only applies if a member is not already suspended for misconduct in an "Emergency Suspension" status.

### Commanding Officer, Suspended Member's Assignment

1.    Upon receipt of an order to take disciplinary action involving a member of your command, ensure discipline is enacted expeditiously and/or in coordination with deadlines from the Office of Administrative Hearings.

2.    Track the discipline and provide reporting to the Office of Administrative Hearings as soon as completed.

### Office of Administrative Hearings

Upon receipt of an order to take disciplinary action, notify the member's command and set reasonable deadlines for completion.

### **Restoration of Police Powers — Administrative Suspensions**

1.    Members subject to Administrative Suspension (e.g., failure to qualify with a handgun or failure to maintain MPTSC certification, etc.) may have their police powers and duty status restored

by their commanding officer after the conditions that caused the suspension have been resolved.

2.    The restoring entity must complete a Duty Status Change Form, 344 (See Appendix B), and forward it to HRS at: Dutystatuschange@BaltimorePolice.org.

## Restoration of Police Powers — Medical Suspensions

1.    Members subject to Medical Suspension may have their police powers and duty status restored by their commanding officer after the fitness for duty evaluation procedures have been completed, pursuant to Policy 1733, *Fitness for Duty Evaluations*.

2.    The restoring entity must complete a Duty Status Change Form, 344 (See Appendix B), and forward it to HRS at: Dutystatuschange@BaltimorePolice.org.

## Restoration of Police Powers — Emergency Suspensions

1.    Members subject to Emergency Suspension may only have their police powers reinstated by OPR.

2.    OPR must complete a Duty Status Change Form, 344 (See Appendix B), and forward it to HRS at: Dutystatuschange@BaltimorePolice.org.

## Restoration of Police Powers — Disciplinary Suspensions

1.    Members subject to Disciplinary Suspension (the temporary removal of a member from duty, without pay, as a final disciplinary action) may have their police powers and duty status restored by their commanding officer after the conditions that caused the suspension have been resolved.

**NOTE:** The member's commanding officer can only restore police powers if the member was suspended by the command as part of the final disciplinary action. If the member was suspended in an Emergency Suspension status then only OPR can restore police powers.

2.    The restoring entity must complete a Duty Status Change Form, 344 (See Appendix B) and forward it to HRS at: Dutystatuschange@BaltimorePolice.org.


## ADDITIONAL RESPONSIBILITIES

### Director, Human Resources Section

1.    Receive Duty Status Change, Form 344 and create a Notice of Personnel Action whenever a member is suspended or restored.

2.    Ensure there is an indication as to whether the suspension is to be with or without full pay and benefits.

3.    Notify PTSC of the Notice of Personnel Action.

4.    Ensure compliance with Policy 1733, *Fitness for Duty Evaluations*, for all members whose police powers are suspended for medical reasons.

5.    Maintain a hard copy of the Notice of Personnel Action and the Form 344 in the member's personnel jacket.


**Director, Professional Development and Training Academy**

Ensure that appropriate procedures are in place within the Armory Unit for the receipt and secure storage of the police equipment that will be submitted upon a member's suspension from duty.


## APPENDICES

A.    Suspension of Police Powers, Form 154
B.    Duty Status Change, Form 344


## ASSOCIATED POLICIES

Policy 409,    *Firearms Regulations*
Policy 711,    *Domestic Violence*
Policy 1719,    *Police Officer Certification*
Policy 1733,    *Fitness For Duty Evaluations*
Baltimore City Administrative Manual – "Workplace Violence Policy", Section 227-1


## RESCISSION

Remove from files and destroy/recycle General Order C-4, *Suspension Procedures*, dated 11 July 2011.


## COMMUNICATION OF POLICY

This policy is effective on the date listed herein.  Each employee is responsible for complying with the contents of this policy.

## APPENDIX A

Suspension of Police Powers, Form 154

Suspension of Police Powers
Form 154

**POLICE DEPARTMENT**
**BALTIMORE, MARYLAND**

### SUSPENSION OF POLICE POWERS

**MEMBER TO BE SUSPENDED**

**PERMANENT RANK SUPERVISOR CONDUCTING SUSPENSION**

**ORDER OF SUSPENSION**

**PART 1** — Effective IMMEDIATELY, your authority and police powers as a sworn member of the Baltimore Police Department are **SUSPENDED** due to

Check the appropriate box

☐ .... An allegation of **misconduct or criminal activity**.

☐ .... An **administrative or medical matter** (such as failing to qualify with a firearm, extended illness, etc.).

☐ .... A formal recommendation has been made to the Police Commissioner by a Departmental Disciplinary Hearing Board that your **employment with the Baltimore Police Department be terminated**.

This suspension constitutes a REVOCATION OF YOUR AUTHORITY to exercise the duties and powers of a sworn police officer.

**PART 2** — This suspension shall be _____ ☐ WITH full pay and benefits    ☐ WITHOUT pay and benefits.
*NOTE: A Suspension Without Pay may ONLY occur by direction of the Suspension Hearing Officer and ONLY at the conclusion of a Suspension Hearing.*

**PART 3**

1. You are prohibited from taking any police action.
2. If you encounter circumstances requiring police action, regardless of time or location, you are required to notify the appropriate on-duty law enforcement authorities.
3. You MAY NOT carry any departmental firearm until this Order of Suspension is lifted and your police powers have been restored by your Commanding Officer.
4. If you possess any permit to carry a concealed, privately owned firearm, you MAY NOT carry or transport that firearm into any Departmental facility, building, vehicle, etc.
5. You MUST abide by all remaining General Orders, policies, procedures, and directives of the Baltimore Police Department EXCEPT those governing the exercise of police powers and the ability to carry a firearm.
6. You MUST immediately surrender the following items to the Permanent Rank Supervisor conducting this Suspension: (1) All departmental firearm(s), ammunition, magazines, and firearm accessories, (2) Badge, (3) Departmental ID card, (4) MPCTC certification card, (5) issued body armor, (6) If issued, any Conducted Electrical Weapon, with cartridge(s), (7) BWC if issued, (8) Your police radio, and (9) If directed to do so, any departmental cell phone, smartphone, SidePartner, etc.
7. You MUST report for your next scheduled tour of duty in an administrative capacity, or at a time and place as may be determined by the Permanent Rank Supervisor conducting this Suspension, unless directed to do otherwise by your Commanding Officer. This Order of Suspension DOES NOT, in and of itself, grant or authorize any form of leave.

**SUSPENDED MEMBER'S ACKNOWLEDGMENT**

BY SIGNING BELOW, I CERTIFY THAT I HAVE READ, UNDERSTAND, AND WILL COMPLY WITH THE RESTRICTIONS LISTED IN THE ABOVE ORDER OF SUSPENSION, AND THAT I HAVE RECEIVED A COPY OF THIS ENTIRE DOCUMENT.

## APPENDIX B

Duty Status Change, Form 344

Personnel Duty Status Change
Form 344

**POLICE DEPARTMENT**
**BALTIMORE, MARYLAND**

**TO:** DIRECTOR, HUMAN RESOURCES

**VIA:** OFFICIAL CHANNELS

**FROM:** _____

**MEMBER:** _____

| Last Name | First Name | M | Seq # |

| Rank | Current Assignment | EOD | DOB | Locator # |

| **Date of Incident** | **Date of Initial Suspension** | **Date of Suspension Hearing** |

**EFFECTIVE DATE OF DUTY STATUS CHANGE:** _____

*Check ALL that apply*

| FROM: | TO: |
|---|---|
| ☐ Full Duty | ☐ Full Duty |
| ☐ Limited Duty: With Powers (medical reasons)<br>☐Temporary  ☐ Permanent | ☐ Limited Duty: With Powers (medical reasons)<br>☐Temporary  ☐ Permanent |
| ☐ Limited Duty: Without Powers (medical reasons)<br>☐Temporary  ☐ Permanent | ☐ Limited Duty: Without Powers (medical reasons)<br>☐Temporary  ☐ Permanent |
| ☐ Limited Duty (other): | ☐ Limited Duty (other): |
| ☐ Powers Suspended<br>☐Administrative<br>☐Disciplinary<br>☐Firearms Failure<br>☐Medical<br>  ☐LOD ☐NLOD | ☐ Powers Suspended<br>☐Administrative<br>☐Disciplinary<br>☐Firearms Failure<br>☐Medical<br>  ☐LOD ☐NLOD |
| ☐ Suspended From Duty<br>☐Administrative<br>☐Disciplinary<br>☐Medical<br>  ☐LOD ☐NLOD | ☐ Suspended From Duty<br>☐Administrative<br>☐Disciplinary<br>☐Medical<br>  ☐LOD ☐NLOD |
| ☐ Working    ☐ Not Working | ☐ Working    ☐ Not Working |
| ☐ With Pay   ☐ Without Pay | ☐ With Pay   ☐ Without Pay |
| ☐ Detailed: | ☐ Detailed: |
| ☐ Transferred: | ☐ Transferred: |

Comments:

| Suspending / Restoring Authority Printed Name | Assignment | Signature | Date |
|---|---|---|---|
| | | | |

# Policy 506



| Subject | | |
|---|---|---|
| **TELEPHONE REPORTING UNIT (TRU)** | | |
| Date Published | | Page |
| **12 February 2020**<br>**Amended 18 August 2025** | | **1 of 3** |

## *By Order of the Police Commissioner*

### POLICY

The Baltimore Police Department (BPD) established the Telephone Reporting Unit (TRU) to reduce Patrol response to low-priority calls for service (CFS). This allows patrol officers to respond more expeditiously to higher priority CFS, conduct proactive patrol, engage with citizens, and address community concerns. Based on the TRU investigation, a report may be written or the call may be given an oral code. TRU does not relieve the responsibility of patrol members from conducting necessary investigations.

### GENERAL

1.   TRU will attempt to assist with any call for police service after reviewing the initial intake information from the 911/311 operator.

2.   TRU is responsible for attempting to make contact with all citizens who are waiting for police service longer than twenty-five (25) minutes.

3.   TRU members will be guided by the Standard Operating Procedures established by the Communications Section.

4.   TRU is authorized to investigate the following incidents, but is not limited to:

   4.1.   Auto Accidents (excluding tow, injury, or government vehicle),

   4.2.   Civil Matters,

   4.3.   Destruction of Property,

   4.4.   False Pretense (excluding identity theft),

   4.5.   Follow-up,

   4.6.   Hit and Run (excluding those with identifying striking vehicle info),

   4.7.   Lost Property,

   4.8.   Larceny,

4.9.   Larceny from Auto,

4.10.  Nuisance Complaints (excluding parking complaints involving blocked driveways and handicapped spaces),

4.11.  Out of Jurisdiction,

4.12.  ~~Stolen Auto (excluding when a citation is necessary),~~[1]

4.13.  Unauthorized Use, and

4.14.  911 No Voice (must make contact with complainant with confidence that no emergency exists).

5.     TRU will **NOT** handle any calls meeting the following criteria:

    5.1.   Domestic related,

    5.2.   In-progress (excluding apparently no longer in progress),

    5.3.   Incident just occurred (excluding apparently no longer just occurred),

    5.4.   Suspect is on scene,

    5.5.   Tangible evidence needing collection and/or submission (may collect select evidence digitally), and

    5.6.   Injury or threat present.

    5.7.   Stolen Auto[2]

## REQUIRED ACTION

**TRU Member Responsibilities**

6.     Monitor the pending calls for service using the Computerized Aided Dispatch (CAD) System.

7.     Contact the complainant and explain the purpose for the call.

8.     Determine if a crime or incident has occurred which requires abatement by written report or oral disposition code via TRU.

9.     If a call requires investigation by Patrol, supplement with a reason and pre-empt. Notify TRU Supervisor for re-routing back to the appropriate DAREA.

10.   Complete all reports by the end of your tour of duty.

---

[1] Amended by PCM 25-08 Telephone Reporting Unit (TRU) Not Authorized to Investigate Stolen Autos
[2] Amended by PCM 25-08 Telephone Reporting Unit (TRU) Not Authorized to Investigate Stolen Autos

| Policy 506 | TELEPHONE REPORTING UNIT (TRU) | Page 3 of 3 |

**TRU Supervisor Responsibilities**

11.     Monitor and review all pending calls city-wide and determine if TRU assistance is appropriate. If appropriate, transfer call directly to TRU member or TRU DAREA.

12.     Review and re-route any call for service deemed ineligible for abatement by TRU.

13.     Collect and ensure all reports are saved on the BPD shared drive, reviewing for accuracy and completeness (make corrections as necessary).

14.     Collect individual performance worksheets and prepare daily unit performance sheets.

15.     Prepare accountability report to include original written reports and deliver to the Records Management Section (RMS). Email copies to appropriate district RMS personnel.

16.     Provide TRU members with TRU Policy and Standard Operating Procedures and ensure adherence.

## RESCISSION

Remove and destroy/recycle Policy 506, *Telephone Reporting Unit (TRU)*, dated 1 August 2016.

## COMMUNICATION OF POLICY

This policy is effective on the date listed herein. Each employee is responsible for complying with the contents of this policy.

Thomas V. Baltimore Police Department

## Police Department
### BALTIMORE, MARYLAND

**REPORT**
**Form 92/95**

**DATE:** 24 April 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**      **Major H. Middleton**

**VIA:**      Official Channels

**FROM:**      P/O Thomas, Jordan K576

**SUBJECT:**   Reporting supervisor negligence

Ma'am,

I respectfully report that on April 24th, 2026, I was working the Southern District front desk position for my regular tour of duty. At approximately 0930 hours, I notified Sgt. A. Strand that I had to report to the Public Integrity Division to give a mandatory statement at 1030 hours. I asked Sgt. Strand if I could take my personal car to PID, because I wanted to do something unrelated to work while in that area. I already knew that generally, members are prohibited from driving their personal cars while on duty but I figured due to the nature of my request, that it would be worth asking. Sgt. Strand denied my request to operate my personal car and to do the unrelated thing I wanted to do, however, still on the subject of transporting myself to PID, Sgt. Strand suggested the idea that I utilize an unmarked/civilian vehicle to go there on my own since she did not want to "down a unit" to take me to PID and keep more Officers on the street. (She suggested an unmarked vehicle because I am administratively suspended and unable to operate police cars, hence why I typically need to be transported to PID by another Officer). I said, "like the Maverick?" referring to the unmarked black admin Chevrolet Maverick that we have and she said yes. I then asked her if she was sure she did not just want to have a unit come to the station to pick me up and transport me to PID since that is the common practice, and Sgt, Strand said she did not want to be "down an Officer" and said no to that. Sgt. Strand then said that she would ask Sgt. C. Brooks (The admin Sgt) if she would allow me to drive their admin car to PID. I then asked Sgt. Strand if it would be easier on her if I asked Sgt. Brooks on her behalf instead (Sgt. Strand was doing work at her desk and Sgt. Brooks' office is right behind where I sit while working the front desk) to take some of the work away from her. Sgt. Strand said no. This entire interaction was about 3 minutes long. At 1003, I responded back to Sgt. Strand's Office to ask if she had spoken to Sgt. Brooks since about half an hour had passed since she told me what her plan was in regards to my transportation and had not heard anything from anyone within that half an hour and I was getting close to the time I was supposed to be at PID. Before I could ask, Sgt. Strand acknowledged my presence and asked me "what time was your thing again?", and I responded "in 27 minutes" referring to the fact it was 1003 and my statement was for 1030. Sgt.

1:26 - CV - 01682 - MJM

Strand then got on the radio and asked for a sector 2 unit to respond to the station to pick me up. Knowing that it typically takes a unit between 7-10 minutes to respond to the station, and sometimes 10-15 minutes if they are coming from sector 2, and it being 1003 and having to factor the wait time on top of the commute itself to PID from the station, I advised Sgt. Strand that I thought she was going to ask Sgt. Brooks about me using the admin car. Sgt. Strand replied in an annoyed and dismissive tone of voice "I do not have time to do that". I then asked again, since she just told me she had no time, and I was now on a time crunch, if she'd like me to ask Sgt. Brooks on her behalf and she said "no you may not". This was confusing to me because only half an hour ago, Sgt. Strand said she would ask Sgt. Brooks about the car, but now all of a sudden she is telling me she "has no time" even though she said she would do this half an hour ago and only would have taken about a minute to do what with the distance between their offices. This second interaction all occurred in the presence of Sgt. M. Seitler. I then responded to the District's parking lot to await the Officer that keyed up to come and transport me. At approximately 1010 hours, I texted the PID Detective that I was likely going to be late due to this negligence by Sgt. Strand. I saw Officer S. Maldonado in the parking lot of the District, just getting ready to start his shift, and I asked him if he'd be able to take me to PID because again, of the time crunch. This Officer was already at the station, and the sector 2 Officer that keyed up to come for me was coming from an unknown location with no ETA. Officer Maldonado said he would transport me. I told him to ask Sgt. Strand if it was fine to do so simply because I already knew that a decision like this, while it would benefit me and I'd likely make it to PID on time, would be ill-perceived by Sgt. Strand if discovered, and I felt the duty to communicate. Officer Maldonado called Sgt. Strand on his phone while we were sitting in his patrol car, and as I suspected, Sgt. Strand told him not to transport me. Now approximately 1015, I was still waiting for the transportation that volunteered to arrive. Officer R. James then arrives at the station, and advises me that he was going to take me to PID (he was not the Officer who volunteered to pick me up on the radio either). I then hopped in with him, and as we were about to leave the station, Sgt. Strand (who must have been standing outside and observed me in the car), ordered Officer James to stop, to which he told her that he would be conducting the transport so I would not be late. Sgt. Strand replied positively to Officer James, but then proceeded to tell me that "she was the Sergeant, and not to go behind her back and make my own arrangements). I simply nodded by head without giving a verbal response and Officer James proceeded to take me to PID, arriving at 1041. AT approximately 1150 hours when I returned to the District, I saw Sgt. Brooks in her office and she initiated a conversation with me, asking me "what happened between you and Sgt. Strand?". This was confusing to me, because as stated above Sgt. Strand stated to me that she was not going to ask Sgt. Brooks about me using their admin car despite saying that she would, therefore meaning no conversation should have occurred between the two Sergeants to my understanding at the time. I asked Sgt. Brooks what she was talking about, and this was when she advised me that apparently, Sgt. Strand had entered Sgt. Brooks' office to complain to her about me asking about how I was going to get to PID for my statement. Sgt. Brooks told me that Sgt. Strand had told her "I want to cuss him out so bad" and "he is so fucking annoying". Sgt. Brooks told me that she allowed her to say what she was saying about me, and then she eventually left. When I asked Sgt. Brooks about what time this occurred, she was unable to recount. I speculate that this conversation happened after I had already left to PID considering that between 0930 and 1003 while I was waiting for Sgt. Strand or Sgt. Brooks to come to me about my transportation situation, I was sitting at the front desk of the station which was my assigned post for the day, which like I have said previously, is in very close proximity to the front

desk, so close that I can speak to and hear anyone in that office and vice versa, and I did not hear Sgt. Brooks and Sgt. Strand having any conversation between those times. The interactions I had with Sgt. Strand and failure of Sgt. Strand to effectively and timely get arrangements for me to get to PID on time despite having a full hour notice were very distasteful. If the PID detective so wanted to, he could have very easily reported me for failure to respond on time to my statement and I would have another investigation that I would be under for neglect of duty and it was because of her failure to do what she said she was going to do, and her shutting down twice, the help I offered her by offering to ask Sgt. Brooks the question she told me she'd ask her herself, only to let half an hour go by without doing anything, and then waiting until the last minute to have my transport done the long way, by waiting for a unit to respond to the station to get me. I feel as if she was just going to do this anyways, she should have not waited until 27 minutes were left for me to be at PID to facilitate that. Her changing her plan without telling me (I had to go to her the second time) without any explanation as to why all of a sudden she was no longer willing to ask Sgt. Brooks what she had planned to ask her or explanation as to why I could not simply ask her myself was all unnecessary, and demonstrated a hostile and uncomfortable work environment, especially knowing that Sgt. Strand had told Sgt. Brooks that she felt some desire to become verbally aggressive with me. This creates an undertone about Sgt. Strand's regards for me and makes me uncomfortable to speak with her, like other supervisors I have been complaining about in this environment. I found Sgt. Strand's comments to me about "making my own arrangements" and her "being the Sergeant" to be distasteful as I would not have had to even make the choices I made to ensure I would not be late, had she just did what she said she was going to do, and even if the request for the admin car was denied, she still would have had ample time to get transportation for me to PID so I would not be late. I trusted her to be the "Sergeant" and my needs were treated with no care, annoyance and inconvenience, leading me to have to make choices for myself so I would be punctual and on time, not to mention being told by Sgt. Brooks that Sgt. Strand had made those concerning comments about wanting to "cuss out" a subordinate. This constant letting down of the supervision where I work makes it very difficult and exhausting to trust my superiors when it comes to anything regarding me. .

Respectfully Submitted,

P/O Thomas, Jordan K576

Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 1 May 2026

**ASSIGNMENT: Southern District**

**TO:**        **Major H. Middleton**

**VIA:**       Official Channels

**FROM:**   P/O Thomas, Jordan K576

**SUBJECT:**   Reporting Health and Wellness section would not assist in my transfer

Ma'am,

     I respectfully report that on 04/30/2026, it had come to my attention that a lawsuit that I have filed against the BPD had been made public on a major media/news outlet. In response to this discovery, I immediately notified Director Vernon Herron of the Health and Wellness Section, and advised him of my discovery and gave him a brief synopsis of the basis of my lawsuit with the purpose of making him understand I needed to be transferred from the Southern District as soon as possible. When I specifically advised him that this lawsuit, which highlights misconduct by supervisory/command staff in my District who I work for, would cause extreme stress due to the possibilities of confrontation and retaliation/hostile work environment worsening than the point it already was at, Director Herron stated "nobody is going to retaliate against you man". "And if they do, then you can file with the EEO" (he was referring to the Internal Affairs Section's EODS unit). Director Herron essentially was telling me he does not believe circumstances exist at the time which would necessitate me being transferred, despite everything I had told him. When I specifically asked after that, "So, is the Health and Wellness Section going to assist me with my transfers", Director Herron chuckled and then shifted the subject and said "Let me ask you a question man, are you suspended?", to which I replied that I was. Director Herron expressed surprise and unawareness that I was still suspended, citing that he believed it was established that I would be re-instated following the Phase III intervention I was subjected to on April 3rd, 2026. He then asked me if I signed a performance improvement plan that was supposed to have beem created after the intervention, to which I replied no, which prompted that conversation to expand. I told Director Herron that despite almost a month passing since the intervention, no supervisor or command staff had approached me with anything to say in regards to the performance improvement plan other than how on April 17th, Sgt. J. Moore advised me that "we will go over it on Sunday" referring to Sunday, April 19th. I advised

1:26-CV-01682-MJM

Director Herron that when the 19th came, no such conversation occurred. I advised Director Herron that in response to this, on the morning of April 20th, I asked Sgt. Moore in the presence of Lt. J. Jordan if he may ask Major Middleton if at the conclusion of my performance improvement plan, if she had any plan to reinstate my police powers. Both supervisors said they would ask. On the afternoon of the 20th, I asked Lt. Jordan if the question had been proposed to her and I was told it was not. This was the last time my suspension was brought up in conversation that I am aware of, and the last time the performance improvement plan was mentioned. As of the date of this report, I still have received no information on the performance improvement plan via email, Workday, verbally, or by any official channels otherwise. I also advised Director Herron that I was told by Sgt. Moore on the 17th of April that the 19th was supposed to be when the performance improvement plan was to begin, citing that he mentioned it would be "easier for him" to do it that way since the 19th was the 1st day of shift change, rotating us back to the morning shift, and by the time we would rotate again (May 17th, 2026, a 28 day period), the performance improvement plan would be completed since performance improvement plans are the same length. Director Herron concluded the conversation by saying to me that my suspension should not last much longer after hearing all the information I gave him, and that "the department has some explaining to do". As I have said in this report, the main reason this is authored is to pinpoint that I was told I would not be receiving assistance to transfer out of the Southern District from health and wellness at this time.

Respectfully Submitted,

P/O Thomas, Jordan K576

Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

DATE: 1 May 2026

ASSIGNMENT: Southern District

TO:          **Major H. Middleton**

VIA:        Official Channels

FROM:     P/O Thomas, Jordan K576

SUBJECT:   Stating reason for transfer(s)

Ma'am,

     I respectfully submit this 95 form alongside my transfer requests to either Eastern or Western District (Eastern preferred) as I have begun legal litigation against the department as of April 29th, 2026, particularly against members to include command staff of the Southern District, my current assignment. It is, and has not been a safe working environment nor a spacious environment for me to be productive at my job for a very long time. This is due to the hostile work environment created by the supervisory staff at the District across the Baker and Charlie shifts, and the Major, who herself subjected me to a unreasonable administrative suspension on February 27th, 2026 (PID not involved) which has opened the door for more harassment to happen, and the District has failed to intervene. The reason I am writing this optional 95 is because I am trying to have this transfer be expedited as soon as possible, especially since now the legal action I have taken has been publicized on a major news media outlet and people in the Southern District have already reached out to me in reference, meaning that the word is spreading, and the chances for retaliation and an even harsher work environment are significantly high right now.

Respectfully Submitted,

P/O Thomas, Jordan K576

1:26-cv-01682-MJM



FORM 70

# REQUEST FOR TRANSFER

THIS FORM IS USED TO REQUEST A TRANSFER.

SUBMIT TO: TRANSFERSREQUEST@BALTIMOREPOLICE.ORG.

**Members seeking a district to district transfer need to complete the entire form. Members seeking posted positions only need to complete the Requestor Information section.**

## REQUESTOR INFORMATION

| Name: | Jordan Thomas | Reclassification Date (if PO): | 06/21/2022 |
|---|---|---|---|
| Rank/Title: | Police Officer | Promotion Date (if SGT/LT): | |
| Current Assignment | SD District C/B Patrol | Assignment Requested: Eastern District C/B Patrol | |
| Seq. No. | K576 | | |
| Phone: | (718)-781-9852 | | |
| EOD: | 08/10/2020 | | |

| Requestor Signature | | Date 04/29/2026 |
|---|---|---|

---

**RECLASSIFICATION OR PROMOTION DATE ABOVE ARE REQUIRED IN ORDER FOR THIS FORM TO BE VALID.**
**INCOMPLETE INFORMATION WILL INVALIDATE THIS SUBMISSION.**

---

## DISTRICT TO DISTRICT TRANSFER

**Current Assignment**

| District SD | Recommendation: Approved ☑ Disapproved ☐ | Commander Rank/Name MAJOR HENRIETTA MIDDYED | Date: 5.1.26 | Initials: MMM |
|---|---|---|---|---|

**Prospective Assignment**

| District | Recommendation: Approved ☐ Disapproved ☐ | Commander Rank/Name | Date: | Initials: |
|---|---|---|---|---|

**Human Resources**

| Director | Transfer Packet Received? | YES ☐ NO ☐ | Date: | Initials: |
|---|---|---|---|---|

FORM 70 – Rev. 07/2025



**FORM 70**

# REQUEST FOR TRANSFER

THIS FORM IS USED TO REQUEST A TRANSFER.

SUBMIT TO: TRANSFERSREQUEST@BALTIMOREPOLICE.ORG.

**Members seeking a district to district transfer need to complete the entire form. Members seeking posted positions only need to complete the Requestor Information section.**

| REQUESTOR INFORMATION | | | |
|---|---|---|---|
| Name: | Jordan Thomas | Reclassification Date (if PO): | 06/21/2022 |
| Rank/Title: | Police Officer | Promotion Date (if SGT/LT): | |
| Current Assignment | SD District C/B Patrol | Assignment Requested: Western District C/B Patrol | |
| Seq. No. | K576 | | |
| Phone: | (718)-781-9852 | | |
| EOD: | 08/10/2020 | | |

| Requestor Signature | | Date | 04/29/2026 |
|---|---|---|---|

**RECLASSIFICATION OR PROMOTION DATE ABOVE ARE REQUIRED IN ORDER FOR THIS FORM TO BE VALID.**
**INCOMPLETE INFORMATION WILL INVALIDATE THIS SUBMISSION.**

| DISTRICT TO DISTRICT TRANSFER | | | | | | |
|---|---|---|---|---|---|---|
| **Current Assignment** | | | | | | |
| District SD | Recommendation: Approved ☒ Disapproved ☐ | Commander Rank/Name MAJOR Henrietta Middleton | Date: 5.1.26 | | Initials: | |
| **Prospective Assignment** | | | | | | |
| District | Recommendation: Approved ☐ Disapproved ☐ | Commander Rank/Name | Date: | | Initials: | |
| **Human Resources** | | | | | | |
| Director | Transfer Packet Received? | YES ☐ | NO ☐ | Date: | Initials: | |

**FORM 70 – Rev. 07/2025**

 Outlook

---

**RE: K576 Transfer forms for inter-district transfers**

---

**From** TransfersRequest <TransfersRequest@baltimorepolice.org>

**Date** Fri 5/8/2026 3:18 PM

**To** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>; TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>

**Cc** info@fop3.org <info@fop3.org>; Jon Glazerman <jglazerman@fop3.org>

📎 1 attachment (1 MB)

_Policy 1705 Sworn Transfers rev. 10.15.2025.pdf;

Greetings,
I hope this message finds you well. HR's role in the transfer process is to track the request and submit it to the COP Office. The tracking portion is primarily for recordkeeping purposes, including documenting when the request was made and when it expires. The COP Office handles the actual district-to-district transfer process.
I have attached Policy 1705 for your review regarding how district-to-district transfers are handled.
Please feel free to reach out if you have any questions or concerns. Wishing you a wonderful day

**Ke'Asia Harris**
Human Resources Generalist II
Baltimore Police Department, HR Section
601 E Fayette Street, Baltimore, MD 21202
keasia.harris@baltimorepolice.org
Cell: 443.500.1725 Office: 443.984.9918
Telework days: Tuesday
In office days: Mon/Wed- Fri
General Work hours: 8:30 a/m- 4:30p/m daily (M-F)
Mailing Address- 242 W. 29th Street, Baltimore, MD 21211

Please take a moment to provide feedback on the service you received:
https://www.surveymonkey.com/r/BPDHRSSurvey



**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Friday, May 8, 2026 12:59 PM
**To:** TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Cc:** info@fop3.org; Jon Glazerman <jglazerman@fop3.org>
**Subject:** Re: K576 Transfer forms for inter-district transfers

Good Afternoon,

I am reaching out to ask if these transfers have any traction/timeline on them yet or any update otherwise?

---

**From:** TransfersRequest <TransfersRequest@baltimorepolice.org>
**Sent:** Friday, May 1, 2026 1:45 PM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>; TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Cc:** info@fop3.org <info@fop3.org>; Jon Glazerman <jglazerman@fop3.org>
**Subject:** RE: K576 Transfer forms for inter-district transfers

Greetings, received. Wishing you a wonderful day !

Ke'Asia Harris
Human Resources Generalist II
Baltimore Police Department, HR Section
601 E Fayette Street, Baltimore, MD 21202
keasia.harris@baltimorepolice.org
Cell: 443.500.1725 Office: 443.984.9918
Telework days: Tuesday
In office days: Mon/Wed- Fri
General Work hours: 8:30 a/m- 4:30p/m daily (M-F)
Mailing Address- 242 W. 29th Street, Baltimore, MD 21211

Please take a moment to provide feedback on the service you received:
https://www.surveymonkey.com/r/BPDHRSSurvey

 

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Friday, May 1, 2026 12:30 PM
**To:** TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Cc:** info@fop3.org; Jon Glazerman <jglazerman@fop3.org>
**Subject:** Re: K576 Transfer forms for inter-district transfers

Good morning,

I have gotten the transfer forms signed and attached my 95 form explaining reason for transfer.

As I said in my previous email, I'd prefer the Eastern District before the Western if I am allowed discretion based on operational needs.

Thank you!

**From:** TransfersRequest <TransfersRequest@baltimorepolice.org>
**Sent:** Wednesday, April 29, 2026 2:46 PM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>; TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Cc:** info@fop3.org <info@fop3.org>; Jon Glazerman <jglazerman@fop3.org>
**Subject:** RE: K576 Transfer forms for inter-district transfers

Greetings, yes you can give it to them to sign .

Ke'Asia Harris
Human Resources Generalist II
Baltimore Police Department, HR Section
601 E Fayette Street, Baltimore, MD 21202
keasia.harris@baltimorepolice.org
Cell: 443.500.1725 Office: 443.984.9918
Telework days: Tuesday
In office days: Mon/Wed- Fri
General Work hours: 8:30 a/m- 4:30p/m daily (M-F)
Mailing Address- 242 W. 29th Street, Baltimore, MD 21211

Please take a moment to provide feedback on the service you received:
https://www.surveymonkey.com/r/BPDHRSSurvey

 

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Wednesday, April 29, 2026 12:49 PM
**To:** TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Cc:** info@fop3.org; Jon Glazerman <jglazerman@fop3.org>
**Subject:** Re: K576 Transfer forms for inter-district transfers

Thank you for the clarification. Can I give this paperwork straight to my command staff?

---

**From:** TransfersRequest <TransfersRequest@baltimorepolice.org>
**Sent:** Wednesday, April 29, 2026 12:18 PM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>; TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Cc:** info@fop3.org <info@fop3.org>; Jon Glazerman <jglazerman@fop3.org>
**Subject:** RE: K576 Transfer forms for inter-district transfers

Greetings,
I have received both of your requests for a district-to-district transfer. At this time, each Form 70 must be signed and approved by your current command before the request can move forward, in accordance with Policy 1705.

Additionally, you may submit a Form 95 to provide further explanation if you choose; however, this is optional.

Once the completed forms are received, your request will be considered valid for processing.
Wishing you a wonderful day!

INCOMPLETE INFORMATION WILL INVALIDATE THIS SUBMISSION.

| DISTRICT TO DISTRICT TRANSFER | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Current Assignment** | | | | | | | |
| District | Recommendation: Approved ☐ Disapproved ☐ | | Commander Rank/Name | | Date: | | Initials: |
| **Prospective Assignment** | | | | | | | |

**Ke'Asia Harris**
Human Resources Generalist II
Baltimore Police Department, HR Section
601 E Fayette Street, Baltimore, MD 21202
keasia.harris@baltimorepolice.org
Cell: 443.500.1725 Office: 443.984.9918
Telework days: Tuesday
In office days: Mon/Wed- Fri
General Work hours: 8:30 a/m- 4:30p/m daily (M-F)
Mailing Address- 242 W. 29th Street, Baltimore, MD 21211

Please take a moment to provide feedback on the service you received:
https://www.surveymonkey.com/r/BPDHRSSurvey

 

---

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Wednesday, April 29, 2026 11:33 AM
**To:** TransfersRequest <TransfersRequest@baltimorepolice.org>; COP Office <COPOffice@baltimorepolice.org>
**Cc:** info@fop3.org; Jon Glazerman <jglazerman@fop3.org>
**Subject:** K576 Transfer forms for inter-district transfers

Good morning, I am sending this email in order to request transfer from the Southern District C/B Patrol rotation to either the Eastern District C/B Patrol rotation or the Western District C/B Patrol rotation. I am free to elaborate on why transfer is necessary if an

explanation is required down the line, but for now, please acknowledge that these requests for transfer are urgent and I need to be transferred out of my current assignment as soon as possible. Eastern District would be my first option and Western would be my back-up/second option. The FOP will be tracking these requests.

**Respectfully Submitted,**
**P/O Thomas, Jordan K576**
**Southern District Patrol C/B Patrol Rotate**
**(718)-781-9852 (Mobile)**
**(410)-396-2499 (District)**
**Jordan.Thomas@Baltimorepolice.org**



Thomas v. Baltimore Police Department

**John G ⟩**

**Wednesday 8:43 AM** — May 6th, 2026

Good morning Sgt Glazerman, reaching out to see if you could assist me with getting me administratively reinstated. Major Middleton, my current major, has subjected me to an admin suspension since <u>February 27th</u>. I know I've said in email that I have pending litigation against that department for the decision she made among other things that have occurred since then, but I need to get reinstated. My matters are not PID related, they are strictly in the southern only and the suspension is purely administrative, therefore PID isn't helping. I reached out to Director Vernon Herron recently and he said he cannot help and encouraged me to reach

Union stating There is nothing they can do, ultimately implying I can be suspended indefinitely.

Also shows he stopped responding to questions about transfer out of hostile workplace.

Signed
Jordan Thomas

1: 26-CV-01682-MJM

said he cannot help and encouraged me to reach out to my union rep. But, my union rep has since transferred out of the southern leaving me with nobody. Is there anything the union can do to help me as far as communicating with my major about getting me reinstated or at the very least, a timeline.

Have they taken all of your equipment?

Yes sir as of February 27th

Only thing I have left is body armor

6:25 ◀  📶 5G+ 💯





**John G ❭**

So I have looked into this and so long as you're receiving your full pay and benefits, the department can, in what they determine to be their best interest, suspend a member for administrative matters.

Unfortunately, we do not have a process of fighting against this process as it is in their rights.

So how do I get reinstated? Or at least know when? My Major is refusing to properly communicate with me.

I've been in the dark ever since the suspension happened and I'm not aware of any timeline, again since none of this suspension is PID related

➕  iMessage  🎤



6:25 ◂   .ıll 5G+ 🔋100



John G ⟩

s̶... ...is PID related

**So long as you are receiving full pay and benefits, the department can keep you suspended during their determination that it is in the best interest of the agency.**

Is there any way I can get some type of word on just how long the Major plans on keeping me suspended. Because what it sounds like, is the agency can just keep me suspended indefinitely. Like these members we have that are suspended for years. Every time I've tried to speak to her in the past about reinstatement she never gives me a clear answer and doesn't demonstrate a willingness to get me an answer.

willin**g** to get me an

answe

**John G ⟩**

We do not have a way to get an answer as they do not need to provide us with that information

I've put in my transfer forms to the eastern and western on Friday due to the litigation and hostile working environment. Should I expect any assistance from the union as far as those transfers?

We will track and follow-up on them as we do for any other transfers

Tracking and follow-up as in how?

We reach out and see whether there are openings and ask about time frames throughout



6:26

We reach out an... ...e
...ether there ...
...penings and as... ...ut
time frames t'...

**John G** ⟩



When would it be an appropriate time to ask COP's Office about me moving to the eastern district? If I placed it on Friday that just past what's a reasonable time frame?

*No response*

**Yesterday 7:49 AM**

Thomas v. Baltimore Police Department

## Director Herron 〉

Thu, Apr 30 at 7:00 PM

> Director Herron, good evening. Are you free for a phone call

Wednesday 7:47 AM — May 6th, 2026

> Good morning Director Herron, just following up from our phone call from a few days ago. I feel fine but I'm still suspended and I still haven't had any word from my supervision about a PIP but more importantly like I said, I'm still suspended by my Major. Would you be able to help in any way?

Sorry Jordan, I can't influence you Major's decision. Please call your FOP rep. Hang in there, better days are coming.

Director Herron offering no assistance with situation despite his opinions on it, as referenced in our phone call from April 30th where he believed it was "understood" I'd be reinstated.

Signed,
Jordan Thomas

1: 26-CV-01682-MSM

better day

**Director Herron** 》

Friday 2:50 PM — May 8th, 2026

Do you know if I should be reinstated after the PIP? Even though I still haven't got any word from my Sgt or anyone else otherwise about it, it was still brought to my attention by my Sgt on the 17th of April that it would be over by the <u>17th of May.</u> Leading me to believe I can be reinstated after that.

Did you call the union?

No clear answer to my question.

Other option is to reach out to the Sgt.

This is what the union told me

▪▪ **4 Photos**

Wednesday 8:43 AM

Good morning Sgt Glazerman, reaching out to see if you could assist me with getting me

# Director Herron ⟩

**⚏ 4 Photos**

Wednesday 8:43 AM

Good morning Sgt Glazerman, reaching out to see if you could assist me with getting me administratively reinstated. Major Middleton, my current major, has subjected me to an admin suspension since <u>February 27th</u>. I know I've said in email that I have pending litigation against that department for the decision she made among other things that have occurred since then, but I need to get reinstated. My matters are not PID related, they are strictly in the southern only and the suspension is purely administrative, therefore

**Wow, send an email to your Sgt. About the PIP.**

What should I ask

**Remind him that you are waiting for the PIP, so you can perform accordingly.**

Should I be reinstated following its "supposed" completion on <u>May 17th?</u>

Shared conversation had with Union on May 6th, 2026 with Director Herron stating they are also unable to help me.

— Making me do things that he or other higher-ups should be doing.



Thomas v. Baltimore Police Department

1:26- cv- 01682- MJM

Signed: Jordan Thomas E[...]

📷 Outlook

## PIP update

**From** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>

**Date** Fri 5/8/2026 3:19 PM

**To** Moore, Jordan (BPD) <Jordan.Moore@BaltimorePolice.org>; Sullivan, Charles K. (BPD) <Charles.Sullivan@BaltimorePolice.org>; Hyman, LaWang (BPD) <LaWang.Hyman2@baltimorepolice.org>; Herron, Vernon (BPD) <Vernon.Herron@baltimorepolice.org>

**Cc** info@fop3.org <info@fop3.org>; Jon Glazerman <jglazerman@fop3.org>; Edmondson, Gary (BPD) <Gary.Edmondson@BaltimorePolice.org>; Middleton, Henrietta (BPD) <Henrietta.Middleton@BaltimorePolice.org>; Officer Safety and Wellness (BPD) <OSW@baltimorepolice.org>; Jordan, Joshua (BPD) <JoshuaJordan@BaltimorePolice.org>

Good afternoon,

I am sending this email to request any information about the PIP I am supposed to be under. I was informed on April 17th by Sgt. Moore that on April 19th, that we would "go over" the PIP as it was to begin at the start of the rotation from C shift to B shift, and conclude on the rotation back from B shift to C shift on May 17th.

As of this date, I haven't received any word or any notice from any entity/person present during the phase III intervention from April 3rd about this PIP. As stated the only word I received about it was on April 17th and that it was supposedly to be "gone over" with me on Sunday the 19th but as I said, that hasn't happened and I'm not even sure if I am under a PIP as of this date due to the fact I haven't seen, signed, or had anything regarding a PIP brought to my attention.

**Director Herron has expressed surprise when I spoke to him regarding the subject on April 30th via a telephone call that I was <u>still</u> administratively suspended and thought it was "understood" that I'd be reinstated shortly following the Phase III intervention, so I'd be able to complete the PIP as some of the things mentioned that needed improvement on required me to be reinstated. This leads me to believe there has been some sort of miscommunication somewhere above me regarding my duty status as Director Herron told me when I brought the matter up, he believed I had already been reinstated long ago.**

I am trying to understand if 1), a PIP has been formed without my knowledge, and if I was supposed to have been reinstated much earlier on in order to satisfy this PIP (as most of the things mentioned that needed improvement would be impossible to complete if I was not full-duty status), if this PIP is/was still supposed to conclude on the 17th of May, and 2), if following May 17th, I was to be reinstated to full-duty status if there was a plan for me to remain suspended during the PIP's duration and reinstated <u>after</u> it's completion. I need to understand what my timeline for reinstatement looks like, and I need to know information about any PIP.

As of this email's sending, I have not been responded to by anybody involved. I have seen Sgt. Moore and Lt. Jordan in person and my requests from the email were not brought to me.

Thomas V. Baltimore Police Department

**Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

MAY 9 AM11:05

**DATE:** 9 May 2026

**ASSIGNMENT: Southern District**

**TO:**       **Major H. Middleton**

**VIA:**      Official Channels

**FROM:**     P/O Thomas, Jordan K576

**SUBJECT:**  Reporting supervisor's husband harassing me, retaliation

Ma'am,

    I respectfully report that on May 9th, 2026, at approximately 0730 hours, a man (I do not know his name) responded to the SD District. I was working in an admin suspended capacity positioned at the front desk. I was able to see through the glass at the front desk that someone was approaching the entrance to the District at a slightly quick pace. Anticipating this person to walk in, and so I could open the door quickly for them by using the electric lock mechanism, I attempted to change the door's monitoring panel's lock screen to that of the District's entry doors so I could press the button to unlock the door for them. (The last person who was monitoring the front desk had the door's monitoring panel's lock screen set to the rear exit gate of the station). Because the system often suffers from an input lag it can take a few seconds to get the screen onto the right door/gate and then to get the door open. While the system was still changing to where the front door was, the person had made it to the door, tried to open it, and realized it was locked. They then loudly knocked on the glass door immediately after, to which I extended my arm up to the glass and held a finger up to signify to the person to give me a moment. The person must not have seen my gesture, because they knocked the glass again, this time louder than the first time and pulled the locked door handle again. This then prompted me to stand up and slightly lean forward into plain view and loudly said "wait" as the monitoring panel was still transitioning screens and I could not open the door as quickly, or use its PA system to inform the person to wait through the microphone. (I wanted to make sure this time I was visible since my hand gesture must not have been noticed as I stated, and I had to be loud due to the glass barriers at the desk, and at the doors). Finally, the monitoring screen switched to the front door, and I was able to let the person into the building. I said to him 'good morning, what could I do for you?" as he walked to where I was. The person, visibility agitated, asked me if I was "having a good morning". I replied "yes, how can I help you". The man then stared at me with the same agitated expression for a few seconds, and then advised me that he was Sgt. Chaneeka Brooks' husband

SO:TTᴴᵈ 6 ᴬᵁᴹ

1:26 - CV- 01682 - MJM

(the admin Sgt for the SD District), and he was there to collect a package that arrived for her at the station. (I did not immediately recognize the man as Sgt. Brooks' husband because I do not see him often, but upon him telling me who he was, I began to recall instances where I've spoken to him before, for example one time how he came to the District to drop off flowers for Sgt. Brooks in 2025). I then checked and asked him if it was more than one package or not, since I know Sgt. Brooks' usually has a lot of packages that come to the District and because I actually found two upon his request. He said no, and then told me that I "did enough" and that he hopes I "have a better morning" before walking out of the doors and leaving the station. Approximately 3 minutes later however, the man returned to the station, and I allowed him into the station. This time, he specifically only came to verbally harass me. He stated that I "had a bad attitude", that I am "very aggressive" and stated that I am "always rude to people" implying that he knows of me beyond our past interactions with each other, perhaps from his wife Sgt. Brooks, because the other times I have spoken to this man, we had no conflict. He then specifically stated "I don't even know why you are police man, you need to hang it up man." Despite knowing now that this man is the husband of a Sgt of whom I never have had the best relationship with and who I listed in pending litigation against the agency, I still attempted to calm the man down and explain that he knocked loudly on the glass door and was pulling the locked door, which was why I loudly announced "wait" to him through the glass even though anything I said to him could be perceived as me being argumentative and go back to Sgt. Brooks under a false narrative. (Even though he did not explicitly tell me why he was upset, I assumed it had to have been my loud announcement to "wait" because nothing else I did could have been interpreted as aggression, despite the fact my announcement was not a scream, or a yell. Only a slight tone increase of my voice). I wanted to explain the input lag with the door's locking mechanism as well, and the fact I had to loudly announce "wait" because of the distance, and two glass barriers but he did not allow me to speak, opting to angrily walk out of the front door as I was speaking. I did not manage to explain anything to the man before he walked out. I was only able to get a few words out as he was walking away in reference to the knocking, but that was it. Fearing that this incident would get back to Sgt. Brooks as again, this was her husband, and because my history with Sgt Brooks is not the greatest, and because she is listed in the lawsuit I have pending against the agency, and because I do not want to be subjected to adverse treatment at work, or confronted otherwise, I contacted Director Vernon Herron with health and wellness via text at 0748 hours. Director Herron and I have spoken before in regards to the hostile working environment I have been subjected to, with our latest conversation being over the phone on April 30th, 2026. During that conversation, we spoke about the fact my lawsuit pending against the agency had been made public and how I needed to be transferred out of the District as soon as possible to avoid workplace retaliation and further hostility than I was already being subjected to at the time, since word of the news article was spreading through the SD District. Director Herron dismissed my worry that I needed to be moved out of the District, and essentially advised health and wellness was not going to help transfer me out, however he did tell me to place two transfers in for two District's I had decided I wanted to go to. On the day of this incident, I specifically stated to him that I needed my transfer(s) from the Southern District to the Eastern or Western Districts to really be pushed as fast as possible because of how a Sgt's husband came to the desk to verbally harass me (in reference to his second appearance to the front desk to specifically talk about me, to me). Director Herron told me he cannot make that happen, and instead instructed me to file a complaint. (Which I will be doing). I notified Sgt. J. Glazerman of the union as well to see if the union can push harder now to assist with my transfer(s), but as of this report's writing, he has not

got back to me. He is also and has been aware of my situation in the SD District since March of 2026. Approximately 45 minutes later, the man returned to the District a 3rd time, requesting to speak to Lt. J. Jordan but did not specify what for. I went and got Lt. Jordan, and he and the man went somewhere in the station together.  About ten or fifteen minutes after this, the man emerges from inside of the station and leaves the District again. I do not know what he wanted to speak to Lt. Jordan for, but I can only assume that after interacting with me, he likely told Sgt. Brooks about his interactions with me, and she likely instructed him to complain on me. However, Lt. Jordan did not come to me to speak about the incident, so perhaps the conversation was unrelated to me. Nonetheless. I still mention this as I now highly believe that due to this man's initial conduct and the fact he came back to the station a 2nd time specifically to harass me, that this will result in the hostile work environment I have been complaining about getting worse, all under a narrative misconstrued by Sgt. Brook's husband without my side being heard. Despite telling and having told both the union and health and wellness about my desperate needs to transfer out of the distinct numerous times, the two entities refuse to assist or acknowledge my hostile work environment. I now fear the interaction that I had with Sgt. Brook's husband will negatively affect me as his version of events will be taken as what actually occurred and cause conflict in the workplace between me and Sgt. Brooks, who again, I already have a "messy" work relationship with. I also believe that since word of my lawsuit against the agency has made it to the SD District, that it is entirely possible that Sgt. Brooks' husband also has been made aware of it, and is aware that Sgt. Brooks is mentioned in it. This may have fueled his agitated conduct towards me, during his 1st and 2nd interactions with me. I especially believe this because as I have stated, every other time I have interacted with him, there was no conflict or complaint he had of me otherwise. I interpreted Sgt. Brooks' husband pulling on the District's front door and loudly knocking on the glass despite it being locked, which he has never done before, as a way to provoke a response from me in order for him to be able to have "grounds" to be able to start an issue with me, for what I believe to be in retaliation for his wife being named in my lawsuit to make my working environment worse.

Respectfully Submitted,

P/O Thomas, Jordan K576



**Director Herron >** ay 17th?

Ask that ? Of the Sgt. Keep all your records.

**Yesterday 7:48 AM**

> Director, good morning. Sorry to bother you this early. But I 100% need your help to be moved out of this district and to the eastern or western like I placed my transfer forms for. I am at work sitting at the front desk and a Sgt's husband just came up here and harassed me. This is going too far now I cannot work in this District anymore.

GM Jordan, you know I don't have the authority to do that.  File a complaint.

> With who, PIB?

**Delivered**

**6:26**  📶 5G 100

When would it be an appro( J )time to ask COP... e about me mo... eastern dist...placed it on Friday that just past what's a reasonable time frame?

**John G ›**

**Yesterday 7:49 AM**

Sgt Glazerman, good morning. Sorry to bother you this early. But I 100% need your help to be moved out of this district and to the eastern or western like I placed my transfer forms for.

I am at work sitting at the front desk and a Sgt's husband just came up here and harassed me. This is going too far now I cannot work in this District anymore.

I need to be moved like, by Monday. My situation is getting worse and worse by the day.

**Delivered**

+    iMessage

Thomas V. Baltimore Police Department

**Police Department**
BALTIMORE, MARYLAND

**REPORT**
**Form 92/95**

DATE: 9 May 2026

ASSIGNMENT: Southern District

TO:         **Major H. Middleton**

VIA:        Official Channels

FROM:       P/O Thomas, Jordan K576

SUBJECT:   Reporting not being assigned any OT despite notification in favoritism of others

Ma'am,

I respectfully report that on May 9th, 2026, I observed the SD District's OT board for the purpose of seeing if I had got any front desk OT dates that I asked for. I observed that I was given none, and instead, the front desk spots were given to numerous other Officers, most of whom I have more time on the job than, one of which is not in patrol, and two not even being assigned to the SD District. The way the OT board in the SD District works is a member who desires to work OT, particularly on the front desk, is to write a 95 form requesting what days they want to work, and then the 95 form is sent to admin Sgt. C. Brooks. The list is then put together, and Officers are supposedly placed on the OT list in order of seniority (Sequence number). Once the list is completed, it is printed and placed on the OT board for Officers to see if their requests were fulfilled. This is exactly what I did on April 26th, 2026. Where I requested a large range of days to work OT in the month of May. I specifically asked for 24 shifts across 12 days in May. I also am aware that not all requests are possible to be granted, which is why I placed so many dates on my request, not necessarily to work every single shift I asked for, but rather to scramble as many shifts as I could based on what dates were available. I also made this clear on my 95 form when it was written, stating that my requests for the dates and shifts were all strictly dependent on if either shift had openings. I am not sure exactly when this new OT board was put up, since I was off ever since May 5th, 2026. But when I came to work on the 9th for my regularly assigned shift, I notified the new board and I observed out of 24 requested shifts, I did not receive a single one. I specifically made sure to write and submit my 95 form as early as I could (despite there not being an announcement period to do so) so I could secure any OT that I could. However, as I stated, multiple Officers who received shifts that I asked for have lower

seniority than I do, and few of the ones that have seniority over me, are either not in patrol or not assigned to the SD District. This is especially unfair to me not only because of the fact I asked for so many dates that I find it hard to believe I was not given a single one, but because I am administratively suspended, which means my options for OT are strictly limited to only the front desk. All of the Officers given the front desk positions on the dates I asked for are all full duty status. I also made sure to mention in my 95 that I am suspended and that my options are limited to the front desk, which is something Sgt. Brooks knows anyway. I believe I was not given OT dates in favor of other people out of retaliation as on April 30th, only 3 days after Sgt. Brooks received my 95 form (left in her mailbox on the 26th, but she did not return to work until the 27th, and I know she got it because I overheard Officer Katrinka Johnson gave it to her on the 27th), I was notified that word broke out in the SD District that a lawsuit that I have filed against the BPD was on a major news media outlet. In this lawsuit, Sgt. Brooks is mentioned. I believe that she must have found out about this lawsuit, and decided to not give me any OT. I find this heavily insensitive as I stated in my lawsuit, and this part was in the news article, that being on the desk and not being able to work as much OT strains me very much financially. With that said, it would be known to Sgt. Brooks that me getting as much OT as I could is a priority to me, and as the OT is something Sgt. Brooks controls, would make it very easy for her to act against me for having her named in my lawsuit. I further believe this to be the case because Sgt. Brooks did not communicate to me and advise me that I did not get any of the dates that I asked for or why, which is something that supervisors tend to do when a member who asked for OT is not granted it. I believe what has happened to me is a direct result of the hostile work environment I have been subjected to, and retaliation for placing Sgt. Brooks in my lawsuit. I also believe that this is favortism as the following members who received OT on the dates I asked for (Officer J. Washington, Officer Brown, and Officer A.White-Bey), are all "favorites/close friends" of Sgt. Brooks. Officer Washington is not assigned to patrol and works in Neighborhood services, Officer Brown works in the Eastern District and I do not know where Officer White-Bey is assigned. A copy of the 95 I wrote where I requested the days I requested (not the original signed copy I left in Sgt. Brooks' mailbox as I did not anticipate needing a copy of it) as well as copies of the OT board for the time period of my requests will be attached to this form. Update: May 10th 2026, I have located the original timestamped OT Request form. It will be attached. —

Respectfully Submitted,

P/O Thomas, Jordan K576

 Outlook

## Requesting OT dates for SD District front desk potential openings

**From** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>

**Date** Sun 4/26/2026 11:53 AM

**To**   Brooks, Cheaneka (BPD) <Cheaneka.Brooks@baltimorepolice.org>

**Cc**   Johnson, Katrinka (BPD) <Katrinka.Johnson@BaltimorePolice.org>

📎 1 attachment (20 KB)
DOC (1).pdf;

Good morning,

   Please see attached for a 95 form authored by myself requesting consideration to work OT at the SD District's front desk.

**Respectfully Submitted,**
**P/O Thomas, Jordan K576**
**Southern District Patrol C/B Patrol Rotate**
**(718)-781-9852 (Mobile)**
**(410)-396-2499 (District)**
**Jordan.Thomas@Baltimorepolice.org**



**Police Department**
BALTIMORE, MARYLAND

**REPORT**
**Form 92/95**

**DATE:** 26 April 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**      **Major H. Middleton**

**VIA:**     Official Channels

**FROM:**    P/O Thomas, Jordan K576

**SUBJECT:**   Requesting Front desk OT dates

Ma'am,
          I respectfully request to be placed on the front desk for OT on the following days and following shifts if no coverage is available:

May 10th, Charlie OR Adam shift
May 11th, Charlie OR Adam shift
May 12th, Charlie OR Adam shift '
May 13th, Charlie OR Adam shift
May 17th, Baker  OR Adam shift
May 18th, Baker  OR Adam shift
May 19th, Baker  OR Adam shift
May 20th, Baker  OR Adam shift
May 24th, Baker  OR Adam shift
May 25th, Baker  OR Adam shift
May 26th, Baker  OR Adam shift
May 27th, Baker  OR Adam shift

My requests for these dates and shifts are all strictly dependent on if either shift has openings. For example, if Baker shift is not available on 24th, I would gladly accept Adam shift if it was available, as long as the order of the shifts does not conflict with my regualry assigned shifts and/or with the "resting period" set forth by policy. I am willing to accept days/shifts that I have not listed that may be available. I am unable to work OT in regular patrol capacities due to my duty status, making OT very limited for me to work, hence this 95 form.

Respectfully Submitted,

P/O Thomas, Jordan K576

# ADAM Shift

## General Overtime List

Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift consta
is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of ths shift commander. (volunteers will be solicited from the list first)

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCPILINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| Patrol Spots | SUNDAY | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3-May | | 4-May | | 5-May | | 6-May | | 7-May | | 8-May | | 9-May | |
| | 9 | | 11 | | 10 | | 10 | | 11 | | 10 | | 8 | |
| Desk | Wash | | Williams | Perry | Perry | Williams | Williams | Perry | Perry | Williams | Perry | | Wash | |
| | Alex | Mullen | Zaza | Austin | Zaza | Austin | Alex | Mullen | Alex | Mullen | Alex | Mullen | Alex | Mullen |
| DAVID Shift | Zaza | Austin | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Zaza | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | Call up List | | Call up list | | Call Up list | | Call up list | | Call up list | | Call up list | | Call up list | |
| | Kaiyee | | ~~_____~~ | | ~~_____~~ | | ~~_____~~ | | ~~_____~~ | | Byrnes Loor | Kaiyee | | |
| | | | Kaiy 1845-0715 | | Brown 0330 | | Brown 0330 | | Brown 0330 | | ~~_____~~ | ~~_____~~ | |
| | | | | | Kaiyee 1045-0715 | | Kozak (EF) | | | | | | | |
| | | | | | Smith K097 | | | | Smith K097 | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

# ADAM Shift - IF YOU REMOVE THE LIST, PUT IT BACK

## General Overtime List

Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift consta
is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of ths shift commander. (volunteers will be solicited from the list first)

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCPILINARY ACTION OR OVERTIME BAN**

| Patrol Spots | SUNDAY | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 10-May | | 11-May | | 12-May | | 13-May | | 14-May | | 15-May | | 16-May | |
| | 8 | | 9 | | 9 | | 9 | | 8 | | 9 | | 8 | |
| Desk | Wash | | Williams | | Williams | | Williams | | Williams | | Williams | | Wash | |
| | | | | | | | | | | | | | | |
| DAVID Shift | Alex | Mullen | Zaza | Austin | Zaza | Austin | Zaza | Austin | Alex | Mullen | Alex | Mullen | Alex | Mullen |
| | Zaza | | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Zaza | Austin |
| | | | | | | | | | | | | | | |
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | Call up List | | Call up list | | Call Up list | | Call up list | | Call up list | | Call up list | | Call up list | |
| 8 | | | | | | | | | | | Byrnes LOOr | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |

# ADAM Shift

## General Overtime List

*Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift consta...*

*is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of ths shift commander. (volunteers will be solicited from the list first)*

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCPILINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| Patrol Spots | SUNDAY 17-May 8 | | MONDAY 18-May 7 | | TUESDAY 19-May 9 | | WEDNESDAY 20-May 10 | | THURSDAY 21-May 8 | | FRIDAY 22-May 10 | | SATURDAY 23-May 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Desk | Wash | | Wash | | Williams | | Williams | | Williams | | Williams | | Williams | |
| DAVID Shift | Alex | Mullen | Alex | Mullen | Zaza | Austin | Zaza | Austin | Alex | Mullen | Alex | Mullen | Alex | Mullen |
| | Zaza | Austin | Zaza | Austin | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale |
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | Call up List | | Call up list | | Call Up list | | Call up list | | Call up list | | Call up list | | Call up list | |
| 9 | | | | | | | Owens | | Owens | | Owens | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |

# BAKER Shift

## General Overtime List

*Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift constant is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of ths shift commander. (volunteers will be solicited from the list first)*

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCIPLINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| Patrol Spots | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| | 3-May | 4-May | 5-May | 6-May | 7-May | 8-May | 9-May |
| | 14 | 12 | 11 | 11 | 11 | 11 | 14 |
| Desk | Thomas | Thomas | Thoms | West L085 | Maldonado K415 | Maldonado K415 | Thomas |
| | | | | | | | |
| | | | | Rankine K893 | Rankine K893 | Rankine K893 | Rankine K893 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | Call In | Call In | Call In | Call In | Call In | Call In | Call In |
| | Edmond | Edmond | Masseaux X L077 | Masseaux L077 | Masseaux L077 | ~~████~~ | Gannon L231 |
| | VASQW71035 | ~~████~~ Holleman | Upon | ~~████~~ | Murphy | Birch | Davis E159 |
| | ~~████~~ | ~~████~~ | Edmond | Caruso Kiss | Holleman | Murphy | Murphy |
| | Davis | Birch | -Holleman | Laza | Gannon L231 | Holleman | |
| | | ~~████~~ | Laza | ~~████~~ | | Gannon L231 | |
| | | Laza | Birch | Alexander | | | |
| | | Alexander | Alexander | Holleman | | | |
| | | Davis | | Kiel | | | |
| | | | | | | | |

## BAKER Shift - *IF YOU REMOVE THE LIST, PUT IT BACK*

### General Overtime List

Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift constant is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of ths shift commander. (volunteers will be solicited from the list first)

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCIPLINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| Patrol Spots | 10-May | 11-May | 12-May | 13-May | 14-May | 15-May | 16-May |
| | 12 | 12 | 13 | 12 | 11 | 12 | 12 |
| Desk | Thomas K576 | Thomas K576 | Thomas K576 | Thomas K576 | Malondian K415 mardonado | Malondian K415 Macdonads | Thomas K576 |
| | | | | | | | |
| | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| 1 | | Masseaux L077 | Masseaux L077 | Masseaux L077 | Rankine | Rankine | Rankine |
| 2 | | | | | | Masseaux L077 | Rodriguez |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | Call In | Call In | Call In | Call In | Call In | Call In | Call In |
| 6 | | Birch K147 | Gannon L231 | Birch K982 | Murphy | Birch K982 | Gannon L231 |
| 7 | | Alexander K057 | Harrison | Gannon L231 | Harrison | Gannon L231 | Harrison |
| 8 | | Paraka | Alexander K057 | Alexander K057 | | Harrison | |
| 9 | | | Hood | Hood | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |

# BAKER Shift

## General Overtime List

Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift constant is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of ths shift commander. (volunteers will be solicited from the list first)

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCPILINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| Patrol Spots | | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|---|
| | | 17-May | 18-May | 19-May | 20-May | 21-May | 22-May | 23-May |
| | | 12 | 11 | 10 | 11 | 11 | 12 | 12 |
| Desk | | West L085 | West L085 | Brown K523 | Bey Bey J583 | Masseaux L077 | Masseaux L077 | *Raja* |
| | | | | | | | | |
| | | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| 1 | | | Paracha | Rodriguez | Rodriguez | Rodriguez | Rodriguez | Paracha |
| 2 | | | | Lopez K819 | Lopez K819 | Paracha | Paracha | |
| 3 | | | | Masseaux L077 | Masseaux L077 | Lopez K819 | Lopez K819 | |
| 4 | | | | | | | | |
| 5 | | Call In | Call In | Call In | Call In | Call In | Call In | Call In |
| 6 | | Raja (1160) | Hood | Alexander K057 | Gannon L231 | Masseaux L077 | Masseaux L077 | Gannon L231 |
| 7 | | | Raja (1100) | Hood | Alexander K057 | Gannon L231 | Gannon L231 | |
| 8 | | | | | Hood | Alexander K057 | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |

## CHARLIE Shift

### General Overtime List

*Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift constant is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of the shift commander. (volunteers will be solicited from the list first)*

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCIPLINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| Patrol Spots | SUNDAY | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3-May | | 4-May | | 5-May | | 6-May | | 7-May | | 8-May | | 9-May | |
| | 12 | | 12 | | 13 | | 9 *Shultz* | | 11 *Sean Shultz* | | 11 | | 11 | |
| Desk | McCray | 1783 | Brown | K523 | Bey Bey | J583 | McCray | 1783 | McCray | 1783 | *(signature)* | | Lane | K503 |
| | Alex | Mullen | Zaza | Austin | Zaza | Austin | Alex | Mullen | Alex | Mullen | Alex | Mullen | Alex | Mullen |
| DAVID Shift | Zaza | Austin | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Zaza | |
| 1 | | | Rodriguez K734 | | Rodriguez K734 | | Rodriguez K734 | | Rodriguez K734 | | Rodriguez K734 | | | |
| 2 | | | | | Lopez K819 | | Paracha K162 | | Paracha K162 | | Paracha K162 | | | |
| 3 | | | | | | | Lopez K819 | | Lopez K819 | | | | | |
| 4 | Call up List | | Call up list | | Call Up list | | | | | | Call up list | | Call up list | |
| 5 | KOI K717 | | Hood H844 | | Owens J068 | | Call up list | | Call up list | | Hood H844 | | | |
| 6 | OHIN J247 | | Koi K717 | | Hood H844 | | Owens J068 | | Owens J068 | | Weese I520 | | Raja L068 | |
| 7 | HOOD H844 | | Ohin J247 | | Koi K717 | | Koi K717 | | Bah K889 | | Raja L068 | | OHIN J247 | |
| 8 | WEST L085 | | Weese I520 | | Ohin J247 | | Bah K889 | | Raja L068 | | | | WEST L085 | |
| 9 | | | Bah K889 | | Weese I520 | | Zaza J954 | | Robinson K8 3m | | | | | |
| 10 | | | Klee J245 | | Cardosa K888 | | Raja L068 | | Smith K097 | | | | | |
| 11 | | | ~~Cardosa K888~~ | | | | Lee J245 | | | | | | | |
| 12 | | | Sturk K64 | | | | Robinson K856 | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |

# CHARLIE Shift- IF YOU REMOVED THE LIST, PLEASE PUT IT BACK

## General Overtime List

Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift constant

is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of ths shift commander. (volunteers will be solicited from the list first)

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCIPLINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| Patrol Spots | SUNDAY 10-May 12 | | MONDAY 11-May 12 | | TUESDAY 12-May 13 | | WEDNESDAY 13-May 12 | | THURSDAY 14-May 11 | | FRIDAY 15-May 12 | | SATURDAY 16-May 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Desk | | | Brown K523 | | Brown | K523 | Brown | K523 | Paracha K162 K162 | | | | BeyBey J583 | |
| DAVID Shift | Alex   Mullen | | Zaza   Austin | | Zaza   Austin | | Zaza   Austin | | Alex   Mullen | | Alex   Mullen | | Alex   Mullen | |
| | Zaza | | Hooper   Natale | | Hooper   Natale | | Hooper   Natale | | Hooper   Natale | | Hooper   Natale | | Zaza   Austin | |
| | ███████ | | | | | | | | | | | | | |
| 1 | | | Rodriguez K734 | | Rodriguez K734 | | Lopez K819 | | Rodriguez K734 | | Paracha K162 | | Rodriguez K734 | |
| 2 | | | Paracha K162 | | Lopez K819 | | | | Paracha K162 | | | | | |
| 3 | | | Lopez K819 | | | | | | Lopez K819 | | | | | |
| 4 | Call up List | | | | Call Up list | | | | | | Call up list | | Call up list | |
| 5 | HOOD | | Call up list | | OWENS | | Call up list | | Call up list | | ~~████~~ Lopez | | Rasa | |
| 6 | West 1025 | | WRESC | | HOOD | | OWM) | | Owen) | | Owens | | Alleyne L222 | |
| 7 | OHIN J247 | | WEST 1025 | | WRESC | | HOOD | | Alleyne L222 | | WRESC | | WRESC | |
| 8 | | | OHIN J247 | | OHIN J247 | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |

CHARLIE Shift

## CHARLIE Shift

### General Overtime List

Officers on this list will be expected to work patrol shortages or discretionary details and will be selected based on senority to fill patrol shortages until the shift constant is met. Officers not randomly selected will be utlized for discretionary details or at the discretion of the shift commander. (volunteers will be solicited from the list first)

**Overtime Units are to report directly to the Shift Commander and be present at that shift's Roll Call.**

**REFUSAL TO WORK OVERTIME ONCE APPROVED WILL RESULT IN DISCIPLINARY ACTION OR OVERTIME BAN**

*See BPD Manual for Payroll Processes, page 8, section 3.8.2.1*

| | | SUNDAY 17-May 13 | | MONDAY 18-May 13 | | TUESDAY 19-May 12 | | WEDNESDAY 20-May 14 | | THURSDAY 21-May 13 | | FRIDAY 22-May 13 | | SATURDAY 23-May 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Desk | | Thomas | K576 | Thomas | K576 | Thomas | K576 | Thomas | K576 | BeyBey | J583 | Malondian | K415 | BeyBey | J583 |
| DAVID Shift | | Alex | Mullen | Alex | Mullen | Zaza | Austin | Zaza | Austin | Alex | Mullen | Alex | Mullen | Alex | Mullen |
| | | Zaza | Austin | Zaza | Austin | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale | Hooper | Natale |
| | | ███ | | ███ | | ███ | | ███ | | ███ | | ███ | | ███ | |
| | 1 | Rankine | | Rankine | | | | | | Rankine | | Rankine | | Rankine | |
| | 2 | ███ | | | | | | | | | | | | | |
| | 3 | ███ | | | | | | | | | | | | | |
| | 4 | ███ | | | | | | | | | | | | | |
| | 5 | Call up List | | Call up list | | Call Up list | | Call up list | | Call up list | | Call up list | | Call up list | |
| | 6 | WPea | | WPea | | Hood | | Hood | | ~~WPea~~ | | WPea | | WPea | |
| | 7 | | | | | WPea | | ~~~~ | | | | Birch | | Birch | |
| | 8 | | | | | Birch | | | | | | | | | |
| | 9 | | | | | | | | | | | | | | |
| | 10 | | | | | | | | | | | | | | |
| | 11 | | | | | | | | | | | | | | |
| | 12 | | | | | | | | | | | | | | |
| | 13 | | | | | | | | | | | | | | |
| | 14 | | | | | | | | | | | | | | |

Thomas v. Baltimore Police Department

1:26-cv- 01682- MSM

## Police Department
### BALTIMORE, MARYLAND

REPORT
Form 92/95

**DATE:** 13 May 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**      **Major H. Middleton**

**VIA:**      Official Channels

**FROM:**      P/O Thomas, Jordan K576

**SUBJECT:** Reporting Police Department's efforts to revoke police officer certification

Ma'am,

     I respectfully report that on May 12th, 2026, at 1722 hours, I received an email on my personal email account from Lt. Colonel Matt Correll, stating that on July 21st and 22nd, that I was to be subjected to a Revocation hearing with the Maryland Police and Corrections Training Commission (MPCTC). A Revocation hearing is a court proceeding-style gathering in which the BPD will make an argument to the MPCTC as to why they believe my certification should be revoked, and I, with the aid of legal representation, have the right to defend why my certification should remain. I am reporting this notification because I believe that this is only happening because of the complaints that I have been making about my work environment as early as March of 2026, when I first placed a complaint against the agency with the Federal EEOC in reference to an unjustified suspension, negligence to investigate/consider factors leading up to that suspension, and overall workplace hostility, harassment, and retaliation. I believe that the agency is attempting to terminate me without having justification to do so, and by jumping past giving me the due processes of departmental trial boards, which are processes where Officers get the opportunity to oppose discipline they believe is incorrect. I believe that the agency's refusal to properly investigate my claims, refusal to transfer me out of my hostile work environment, and failure to properly investigate the matters they are accusing me of, and using as their justification to have my certification revoked, is the result of the agency attempting to unfairly terminate my employment. I find that the timing of which this meeting was requested to MPCTC by the agency (April 21st, 2026 according to the hearing notice I was given), to be convenient as it was after I filed a complaint with the Federal EEOC, received a right to sue letter, and had already began documenting all occurrences of workplace hostility/harassment, and had placed one transfer form already. This makes me believe that this meeting was requested out of retaliation for me speaking up against the agency and trying to report misconduct. I also find the timing of which the MPCTC rendered a response to the agency to be convenient as well,

considering the response was given to the agency on April 30th, 2026), which was the day after I filed my lawsuit against the agency, and the same day that the news broke out publicly that I had begun litigation against the agency. I also find the date that I was notified of this revocation hearing (May 11th, 2026) to be a demonstration of the agency's poor communication with me, but I also believe it was an attempt to "intimidate" me, as on the same day, at 0900 hours, I had made a complaint to the agency's Public Integrity Division (PID, Internal Affairs section) about members of my hostile work environment as the environment was getting increasingly worse (two new incidents occurred on May 9th, 2026), and I had already exhausted all other options which failed. I find it highly suspicious that I was notified of this revocation hearing about 8 hours after I filed a complaint with PID, as it seems very retaliatory. I also believe that the meeting itself is based on information that is not true, and information which is incorrect (based on the reasons the agency cited the need for a revocation hearing in the notification I received). I also find it highly suspicious that a lot of information was left out, such as the incident in which I responded to a signal 13 in the Eastern District, which led me to be suspended as a direct result of Sgt. Y. Brown's false statements, which it would be assumed an incident with such brazen allegations against me would be a huge part of the agency's argument that my police certification is to be revoked. Some of the things mentioned in the agency's argument, I have not been subject to discipline for, and others cannot even be proven, such as allegations that I "speed" in departmental vehicles, an allegation that I have never been disciplined for, because it's not true. I believe that the agency is attempting to paint me as a bad Officer, as it says in the end of the document, that "Officer Thomas' performance as described in this letter contains instances of *likely* criminal conduct, civil rights violations, and violations of the Maryland Transportation Article". I find usage of the term "likely" to be highly indicative of the fact that they agency is either aware that these allegations hold no merit, or that they refuse to properly investigate on their own to disprove these allegations before jumping to such a measure as requesting a revocation hearing with MPCTC, therefore negatively affecting me. I believe that the agency is attempting to defame my character without having the grounds to do so, and it is all the result of the hostile work environment I have been subjected to for months at this point that the agency has constantly failed to address. The revocation hearing notice also contains a statement that says the agency is aware that I was supposed to be subjected to a performance improvement plan (a plan that was proposed by the agency but was never produced, and communication from me in reference to it that has been neglected causing adverse effects to me, which is already documented on multiple forms). The document mentions that I would needed to have been administratively restored to Full-Duty status in order to satisfy it's conditions, however the agency believes it would be "counterintuitive" to restore my police powers because it believes I no longer meet the criteria to be a police officer. I believe that it is counterintuitive for the agency to set forth an improvement plan for me to apparently "prove" I can perform my duties properly but then not allow me to be able to complete it. I believe that the entire PIP itself is not necessary as mentioned in other 95 forms, that it all stems from the result of working in a hostile environment which does not have my best interests in mind, and form a false statement made by

a Sgt. Y. Brown. But even so, I was fully willing and capable of completing this PIP to show the agency I am not a bad employee, however they, for whatever reason, went back on their decision and continued to keep me in suspension status, which has led to more hostility in the workplace despite efforts from me to discover more about the PIP so I could do it. A copy of the revocation hearing will be attached to this form.

Respectfully Submitted,

P/O Thomas, Jordan K576



# Department of Public Safety and Correctional Services

**Police Training and Standards Commission**
6852 4TH STREET • SYKESVILLE, MARYLAND 21784
(410) 875-3400 • https://mpctc.dpscs.maryland.gov/

Wes Moore, Governor
Aruna Miller, Lt. Governor

**COMMISSION MEMBERS**

Chief Stephen Yates, President
Maryland Chiefs of Police Association

Sheriff Gary Hofmann, President
Maryland Sheriffs' Association
*Represented by* Sheriff Jim DeWees

Anthony Brown, Attorney General
*Represented by* Zenita Hurley
Deputy Attorney General

Colonel Michael Jackson, Superintendent
Department of State Police

Jimmy Paul - Baltimore
Federal Bureau of Investigation

Clyde Boatwright, President
State Fraternal Order of Police

Richard Gibson, State's Attorney
Howard County
Maryland State's Attorneys' Association,
Chair

Chief George Bacom
Chairman, Maryland Municipal League
Police Executive Association

Richard Worley, Police Commissioner
Baltimore Police Department
*Represented by* Lt. Colonel Matt Corell

Chief Dan Franklin, President
Police Chief's Association of P.G. County

John Moses
Wor-Wic Program Advisory Committee -
Criminal Justice

Chief Amal Awad
Regional Representative

Deputy Sheriff D'Warren Lambirth
Regional Representative

Lt. Colonel Ronce Alford
Regional Representative

Raymond Kelly
Community Policing Expertise

Khalilah Harris
Policing Standards Expertise

Susan Radcliffe
Mental Health Expertise

Ganesha Martin
Citizen of the State

Colin Fraser
Citizen of the State

Patrick Campbell
Citizen of the State

**EXECUTIVE DIRECTOR**
Wayne R. Silver, Sr.

April 30, 2026

*[handwritten: Thomas V. Baltimore Police Department 1:26-cv-01682-MJM Signed Jordan Thomas]*

Lieutenant Colonel Matt Corell
Baltimore Police Department
242 West 29th Street
Baltimore, MD 21211-2908

Dear Lt. Col. Corell:

On April 21, 2026, The Maryland Police Training and Standards Commission (Commission) received a request from the Baltimore Police (police department) to hold a hearing to determine whether Officer Jordan Thomas' police certification should be revoked.

The police department provided extensive information to the Commission that, beginning in June 2024, Officer Thomas has engaged in documented disciplinary action, repeated violations of police department policies, and conduct that may implicate constitutional and statutory concerns. Officer Thomas' documented incidents include, but are not limited to, unlawful searches and seizures, failure to activate body-worn camera equipment, unsafe vehicle operation, improper use of force, failure to report use-of-force incidents, and conduct adversely affecting public safety, supervisory trust, and operational effectiveness. The police department's request for the revocation hearing and the information to support its request are being provided in order to provide more thorough notice of the allegations against Officer Thomas.

The police department also provided information that the officer was previously subject to disciplinary measures, including suspension and placement on a performance improvement plan, as well as a temporary suspension of police powers and a fitness-for-duty evaluation. Despite these interventions, the police department reports that the officer resumed behavior of concern shortly after being restored to full duty in January 2026, with additional incidents reflecting continued issues with judgment, adherence to policy, and professional conduct. The police department asserts that these patterns demonstrate a failure to meet established selection and retention standards for sworn law enforcement personnel.

Based on the totality of the information provided by the police department, at its regular meeting on April 22, 2026, in accordance with Md. Code Ann., Public Safety § 3-212, the Commission voted to hold a revocation hearing for Officer Thomas. In accordance with State Gov't § 10-207(b)(5), please be advised that the hearing is for the purpose of determining whether Officer Thomas continues to meet the Commission's selection standards. Section 3-202 of the Public Safety Article and

Lt. Col. Matt Corell
April 30, 2026
Page 2

to certify an individual as a police officer as long as the individual meets its certification standards. Those selection standards are set forth in 12.04.01.04 and 12.04.01.05. The particular selection standards related to Officer Thomas's alleged misconduct are identified in COMAR 12.04.01.05A(1)(a)-(c). Officer Thomas is entitled to appear, to be represented by counsel, to call witnesses, cross-examine witnesses, submit exhibits, and make legal arguments. The hearing will be held on July 21-22, 2026. The Commission strongly recommends that Officer Thomas remain in a non-officer status.

As the requesting agency and consistent with COMAR 12.04.03.03A, the Baltimore Police Department is designated as the petitioner in this proceeding and bears the responsibility for presenting evidence in support of the requested revocation. The Commission will preside over the hearing as the adjudicating authority in accordance with the Maryland Administrative Procedure Act, State Government Article, Title 10, Subtitle 2, and applicable regulations set forth in COMAR 12.04.03.01 to 12.04.03.12 and will render a decision based upon the record established during the hearing. Please advise what counsel will represent your agency and provide this notice to Officer Thomas so that he can provide us with contact information for the person who will represent him at the hearing.

 If you have any questions or concerns, please feel free to contact me at 410-875-3605 or wayne.silver@maryland.gov .

Respectfully,

Wayne R. Silver, Sr.
Executive Director

cc: Matthew Mellady, J.D., Deputy Director
    Lucy Lyles, PhD., Director of Certification and Compliance
    Elise Ice, Assistant Attorney General

Enclosure(s)

# CODE OF MARYLAND REGULATIONS (COMAR)
## Title 12 DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES
## Subtitle 04 POLICE TRAINING AND STANDARDS COMMISSION
### Chapter 03 General Hearing Regulations
Authority: State Government Article, Title 10, Subtitle 02, Annotated Code of Maryland
*Compiled from Division of State Documents January 9, 2025*

## Table of Contents

12.04.03.01 Scope. ............................................................................................................................

12.04.03.02 General Provisions. ...........................................................................................................

12.04.03.03 Parties—Representation. ..................................................................................................

12.04.03.04 Notice of Hearing. .............................................................................................................

12.04.03.05 Postponements. ................................................................................................................

12.04.03.06 Presiding Officer—Duties. .................................................................................................

12.04.03.07 Attendance. .......................................................................................................................

12.04.03.08 Hearing Procedures — Testimony and Evidence. ...............................................................

12.04.03.09 Decisions and Orders. ........................................................................................................

12.04.03.10 Request for Reconsideration. .............................................................................................

12.04.03.12 Judicial Appeal. .................................................................................................................

## 12.04.03.01 Scope.

A. These regulations apply to administrative hearings before the Police Training Commission (Commission), where issues concerning tl legal rights, duties, statutory entitlements, or privileges of specific parties are decided as required by law or constitutional right.

B. These regulations do not apply to:

(1) An employee grievance hearing;

(2) An informal investigation;

(3) A Commission action on an application for certification or recertification as a police officer;

(4) A decision made by the Executive or Deputy Director pursuant to authority delegated by the Commission;

(5) A decision to conduct or not to conduct a hearing; or

(6) A proceeding where a hearing is not required by law.

## 12.04.03.02 General Provisions.

A. A hearing conducted by the Commission is subject to the provisions of the Administrative Procedure Act.

B. The Commission may conduct a hearing only if a majority of the Commission's authorized membership is present.

## 12.04.03.03 Parties—Representation.

A. A party to a hearing includes an individual or agency that the Commission names or designates or who is entitled to be a party to a hearing.

B. A party may be represented by counsel at a hearing.

## 12.04.03.04 Notice of Hearing.

A. The Commission shall provide all parties with written notice of a hearing at least 10 business days before the scheduled hearing dat

B. A written notice shall comply with State Government Article, §§10-207 and 10-208 and include:

(1) The date, time, and place of the hearing;

(2) A brief explanation of the allegations and issues;

(3) Citations of relevant law or regulation; and

(4) A copy of COMAR 12.04.03.

## 12.04.03.05 Postponements.

A. The presiding officer may postpone a hearing upon a written request of any party, if the:

(1) Presiding officer receives the request at least 3 business days before the scheduled hearing date; and

(2) Request establishes good cause for the postponement as determined by the presiding officer.

B. Absent a postponement request, the presiding officer may postpone the hearing for good cause.

## 12.04.03.06 Presiding Officer—Duties.

A. The Commission chairman, or a designee, shall be the presiding officer who shall:

(1) Be in charge of the hearing;

(2) Permit the examination of witnesses;

(3) Rule on the admissibility of evidence;

(4) Decide the order in which parties may testify, present evidence, or present argument;

(5) Adjourn or recess the hearing from time to time;

(6) Decide if a party is required to submit a written brief or motion supporting the party's position and establish deadlines for submissions;

(7) Reschedule the hearing if a majority of the Commission is not present; and

(8) Maintain a record of the hearing as required under State Government Article, §10-218, Annotated Code of Maryland.

B. The presiding officer shall determine that a party:

(1) Has been informed of the nature of the proceedings;

(2) Understands the language and intent of these regulations; and

(3) Is cognizant of the rights under applicable statutes upon which the subject of the hearing is conducted as well as rights under these regulations.

C. If the presiding officer is not satisfied that a party is fully informed as to these matters, the presiding officer shall note this on the record.

D. The presiding officer when deciding the case or issuing an order pursuant to the provisions of these regulations and of law shall inform the party of the right to appeal a decision or order and the methods and procedures for making that appeal.

E. The presiding officer may:

(1) Examine witnesses;

(2) Call witnesses; and

(3) Request the Office of the Attorney General to provide counsel to the Commission and to Commission staff who may be presenting evidence at the hearing.

## 12.04.03.07 Attendance.

A. If a party fails to appear for the hearing and the presiding officer has reason to believe the party received notice of the hearing, the presiding officer may:

(1) Proceed with the hearing based on the information available; or

(2) Reschedule the hearing.

B. A party may waive the right to appear for the hearing.

## 12.04.03.08 Hearing Procedures — Testimony and Evidence.

A. The introduction of evidence at a hearing shall comport with procedures under State Government Article, §10-213, Annotated Code of Maryland.

B. When a party is represented by counsel, only counsel may submit evidence, question witnesses and file objections, exceptions, and motions on behalf of the party.

C. A party testifying shall be under oath administered by an individual authorized by the presiding officer.

D. The presiding officer shall require the following oath be used, "Do you solemnly swear or affirm under the penalties of perjury that the responses given and statements made will be the truth, the whole truth, and nothing but the truth?"

E. The burden of proof is on the party bringing the issue before the Commission.

F. The standard of proof is a preponderance of evidence.

G. A party may submit a brief, or the presiding officer may order that a brief be submitted, concerning the issues of fact and law involved in the hearing. The presiding officer shall determine:

(1) The form for the brief; and

(2) Submission deadlines.

## 12.04.03.09 Decisions and Orders.

A. A decision by the Commission shall be made by a majority of the members present at the hearing.

B. The presiding officer shall prepare the Commission's final decision and order in writing that includes findings of fact and conclusions of law that are based exclusively on testimony, evidence, and other matters that are a part of the hearing record.

C. The Commission shall deliver or mail a copy of the decision and order and accompanying findings and conclusions to each party or the party's counsel of record.

D. Unless specified otherwise, orders of the presiding officer or the Commission shall be immediately implemented.

## 12.04.03.10 Request for Reconsideration.

A. A party may request reconsideration of a final decision by the Commission.

B. A request for reconsideration shall:

(1) Be in writing;

(2) Be received by the presiding officer issuing the decision not later than 10 days after receipt of the final decision or order by the party or the party's counsel of record; and

(3) State in detail the grounds for the request.

C. Within a reasonable period following receipt of the request for reconsideration, the presiding officer, with input from the Commission members hearing the case, shall either grant or deny the request.

D. The presiding officer shall mail the decision on the request for reconsideration under §C(4) of this regulation to the individual makir the request.

E. At the discretion of the Commission, a request for reconsideration may stay enforcement of the order until disposition of the reque or subsequent action based on that request.

F. Submitting a request for reconsideration does not stay the time requirements for filing an appeal.

## 12.04.03.12 Judicial Appeal.

A party aggrieved by the Commission's final decision, or by an interlocutory order, is entitled to judicial review as provided in State Government Article, §10-222, Annotated Code of Maryland, or any other applicable provision of law.



# BALTIMORE POLICE DEPARTMENT



**Brandon M. Scott**
**Mayor**

**Richard J. Worley Jr.**
**Police Commissioner**

April 21, 2026

Executive Director Wayne R. Silver, Sr.
Maryland Police and Correctional Training Commissions
6852 4th Street
Sykesville, Maryland 21784

RE:  Request for Revocation Hearing
     Baltimore Police Officer Jordan Thomas
     MPCTC No. 199272

Executive Director Silver,

The Baltimore Police Department (BPD) no longer believes that Police Officer Jordan Thomas meets the selection standards for certification as a police officer in the State of Maryland. We are requesting that the Maryland Police Training and Standards Commission conduct a revocation hearing in order to explore Officer Thomas's suitability to continue as a certified police officer.

Our hearing request is based on a series of concerning events that call into question Officer Thomas's ability to safely and legally exercise the duties of a police officer, both within the BPD workforce and among the general public. This series of events stretches as far back as June 2024. It implicates serious, recurring deficiencies in the performance of Officer Thomas with regards to his professional judgement, emotional regulation, adherence to laws and departmental policies, and obedience to supervision.

Officer Thomas is 26-years-old. He has been a sworn member of the BPD for more than five years. For an officer of this age and with this time-in-service, the BPD does not believe that general inexperience is at the root of Officer Thomas's concerning deficiencies. Instead, having genuinely attempted – without success – to improve Officer Thomas's performance through formal Human Resources interventions, informal guidance and counselling from supervisors, inpatient and outpatient treatment, and psychological evaluation, the BPD firmly believes that Officer Thomas is actively failing to meet the selection standards required by COMAR 12.04.01, specifically:

> COMAR 12.04.01.05A(1):  An agency head or authorized agency under §A(7) of this regulation shall perform a comprehensive background investigation to determine if an applicant:

(a): Is of good moral character and reputation; and

(c): Displays the behavior necessary to perform the duties of a police officer.

In June 2024, the BPD sustained an allegation against Officer Thomas for recording a conversation with a coworker without that coworker's permission. Officer Thomas received a 20-day suspension without pay for this violation.

Beginning in early 2025, the tempo of concerning incidents accelerated:

- In January 2025, Officer Thomas performed a "pat down" of a civilian without sufficient legal or policy grounds and without his body-worn camera (BWC) activated. The pat down led to the discovery of what was believed to be a Controlled Dangerous Substance, upon which Officer Thomas then effected a custodial arrest. The potential constitutional violation is self-evident; the policy and BWC violations were, or should have been, readily known to Officer Thomas.

- In February 2025, four incidents were reported:

  o Officer Thomas's first-line supervisor received numerous complaints from Officer Thomas's sworn coworkers regarding the speed at which Officer Thomas operated the Prisoner Transport Vehicle (PTV). That supervisor conducted an audit of relevant BWC video. The audit revealed that Officer Thomas operated the PTV in an unsafe manner, driving "extremely fast" and "blowing red lights without slowing and clearing intersections", all without an apparent emergency need to do so;

  o After being removed as an operator of the PTV for those unsafe driving habits, Officer Thomas became so distraught that he was found during a tour-of-duty by a first-line administrator (a police lieutenant) to be walking along South Baltimore's Hanover Street Bridge (a mode and location of patrol not assigned to him and neither acceptable nor necessary at the time);

  o Officer Thomas took himself out-of-service before the end of his shift because he was upset that his handcuffs had been left on a prisoner who had been transported to the booking facility; and

  o A first-line supervisor determined that Officer Thomas deployed his Conducted Electrical Weapon (i.e., Taser) under conditions in which, absent Officer Thomas's escalatory behavior towards the involved civilian, a Taser deployment would not have been necessary.

- In March 2025, Officer Thomas was instructed to secure an automobile that had been involved in a non-fatal shooting incident. Officer Thomas was to secure the automobile pending the arrival of BPD detectives. Contrary to instructions, Officer Thomas instead conducted a self-initiated, warrantless evidentiary search of the automobile, found what he believed to be evidence in the glove box, and then directed other officers to "put all the persons [associated with the vehicle] in handcuffs". All of these actions occurred without direction or approval from the assigned detectives and had a negative impact on their investigation.

- In April 2025, five incidents were reported:

  o Officer Thomas was assigned to guard an arrestee who was receiving in-patient treatment at Baltimore's Mercy Hospital. In order to purchase a meal from the hospital cafeteria, Officer Thomas, without permission and wholly contrary to BPD policy, left the prisoner unguarded and handcuffed to the hospital bed;

- o  Officer Thomas conducted a traffic stop and engaged in a verbal dispute with the involved motorist. The dispute became so visible that an uninvolved bystander took notice. The bystander engaged verbally with Officer Thomas from across the street. Officer Thomas told the bystander that he (Officer Thomas) would place the bystander in handcuffs if the bystander continued to engage. When the bystander instead walked behind Officer Thomas's patrol vehicle to take a picture of its license tag number, Officer Thomas attempted to apprehend the bystander. A physical fight broke out between Officer Thomas and the bystander, during which Officer Thomas managed to handcuff the bystander and then load him into the patrol vehicle. The now-apprehended and -handcuffed bystander began screaming inside the police vehicle. Contrary to BPD policy, Officer Thomas ignored the bystander's screams. It was only upon the arrival of a patrol sergeant that the bystander's screams were acknowledged. That sergeant determined that hospital treatment would be required for an injury to one of the bystander's wrists (later determined to be nerve damage);

- o  A patrol sergeant from the BPD's Southeast District contacted Officer Thomas's patrol sergeant in the BPD's Southern District (Officer Thomas's district of assignment). The Southeast District sergeant notified Officer Thomas's sergeant that a Southeast District patrol officer had witnessed Officer Thomas engage in a use of force against a prisoner at the booking facility. Officer Thomas's sergeant had no knowledge of this incident and confronted Officer Thomas. Officer Thomas's sergeant determined that Officer Thomas had, wholly contrary to BPD policy, failed to report the use of force. Moreover, Officer Thomas's sergeant ultimately concluded that this use of force was unnecessary; and

- o  A day after the discovery of this unreported use of force incident, Officer Thomas reported to two patrol sergeants that, as the result of a break-up with a girlfriend in late 2024, "if there's a short cut, I'm going to take it". The context in which this statement was made appears to indicate that Officer Thomas was referring to short cuts that would circumvent the BPD's expectations rather than short cuts that would benefit, or improve the efficiency of, the BPD.

- In July 2025, Officer Thomas was placed on a Performance Improvement Plan (PIP). Among other purposes, a PIP is a performance management tool used by the BPD to ensure that sworn members have a fair opportunity to improve and meet the BPD's performance standards. It was reported that, during this PIP, a detainee made a complaint of excessive force against Officer Thomas and another officer. Both officers reported that no use of force had occurred. However, a review of the incident determined that not only had Officer Thomas used force, but that the other officer had repeatedly told Officer Thomas to "stop and calm down".

- In late July 2025, Officer Thomas had his police powers suspended by the BPD's Public Integrity Bureau. The suspension occurred following a fitness-for-duty evaluation. This evaluation was performed by Baltimore City's Public Safety Infirmary. Officer Thomas was then assigned to administrative duties. A recommendation was made for him to receive counselling, which he did in both an outpatient and then inpatient setting.

- In late August 2025, and while still suspended, Officer Thomas was referred to the BPD's psychologist for a behavioral health fitness-for-duty examination. The psychologist ultimately determined, in part, that Officer Thomas "...does not meet diagnostic criteria for a psychiatric disorder at this time. There is no evidence that a mental illness contributed to his recent behavior." Thus, upon the completion of

remaining administrative matters, Officer Thomas was restored to full duty, with full police powers, on January 5, 2026.

In early February 2026, shortly after his restoration to full duty on January 5, reporting from first-line supervision indicated that Officer Thomas was again engaging in behaviors of a concerning nature (all in the month of February 2026 alone):

- Again operating a police vehicle at a high rate of speed without an apparent emergency need to do so;

- Operating a police vehicle while holding his unholstered, departmentally-issued handgun in his hand, without a readily apparent tactical or self-defense need to do so;

- Failing to apply for criminal charges in a domestic violence investigation when sufficient evidence existed to seek those charges, contrary to BPD's policy governing its response to incidents of domestic violence;

- Complaints from sworn coworkers that Officer Thomas:

  o Played excessively loud music while operating patrol vehicles, to the point that, on at least one occasion, a coworker had to enter the vehicle and turn the music down; and

  o Was highly agitated, impatient, and quick-tempered when dealing with prisoners, often escalating otherwise calm situations while handling calls for service, and while apparently ignoring multiple occasions on which supervisors had counselled him to do otherwise; and

- Engaging in such a pattern of concerning behaviors that a first-line supervisor requested "further action to be taken as Ofc. Thomas' behavior and decision making has progressively grown worse since his last suspension."

Finally, in March 2026, the Commanding Officer of the BPD's Northwest District (a police major) reported that he had prohibited Officer Thomas from working overtime assignments in the Northwest District. This prohibition was "based on conduct [by Officer Thomas] that has negatively impacted supervisory trust, unit cohesion, and overall operational effectiveness."

Following the reemergence of these concerning incidents in early 2026, Officer Thomas's police powers were once again administratively suspended. He remains suspended at this time. As a result, the BPD recognizes that the Commission may believe that some resolution other than a revocation hearing is more appropriate in this matter. If that is the case, the BPD would offer three counterpoints.

First, many, if not all, of the incidents described here may indeed qualify for disposition by the BPD's Public Integrity Bureau and/or Baltimore City's Administrative Charging Committee (ACC). However, the rate of progression along such a course would likely not match the BPD's organizational interests in rapidly and effectively resolving cases in which selection standards are no longer met by a sworn member. In that same vein, the BPD believes that a revocation hearing is better suited to assessing this case in its entirety, as opposed to the piecemeal approach that would result from assessing one incident at a time.

Second, I have confirmed that, wherever applicable with Officer Thomas, the BPD's Public Integrity Bureau (PIB) is, or already has been, engaging its standard investigatory processes. No effort is being made by the BPD to use a revocation hearing as a means to avoid or replace the involvement of its PIB and/or the ACC. Our interests in making this hearing request rest solely in using the proper mechanism to address unmet selection standards.

Last, the BPD wishes to avoid the jeopardy – to both itself and the general public – that it believes would attach to any additional Performance Improvement Plans offered to Officer Thomas. It is the BPD's position that in

order to provide Officer Thomas with additional attempts to demonstrate improved performance, the BPD would, counterintuitively, first be required to restore Officer Thomas to a status (i.e., full-duty) for which it no longer believes he meets the selection standards.

The reporting on Officer Thomas's performance described in this letter contains instances of likely criminal conduct, civil rights violations, and violations of the Maryland Transportation Article. Officer Thomas has continued to engage in many of these violations, signaling a marked resistance to the formal and informal efforts made by the BPD to correct his performance. In either case, it is the BPD's position that he no longer displays the behavior necessary to perform the duties of a police officer.

The BPD thanks the Commission for its consideration of this hearing request and awaits a final decision.

Sincerely,

M.W. Corell

Lieutenant Colonel Matt Corell
Deputy Chief of Patrol, Area 3
Baltimore Police Department
Matt.Corell@BaltimorePolice.org
443-509-0874

Thomas V. Baltimore Police Department
1:26-cv-01682-MJM    **Police Department**
**BALTIMORE, MARYLAND**

**REPORT**
**Form 92/95**

**DATE:** 13 May 2026

**ASSIGNMENT: Southern District Patrol**

**TO:**      **Major H. Middleton**

**VIA:**      Official Channels

**FROM:**    P/O Thomas, Jordan K576

**SUBJECT:** Reporting Police Commissioner's Office refusal to transfer me

Ma'am,

    I respectfully report that on May 8th, 2026, I sent an email to my entire chain of command (Sgt. J. Moore, Lt. J. Jordan, Captain G. Edmondson, and Major H. Middleton, along with the FOP's email, Sgt. J. Glazerman with the FOP, and member of the health and wellness section (Lt. C. Sullivan, Director V. Herron, and Ms. H. LaWang), for an update on the performance improvement plan I was supposed to be subjected to, based on an early intervention I was also subjected to on April 3rd, 2026, where everyone I mentioned (minus the FOP) were physically present. The nature of the email I sent was that two months had passed since that early intervention and this alleged performance improvement plan (PIP) I was supposed to be subjected to and I had received no type of information about it since. Nobody on the email answered me. Sgt. Glazerman would respond on May 11th, at 0118 hours, but he responded to give me information about something else, not the PIP. He advised me that on May 7th, he reached out to the Police Commissioner's Office to get an update on my transfer, but he did not specify which one (I placed a transfer to Juvenile Booking on March 11th, 2026, and two transfers to Western District and Eastern District on May 1st). On May 12th, 2026, Sgt. Glazerman would email me again and state that the Police Commissioner's Office advised him that due to the fact that I am suspended, my transfer(s) would not be approved. I find this to be an extreme example of poor judgement within the agency, as the agency at this point is aware of the reasons I wanted to transfer, such as my pending legal matters against the agency, the hostile work environment I've been explaining to the agency, and the fact I was subjected to an unfair suspension under false statements by Sgt. Y. Brown. The suspension of which, now being the reason my transfer is not approved. A suspension that should not have happened to begin with, otherwise I would have been transferred. I believe that the agency is being negligent in it's decision to not transfer me as issues with my hostile work environment continue to persist. I also believe that the fact that I made a formal Public Integrity Division complaint against members of my hostile work environment on May 11th at approximately 0900 hours has played a role in this negligent act by the Police Commissioner's Office. It should be noted, that I only complained on matters that would not be considered retaliation, as mentioned in previous forms, I was and

currently still am unable to make statements without fear of termination about matters I have been told I have been entered into BlueTeam (software used by supervisors to refer members for investigation) for. This includes the incidents that got me suspended, including the last one revolving around Sgt. Brown's false statement. I specifically only gave complaints about the "hood slide" incident, the "chair rundown" incident, the "felony phone call for service" incident, the "lateness to PID" inicdent, the incident with Sgt. C. Brooks' husband, and the incident where I was not granted any OT. I believe that the Police Commissioner's Office's decision to not transfer me to be in response to my complaint to PID to hold merrit  due to the convenient timing of the whole ordeal, as again, I made my PID complaint on May 11th, at 0900 hours, and I received word from the Police Commissioner's Office refusing to transfer me on May 12th at 1330 hours. I'd also receive a notice of a revocation hearing for my police certification on May 11th after 1700 hours which I also believe to be an instance of retaliation for my complaint, among other things. This is noted in another form 95 in more detail.  I believe this negligent decision by the Police Commissioner's demonstrates a blatant disregard for my best interests, especially since suspended personnel are not unable to be transferred. The email chain referenced in this form will be attached to this form.

Respectfully Submitted,

P/O Thomas, Jordan K576



**Jon Glazerman**
**Lodge Operating Officer**
**Baltimore City Lodge #3**
**Fraternal Order of Police**

jglazerman@fop3.org
Office - 410-243-9141
Mobile – 443-204-1580

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Friday, May 8, 2026 3:19 PM
**To:** Moore, Jordan (BPD) <Jordan.Moore@BaltimorePolice.org>; Sullivan, Charles K. (BPD) <Charles.Sullivan@BaltimorePolice.org>; Hyman, LaWang (BPD) <LaWang.Hyman2@baltimorepolice.org>; Herron, Vernon (BPD) <Vernon.Herron@baltimorepolice.org>
**Cc:** Information FOP BCL #3 <info@fop3.org>; Jon Glazerman <jglazerman@fop3.org>; Edmondson, Gary (BPD) <Gary.Edmondson@BaltimorePolice.org>; Middleton, Henrietta (BPD) <Henrietta.Middleton@BaltimorePolice.org>; Officer Safety and Wellness (BPD) <OSW@baltimorepolice.org>; Jordan, Joshua (BPD) <Joshua.Jordan@BaltimorePolice.org>
**Subject:** PIP update

Good afternoon,

I am sending this email to request any information about the PIP I am supposed to be under. I was informed on April 17th by Sgt. Moore that on April 19th, that we would "go over" the PIP as it was to begin at the start of the rotation from C shift to B shift, and conclude on the rotation back from B shift to C shift on May 17th.

As of this date, I haven't received any word or any notice from any entity/person present during the phase III intervention from April 3rd about this PIP. As stated the only word I received about it was on April 17th and that it was supposedly to be "gone over" with me on Sunday the 19th but as I said, that hasn't happened and I'm not even sure if I am under a PIP as of this date due to the fact I haven't seen, signed, or had anything regarding a PIP brought to my attention.

**Director Herron has expressed surprise when I spoke to him regarding the subject on April 30th via a telephone call that I was <u>still</u> administratively suspended and thought it was "understood" that I'd be reinstated shortly following the Phase III intervention, so I'd be able to complete the PIP as some of the things mentioned that needed improvement on required me to be reinstated. This leads me to believe there has been some sort of miscommunication somewhere above me regarding my duty status as Director Herron told me when I brought the matter up, he believed I had already been reinstated long ago.**

I am trying to understand if 1), a PIP has been formed without my knowledge, and if I was supposed to have been reinstated much earlier on in order to satisfy this PIP (as most of the things mentioned that needed improvement would be impossible to complete if I was not full-duty status), if this PIP is/was still supposed to conclude on the 17th of May, and 2), if following May 17th, I was to be reinstated to full-duty status if there was a plan for me to remain

suspended during the PIP's duration and reinstated after it's completion. I need to understand what my timeline for reinstatement looks like, and I need to know information about any PIP.

**From:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Sent:** Monday, May 11, 2026 1:31 PM
**To:** Jon Glazerman <jglazerman@fop3.org>
**Cc:** Elliot Cohen <ecohen@fop3.org>
**Subject:** Re: PIP update

Thank you for the communication. Looking forward to any updates. If any clarity could be brought to my attention as far as me being administratively reinstated moving forward in accordance with the original email I sent, I'd like to hear that as well. Please keep in mind that my suspension is not controlled by Public Integrity Division.

.

**Respectfully Submitted,**
**P/O Thomas, Jordan K576**
**Southern District Patrol C/B Patrol Rotate**
**(410)-261-0988 (Mobile)**
**(410)-396-2499 (District)**
**Jordan.Thomas@Baltimorepolice.org**



**From:** Jon Glazerman <jglazerman@fop3.org>
**Sent:** Monday, May 11, 2026 1:18 PM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Cc:** Elliot Cohen <ecohen@fop3.org>
**Subject:** RE: PIP update

**CAUTION:** This email originated from outside of Baltimore City IT Network Systems.
**Reminder:** DO NOT click links or open attachments unless you recognize the sender and know that the content is safe. Report any suspicious activities using the Report Phishing Email Button, or by emailing to Phishing@baltimorecity.gov

Good afternoon Officer Thomas,

I reached out to the COP office on Thursday May 7 and again today regarding your transfer and I am still awaiting a reply. I have also reached out to the Police Commissioner's Office who advised they will get back to me.

Thank you.

 **Outlook**

---

## Re: PIP update

---

**From** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>

**Date** Tue 5/12/2026 2:12 PM

**To**     Jon Glazerman <jglazerman@fop3.org>

**Cc**     Elliot Cohen <ecohen@fop3.org>

Good afternoon,

Thank you for the communication. Is there any word from the Police Commissioner's Office or the COP's Office as far as me being reinstated so I can complete this PIP?

---

**From:** Jon Glazerman <jglazerman@fop3.org>
**Sent:** Tuesday, May 12, 2026 1:38 PM
**To:** Jordan Thomas <Jordan.Thomas@baltimorepolice.org>
**Cc:** Elliot Cohen <ecohen@fop3.org>
**Subject:** RE: PIP update

**CAUTION:**  This email originated from outside of Baltimore City IT Network Systems.
**Reminder:**  <u>DO NOT</u> click links or open attachments unless you recognize the sender and know that the content is safe.  Report any suspicious activities using the Report Phishing Email Button, or by emailing to Phishing@baltimorecity.gov

Good afternoon Officer Thomas,

I have heard back from the Commissioner's Office and at this time, due to your suspension, they will not be transferring you out of the district.

Thank you.

---



**Jon Glazerman**
**Lodge Operating Officer**
**Baltimore City Lodge #3**
**Fraternal Order of Police**

jglazerman@fop3.org
Office - 410-243-9141
Mobile – 443-204-1580