UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

JORDAN THOMAS

USDC- BALTIMORE
'26 NOV 2 AM10:46

Plaintiff,

v.

BALTIMORE POLICE DEPARTMENT,

Defendant.

Case No.: 1:26-cv-01682-MJM

---

PLAINTIFF'S EMERGENCY MOTION FOR A PROACTIVE PRE-CRISIS TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO
AGAINST IMMINENT RETALIATORY TERMINATION

Plaintiff, appearing pro se, respectfully moves this Honorable Court pursuant to Federal Rule of Civil Procedure 65(a) and (b) for an Emergency Temporary Restraining Order ("TRO") and Preliminary Injunction.

Plaintiff seeks a proactive status quo injunction to enjoin Defendant Baltimore Police Department ("BPD") from processing any separation paperwork, terminating Plaintiff's employment, interrupting Plaintiff's compensation, or altering Plaintiff's current assignment within the Telephone Reporting Unit ("TRU") based upon the September 28, 2026 administrative vote of the Maryland Police Training and Standards Commission ("PTSC").

Emergency intervention is required immediately—prior to the ministerial receipt of a physical paper order—because Defendant's retaliatory intent is already finalized and set in stone by the September 28th vote. Plaintiff faces an imminent, non-speculative, and certain threat of termination the exact moment the physical order transits the mailroom, which will strip Plaintiff of his livelihood and moot his active claims before this Court before an after-the-fact motion can be docketed.

In support thereof, Plaintiff states as follows:

**I. THE IMMINENT AND CERTAIN THREAT OF HARM REQUIRES PROACTIVE INTERVENTION**

HD
Rcv'd by: D. Lewis

1. The United States Supreme Court and the Fourth Circuit have long recognized that a plaintiff facing an imminent, certain threat of retaliatory employment action need not wait for the axe to fall before seeking equitable relief. A court may proactively intervene to preserve the status quo where the defendant's retaliatory intent has already manifested in a concrete administrative step, and the subsequent harm is merely a matter of time.

2. On September 28, 2026, the Maryland Police Training Commission (PTSC), who certifies and licenses Police Officers in the State of Maryland, voted 10-2 to revoke Plaintiff's police certification. This vote was the direct result of a formal request initiated by BPD. Because a lack of certification triggers automatic termination under BPD internal protocols, the 10-2 vote constitutes a fully cocked administrative hammer.

3. The threat is not speculative; the retaliatory intent is finalized. The moment the physical, written ministerial order is received by BPD, the department will execute an immediate termination. This Court must act proactively and quickly to prevent BPD from using the receipt of a state-level administrative order as a shield to execute a fast-tracked, extrajudicial termination designed to circumvent internal protections and evade federal judicial oversight.

## II. BACKGROUND AND THE CHRONOLOGY OF UNMISTAKABLE RETALIATION

4. Procedural History: In March 2026, Plaintiff received a formal Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC") and timely initiated the instant federal civil rights lawsuit in April 2026 (Case No. 1:26-cv-01682-MJM) alleging disparate treatment, bad-faith internal investigations, and systemic harassment by BPD command staff.

5. Immediate Escalation ("The Cat's Paw"): In direct response to the filing of this federal lawsuit, knowing that they could not "silence", be rid of, or terminate Plaintiff "the right way", BPD command staff immediately contacted the PTSC in April 2026—the exact same month the federal suit was filed, and a month after Plaintiff received a right to sue letter, of which BPD was aware of—to formally request a certification revocation hearing. BPD hatched this plan out of retaliatory animus to bypass internal disciplinary protections, as Plaintiff has no sustained major misconduct (Category E or F violations), would constantly have an overwhelming majority of his internal affairs cases rendered unfounded/not sustained/exonerated/basically found of no wrong-doing, and was never granted the contractually and statutorily required internal Trial Boards he has requested in his years at BPD for some of the instances he did receive discipline. But even then, those cases never rose to a termination level either. Plaintiff was simply exercising his rights to appeal decisions made by internal and external disciplinary boards for some of the decisions he did not agree with, as is standard in BPD. Hence why BPD could not terminate Plaintiff, "the right way" as mentioned above because Plaintiff is essentially "not able to be touched, *properly*", because he continues to have his cases unfounded, or requesting Trial Boards, much to BPD's dismay, forcing them to the extreme option of the shady PTSC review tactic they have recently began to employ with "Officers we don't like".

6. Protected Whistleblower Activity: In June 2026, BPD assigned Plaintiff to the Telephone Reporting Unit ("TRU"). While working in TRU, Plaintiff observed an ongoing public safety crisis: patrol officers routinely and systematically ignored emergency "911 no voice" location calls routed back to them by TRU units.

7. Driven by a duty to public safety, Plaintiff meticulously, on his own, audited a time period in which 118 specific instances of ignored 911 no voice emergency calls over a 37-working day period, compiling a comprehensive, data-backed 30+ page dossier of field notes. (See Exhibit A, the document itself).

8. External Oversight Disclosures: In August 2026, Plaintiff made formal whistleblower disclosures by submitting this investigative 30-page dossier to multiple state and federal oversight entities, including: the U.S. Department of Justice ("DOJ"), the Office of the State Prosecutor ("OSP"), the Office of the Inspector General ("OIG"), the Maryland 911 Board, the Baltimore City State's Attorney's Office, and the Federal Consent Decree Monitoring Team. He bypassed BPD's internal affairs knowing it would have been highly likely this information would have been either swept under the rug, or taken too long to be resolved before a citizen is hurt or killed due to this toxic practice at BPD, based on his own previous, multiple attempts to report misconduct to BPD's internal affairs going nowhere, every single time.

9. Coordinated Institutional Blindness: Despite the gravity of these public safety failures, the DOJ, the Baltimore State's Attorney's Office, and the Federal Consent Decree Monitoring Team chose not to open a formal inquiry. Specifically, the Federal Consent Decree's Chairman, Hassan Aden, explicitly stated via email that he believed his team should not be involved, essentially ignoring this very real systemic issue, directly bringing into question the trust the team is expected to uphold in the daunting task of providing federal oversight of the BPD and communicating accountability and safety to the citizens of Baltimore. (See Exhibit B, Email Screenshot provided to me by a member of the team at my request).

10. The Retaliatory Nexus: Because 3 out of the 6 external oversight entities actively chose to close their eyes to Plaintiff's whistleblowing, Plaintiff believes the remaining 3 entities, at this time, have likely opened up investigations on BPD for the claims, or at the very least, BPD has become aware of these communications to the oversight entities by other means, and due to this, BPD was fully emboldened to finalize its retaliatory campaign. One month after Plaintiff made these sweeping disclosures to federal watchdogs, the BPD-instigated PTSC revocation hearing was executed on September 28, 2026 (after being delayed from it's original date of July 21st, 2026, for unknown reasons).

11. The unbroken chronological link is absolute:
* March 2026: EEOC Right to Sue issued.
* April 2026: Federal Lawsuit filed / BPD instantly retaliates by requesting PTSC revocation.
* June 2026: Plaintiff assigned to TRU.
* August 2026: Plaintiff blows the whistle to external agencies on *only* 118 ignored 911 emergency calls out of the many that happen every day, between multiple TRU members, every single day, even on the day of this motion's very submission.
* September 28, 2026: BPD secures a 10-2 revocation vote via a state commission acting as BPD's "cat's paw.", despite the overwhelming evidence in favor of Plaintiff, and the countless and incredibly obvious violations of Plaintiff's due rights as a Police Officer, and constitutional rights that this revocation hearing's proceedings ignored.

**III. ARGUMENT FOR EMERGENCY EQUITABLE RELIEF**

12. Likelihood of Success on the Merits: The timeline establishes an unassailable prima facie case of First Amendment retaliation. BPD cannot demonstrate that it would have sought decertification absent the March EEOC right to sue letter, the April lawsuit and the August whistleblower disclosures, particularly given Plaintiff's clean internal record regarding Category E and F violations, his majority unfounded internal disciplinary case ratio, and the total denial of internal Trial Boards he requested.

13. Irreparable Harm: If a proactive TRO is not issued, BPD will cut off Plaintiff's active pay and benefits immediately upon receiving the PTSC order. Of those benefits, would be a loss of Plaintiff's access to a therapist he is still actively connected to through his insurance, ironically originally ordered to him by BPD themselves in December of 2025. Courts recognize that in First Amendment retaliation contexts, the targeted termination of a whistleblower causes an immediate, unconstitutional "chilling effect" across the entire agency. It sends an unmistakable signal to every other officer in TRU to hide public safety failures or face immediate economic destruction. This constitutional injury cannot be adequately remedied by a back-pay award a year from now.

14. Lack of Adequate State Remedy: While Plaintiff's union retained state-court counsel at Schlachman, Belsky, Weiner & Davey, P.A. (SBWD Law) stand prepared to file an administrative stay in either Baltimore City Court, Baltimore County Court, or Carroll County Court (once they determine which jurisdiction it should fall under) within days of receiving the final written order, BPD's internal machinery is poised to terminate Plaintiff instantly upon receipt—long before a state court can assign a judge, open a file, or hold an emergency hearing. Proactive intervention by this Federal Court is the only mechanism available to preserve the status quo.

15. Public Interest: The public interest heavily favors keeping Plaintiff on active payroll status. The citizens of Baltimore City rely on law enforcement officers who possess the integrity to report systemic failures in the 911 emergency response grid. Labeling an internal whistleblower as "unfit" and stripping his certification serves only to protect corrupt administrative practices at the expense of public safety.

WHEREFORCE, Plaintiff respectfully requests that this Court:

A. Grant this Emergency Motion for a Proactive Temporary Restraining Order;

B. Enjoin Defendant BPD from processing any termination, separation, or stop-pay orders against Plaintiff based on the PTSC administrative action; and

C. Schedule an expedited hearing on Plaintiff's request for a Preliminary Injunction.

Dated: November 2nd, 2026

Respectfully submitted,

Jordan Thomas, Pro Se
3000 Falls Rd Apt 305
(718)-781-9852
Jordanthommaas21@gmail.com